Dennis F. Dunne (admitted *pro hac vice*)
Samuel A. Khalil (admitted *pro hac vice*)
MILBANK LLP
55 Hudson Yards
New York, NY 10001-2163
ddunne@milbank.com
skhalil@milbank.com

Andrew M. Leblanc (admitted *pro hac vice*)
MILBANK LLP
1850 K Street, NW, Suite 1100
Washington, DC 20006
aleblanc@milbank.com

*Proposed Co-Counsel for the Official
Committee of Unsecured Creditors*

Ian T. Peck
State Bar No. 24013306
Stephen M. Pezanosky
State Bar No. 15881850
David L. Staab
State Bar No. 24093194
HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700
Dallas, TX 75219
Telephone: 214.651.5000
Facsimile: 214.651.5940
Email: ian.peck@haynesboone.com
Email: stephen.pezanosky@haynesboone.com
Email: david.staab@haynesboone.com

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| PHI, Inc., *et al.*,[1] | Case No. 19-30923-hdh-11 |
| Debtors. | Jointly Administered |

**STATEMENT OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
IN OPPOSITION TO THE DEBTORS' ATTEMPTED RE-HEARING OF THE
COURT'S RULING ON MOTION OF THE DEBTORS PURSUANT TO 11 U.S.C.
§§ 363 AND 503 (I) AUTHORIZING THE DEBTORS TO IMPLEMENT KEY
EMPLOYEE INCENTIVE PLAN AND KEY EMPLOYEE RETENTION PLAN
AND (II) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors appointed in the above-captioned cases

(the "Official Committee") hereby files this its *Statement of the Official Committee of Unsecured*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: PHI, Inc. (5707), PHI Air Medical, LLC (4705), AM Equity Holdings, L.L.C. (0730), PHI Tech Services, Inc. (5089) and PHI Helipass, L.L.C. (4187). The corporate headquarters and the mailing address for the Debtors listed above is 2001 SE Evangeline Thruway, Lafayette, LA 70508.

*Creditors in Opposition to the Debtors' Attempted Re-Hearing of the Court's Ruling on Motion of the Debtors Pursuant to 11 U.S.C. §§ 363 and 503 (I) Authorizing the Debtors to Implement Key Employee Incentive Plan and Key Employee Retention Plan and (II) Granting Related Relief* (the "Statement in Opposition"). In support of the Statement in Opposition, the Official Committee respectfully states as follows:*

## BACKGROUND INFORMATION

1.      On March 22, 2019, the Debtors filed their *Motion of the Debtors Pursuant to 11 U.S.C. §§ 363 and 503 (I) Authorizing the Debtors to Implement Key Employee Incentive Plan and Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 108] (the "Employee Incentive Motion").

2.      The United States Trustee filed the *United States Trustee's Objection to Motion of the Debtors Pursuant to 11 U.S.C. § 363 and 503 (I) Authorizing the Debtors to Implement Key Employee Incentive Plan and Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 186] (the "U.S. Trustee Objection").

3.      On April 12, 2019, the Debtors and the Official Committee filed the *Joint Stipulation Between Debtors and Official Committee of Unsecured Creditors Regarding Extension of Objection Deadlines for and Notice of Continuance of Hearing on Certain Matters Scheduled for Hearing on April 15, 2019* [Docket No. 236], in which the Debtors and the Committee agreed to bifurcate the hearing on the Employee Incentive Motion with respect to the Key Employee Retention Plan (the "KERP") and the Key Employee Incentive Plan (the "KEIP") and adjourn the hearing on the Employee Incentive Motion with respect to the KEIP to April 29, 2019.

4.      On April 15, 2019, the Bankruptcy Court held a hearing to consider the Employee Incentive Motion with respect to the KERP only.  On April 16, 2019, the Court entered its *Order*

4833-4758-8503

*(I) Authorizing the Debtors to Implement to Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 260], which granted the Employee Incentive Motion with respect to the KERP and adjourned the hearing on the Employee Incentive Motion with respect to the KEIP to April 29, 2019 (the "<u>KEIP Hearing</u>").

5.      The Official Committee filed its *Objection* and *Amended Objection of Official Committee of Unsecured Creditors to the Motion Pursuant to 11 U.S.C. § 363 and 503 (I) Authorizing the Debtors to Implement Key Employee Incentive Plan and Key Employee Retention Plan and (II) Granting Related Relief* [Docket Nos. 293 and 302] (the "<u>Committee Objection</u>") to which the Debtors filed a reply [Docket No. 344].

6.      At the commencement of the KEIP Hearing, counsel for the Debtors announced to the Court that:

> [W]e have, over the course of the last 24 hours and into this hearing, worked constructively with the Committee to reach a deal.  We have papered the deal.  Our client has signed off, I believe, and I'll ask Creditors' Committee counsel to also confirm at the end that not only do they agree with the deal that I read into the record, but also that their Committee has approved that deal.

Hearing Transcript pp. 219-20, lns. 23-25, 1-4.  Debtors' counsel then proceeded to meticulously read into the record the parties' agreement to modify certain provisions of the KEIP (the "<u>KEIP Agreement</u>").  *See* Hearing Transcript pp. 220-23.  A copy of the April 29, 2019 Hearing Transcript is attached to this Statement in Opposition as **<u>Exhibit A</u>** (the "<u>Hearing Transcript</u>").[2]  One of the key negotiated provisions of the KEIP Agreement was that "[t]he net operating cash flow metric would switch to an EBITDA metric based on the Debtors' 2019 business plan, provided that $35 million of EBITDA would be the threshold metric, and that metric would be adjusted based on the

---

[2] The KEIP Hearing portion of the Hearing Transcript is contained within pages 219-237 of the Hearing Transcript.

4833-4758-8503

timing of the exit…and all EBITDA targets are net of all amounts payable under the KEIP plan."
Hearing Transcript p. 220, lns. 11-19.

7.      Debtors' counsel thereafter asked counsel to the Official Committee to confirm that
the terms of the KEIP Agreement as read into the record had been agreed to by the Official
Committee, and counsel to the Official Committee confirmed the Official Committee's approval
of the agreement.  Hearing Transcript p. 224, lns. 1-4.  Contrary to the Debtors' recent assertions,
the KEIP Agreement was not subject to, or conditioned on, further discussion, negotiation or
approval of definitive documentation.  Indeed, after reading the entire KEIP Agreement into the
record, Debtors' counsel stated, "So, Your Honor, that's the record.  That's the deal."  Hearing
Transcript p. 223, ln. 13.

8.      To address the U.S. Trustee's objection to the KEIP, the Debtors then proceeded to
make an evidentiary record, including the proffered testimony of the Debtors' CRO, to support the
Debtors' request that the Court approve the KEIP as modified by the KEIP Agreement.  Hearing
Transcript pp. 224-27.  Counsel for the U.S. Trustee cross-examined the Debtors' CRO, and the
Court heard argument from the U.S. Trustee and counsel for the Debtors.  Hearing Transcript pp.
227-36.  After taking a brief recess, the Court issued and orally approved the KEIP as modified by
the KEIP Agreement and requested that the Debtors' counsel prepare and circulate a form of order.
Hearing Transcript p. 237, lns. 1-5.

9.      The Debtors never circulated a proposed form of order to reflect the Court's oral
ruling at the KEIP Hearing.  In fact, soon after the KEIP Hearing, the Debtors apparently decided
that the "deal" that they read into the record was not acceptable and attempted to renegotiate the
express terms of the KEIP Agreement.  For example, the Debtors informed the Official
Committee's advisors that they could not abide by their agreement that EBITDA targets would be

net of amounts payable under the KEIP, which was a key component of the KEIP Agreement. Subsequently, the Debtors also requested modifications to the calculation of EBITDA inconsistent with the EBITDA calculation in the Debtors' 2019 Business Plan and, ultimately, asked the Official Committee to agree to shift the methodology for calculating bonuses back to a net operating cash flow metric.

10. The Official Committee has been willing to discuss potential modifications to the KEIP Agreement and did, in fact, engage in good faith negotiations with the Debtors on these issues. Ultimately, the parties were unable to reach a compromise to modify the terms of the KEIP Agreement.

11. On May 15, 2019, the Debtors unilaterally set another hearing on the KEIP portion of their Employee Incentive Motion by filing their *Amended Notice of Hearing on Motion of the Debtors Pursuant to 11 U.S.C. § 363 and 503 (I) Authorizing the Debtors to Implement Key Employee Incentive Plan and Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 459] (the "Amended Notice"). In the Amended Notice, the Debtors stated that "[a]t the hearing on April 29, 2019, the parties announced on the record that they reached a settlement with respect to the KEIP, **subject to approval of final documentation by the parties**." Amended Notice ¶ 9 (emphasis added). The Amended Notice further stated that "the Debtors and the Committee have engaged in further discussion with respect to such documentation and consistent with the statement made on the record at the April 29, 2019 hearing. To date, the parties have been unable to reach agreement on such documentation regarding a modified KEIP." Amended Notice ¶ 10.

## STATEMENT IN OPPOSITION

12.     The Court has already conducted a complete evidentiary hearing on the KEIP

portion of the Debtors' Employee Incentive Motion and orally approved the KEIP as modified by

the KEIP Agreement.  The Debtors simply have no basis to ask this Court to rehear this matter.[3]

13.     The KEIP Agreement is enforceable as a matter of law under Texas Rule of Civil

Procedure 11 ("Texas Rule 11"), which applies to contested matters and adversary proceedings

pending in Texas bankruptcy courts.  *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230,

232 (5th Cir. 1995) (noting that when "extensive federal legislation exists but fails to address the

specific issue to be decided" and where "a strong federal interest is not present, the *Erie* doctrine

dictates the application of state law" and concluding that Texas Rule 11 applies to a settlement

announced before a bankruptcy court sitting in Texas where "the alleged agreement was negotiated

and to be performed in Texas."); *In re McCarble*, No. 14-33210, 2016 Bankr. LEXIS 2822, at *6

(Bankr. S.D. Tex. Aug. 4, 2016) ("[Texas] Rule 11 applies to a settlement announced before a

bankruptcy court."); *Janzen v. Classy Chassis, Inc., (In re Classy Chassis, Inc.)*, Adv. No. 01-

5102, 2003 Bankr. LEXIS 1974, at *3 (Bankr. W.D. Tex. Sept. 4, 2003) ("Settlements made in a

bankruptcy case are governed by state law, not federal law."); *In re Mortg. Analysis Portfolio

Strategies*, 221 B.R. 386 (Bankr. W.D. Tex. 1998) (applying Texas Rule 11 to a settlement

agreement entered into in connection with a contested matter).

14.     Texas Rule 11 provides that:

> Unless otherwise provided in these rules, no agreement between attorneys or parties
> touching any suit pending will be enforced unless it be in writing, signed and filed with the
> papers as part of the record, or ***unless it be made in open court and entered of record***.

---

[3] Because the Court has already ruled on the Employee Incentive Motion, if the Debtors disagree with the result, a
more appropriate approach would likely be to file a motion to reconsider.

4833-4758-8503

Texas Rule of Civil Procedure 11 (emphasis added).  Here, as detailed above, the KEIP Agreement

was negotiated, agreed to, and then recited in its entirety "in open court and entered into the record"

by Debtors' counsel and confirmed by counsel for the Official Committee.  All material terms of

the KEIP Agreement were read into the record, and the KEIP Agreement was not (contrary to the

Debtors' statements in the Amended Notice) "subject to approval of final documentation by the

parties". Amended Notice ¶ 9.  The KEIP Agreement, as approved by this Court on April 29, 2019,

is plainly enforceable against the Debtors. [4]

15.      This behavior is precisely the kind that Texas Rule 11 is designed to prevent.  One

of the overriding purposes of Texas Rule 11 is to "avoid any dispute over the terms of an 'oral

settlement agreement.'"  *In re Mortg. Analysis Portfolio Strategies*, 221 B.R. at 10 (finding that

an oral settlement agreement that was read into the record at a deposition and then later filed with

the court complied with Texas Rule 11 because "[t]his procedure clearly avoids any dispute over

the terms of an 'oral settlement agreement' which the Texas Supreme Court in *Padilla* found was

the purpose of the Rule.  And here, there is no dispute as to what was said or agreed upon.  How

can there be? It was recorded when made and then filed of record.").  When a court determines

that a settlement agreement has been entered into in compliance with Texas Rule 11, the agreement

may be "summarily enforced." *White Farm Equipment Co. v. Kupcho*, 792 F.2d 526, 530 (5th Cir.

---

[4] Even if the KEIP Agreement were subject to further documentation, that would not change the nature of the agreement or its enforceability against the Debtors.  *See e.g. White Farm Equip. Co. v. Kupcho*, 792 F.2d 526 (5th Cir. 1986) (finding that where all of the material terms of a settlement agreement had been agreed to and read into the record by the parties and where the court had ordered the parties to "draft documents reflecting their agreement", that the refusal by one of the parties to sign the documents ultimately prepared did not render the initial agreement unenforceable); *Gen. Metal Fabricating Crop. v. Stergiou*, 438 S.W.3d 737 (Tex. App. 2014) (holding that a settlement agreement read into the record that contemplated entry into a number of formal agreements to implement the settlement, including "a promissory note, deed of trust, security agreement, and any necessary financing statements" was a binding settlement agreement and not conditioned on final entry or agreement upon formal documentation); *Herring v. Heron Lakes Estates Owners Ass'n*, No. 14-09-00772-CV, 2011 Tex. App. LEXIS 5 (Tex. App. Jan. 4, 2011) ("Parties may enter into a binding settlement agreement even if the parties contemplate that a more formal document memorializing the agreement will be executed at a later date.")

4833-4758-8503

1986) ("Federal Courts have held under a great variety of circumstances that a settlement agreement once entered into cannot be repudiated by either party and will be summarily enforced.") (quoting *Cia Anon Venezolana de Navegacion v. Harris*, 374 F.2d 33, 35 (5th Cir. 1967)).

16.     In *In re Omni Video*, the Fifth Circuit emphasized that enforcing settlement agreements that comply with Texas Rule 11 supports the Fifth Circuit's "policy that valid settlement agreements should be enforced" and emphasized that "[l]itigants may not disavow compacts thus made and approved, for avoiding the bargain would undermine its contractual validity, increase litigation, and impair efficient judicial administration." 60 F.3d at 233 (quoting *White Farm Equipment Co.,* 792 F.2d at 528).  In *White Farm Equipment Co.*, the Fifth Circuit further explained that:

> While suits are filed and defended so that they may be decided in accordance with law, compromise of purely private litigation is universally encouraged.  When the trial date has arrived, the parties are assured of their day in court.  They may then, faced with an imminent decision by a judge or jury, compose their differences.  But, having decided to compromise and having obtained court approval, they may not back and fill.

792 F.2d at 530.

17.     The facts here perfectly illustrate how the failure to enforce an agreement that complies with Texas Rule 11 increases litigation and impairs efficient judicial administration.  For whatever reason, the Debtors have decided that they do not like the "deal" that was announced on the record and now want to disavow the KEIP Agreement.  Allowing the Debtors to re-trade the KEIP Agreement would not only be contrary to controlling Fifth Circuit precedent, but it would also reward the kind of improper behavior that Texas Rule 11 was designed to prevent.

8

**REQUEST FOR ENTRY OF PROPOSED ORDER**
**CONSISTENT WITH THE COURT'S PRIOR RULING**

18.    Attached hereto as Exhibit B is a proposed *Order (I) Authorizing the Debtors to Implement Key Employee Incentive Plan and (II) Granting Related Relief* (the "Proposed Order"), which memorializes and incorporates the Court's ruling approving the KEIP as modified by the KEIP Agreement.  The Official Committee respectfully requests that the Court enter the Proposed Order.

**NOTICE**

19.    Notice of this Statement in Opposition shall be provided to all parties on the Debtors' Limited Service List. The Official Committee respectfully submits that such notice is sufficient under the circumstances and that no further notice is required.

WHEREFORE, for the reasons set forth herein, the Official Committee respectfully requests (i) entry of the Revised Proposed Order and (ii) such other relief as is just and proper.

4833-4758-8503

Dated: May 28, 2019

Respectfully Submitted,

By: */s/ Ian T. Peck*
Ian T. Peck
State Bar No. 24013306
Stephen M. Pezanosky
State Bar No. 15881850
David L. Staab
State Bar No. 24093194
**HAYNES AND BOONE, LLP**
2323 Victory Avenue, Suite 700
Dallas, TX 75219
Telephone: 214.651.5000
Facsimile:  214.651.5940
Email: ian.peck@haynesboone.com
Email: stephen.pezanosky@haynesboone.com
Email: david.staab@haynesboone.com

- and -

**MILBANK LLP**

Dennis F. Dunne (admitted *pro hac vice*)
Samuel A. Khalil (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001-2163
ddunne@milbank.com
skhalil@milbank.com

Andrew M. Leblanc (admitted *pro hac vice*)
1850 K Street, NW, Suite 1100
Washington, DC 20006
aleblanc@milbank.com

*Proposed Co-Counsel for the Official
Committee of Unsecured Creditors*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 28, 2019, true and correct copies of the foregoing were served (i) via e-mail (where available) or via United States first class mail, postage prepaid on the parties on the attached Service List; and (ii) via e-mail on the parties who receive electronic notice in this case pursuant to the Court's ECF filing system.

*/s/ Ian T. Peck*
Ian T. Peck

4833-4758-8503

**PHI, Inc., et al.**
Core/2002 Service List
Case No. 19-30923-SIG

| DESCRIPTION | NAME | NOTICE NAME | ADDRESS 1 | ADDRESS 2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Counsel to Regions Equipment Finance Corp. | Adams and Reese LLP | Attn: Angela N. Grewal | 501 Riverside Avenue | Suite 601 | Jacksonville | FL | 32202 | | 904-355-1700 | 904-355-1797 | angela.grewal@arlaw.com |
| Counsel to Regions Equipment Finance Corp. | Adams and Reese LLP | Attn: John M. Duck | 701 Poydras Street | Suite 4500 | New Orleans | LA | 70139 | | 504-581-3234 | 504-566-0210 | john.duck@arlaw.com |
| Counsel to Able Aerospace Services, Inc. f/k/a Engineering & Component Services, Inc. | Akerly Law PLLC | Attn: Bruce W. Akerly | 878 S. Denton Top Road, Suite 100 | | Coppell | TX | 75019 | | 469-444-1878 | 469-444-1864 | bakerly@akerlylaw.com |
| Arizona Attorney General | Arizona Attorney General | Civil Division | 2005 N. Central Ave | | Phoenix | AZ | 85004-4085 | | | | |
| Counsel to Blue Torch Finance LLC | Bryan Cave Leighton Paisner LLP | Attn: Michael P. Cooley, Keith M. Aurzada | 2200 Ross Avenue | Suite 3300 | Dallas | TX | 75201 | | 214-721-8000 | 214-721-8100 | michael.cooley@bclplaw.com |
| Attorneys for Oracle America, Inc. | Buchalter, A Professional Corporation | Attn: Shawn M. Christianson, Esq. | 55 Second Street | 17th Floor | San Francisco | CA | 94105-3493 | | 415-227-0900 | 415-227-0770 | schristianson@buchalter.com |
| Counsel to World Fuel Services, Inc. | Condon Tobin Sladek Thornton, PLLC | Attn: Kendal B. Reed & J. Seth Moore | 8080 Park Lane | Suite 700 | Dallas | TX | 75231 | | 214-265-3800 | 21-691-6311 | kreed@ctstlaw.com smoore@ctstlaw.com |
| Counsel to Debtors | DLA Piper LLP (US) | Attn: Daniel M. Simon, David Avraham, Tara Nair | 444 West Lake Street, Suite 900 | | Chicago | IL | 60606 | | 312-368-4000 | 312-236-7516 | daniel.simon@dlapiper.com david.avraham@dlapiper.com tara.nair@dlapiper.com |
| Counsel to Debtors | DLA Piper LLP (US) | Attn: Daniel Prieto | 1900 North Pearl Street, Suite 2200 | | Dallas | TX | 75201 | | 214-743-4500 | 214-743-4545 | dan.prieto@dlapiper.com |
| Counsel to Debtors | DLA Piper LLP (US) | Attn: Thomas R. Califano | 1251 Avenue of the Americas | | New York | NY | 10020 | | 212-335-4500 | 212-335-4501 | thomas.califano@dlapiper.com |
| Counsel to HeliFleet 2013-1, LLC | ECN Capital LLC | Attn: Adam Flamen | 181 Bay Street | Suite 2830 | Toronto | ON | M5J2T3 | Canada | | | aflamen@ecncapitalcorp.com |
| Environmental Protection Agency - Region 6 | Environmental Protection Agency | Attn: Bankruptcy Division | 1445 Ross Avenue Ste. 1200 | | Dallas | TX | 75202 | | 214-665-6444 | 214-665-2146 | |
| Counsel to Precision Heliparts, Inc. | FisherBroyles, LLP | Attn: H. Joseph Acosta | Highland Park Place | 4514 Cole Avenue, Suite 600 | Dallas | TX | 75205 | | 214-614-8939 | 214-614-8992 | joseph.acosta@fisherbroyles.com |
| Counsel to Precision Heliparts, Inc. | FisherBroyles, LLP | Attn: Thomas Walker | 945 East Paces Ferry Road NE | Suite 2000 | Atlanta | GA | 30326 | | 404-728-1970 | 470-300-9937 | thomas.walker@fisherbroyles.com |
| Counsel to MASCO Service Corporation | Forshey & Prostok, LLP | Attn: J. Robert Forshey | 777 Main Street | Suite 1290 | Fort Worth | TX | 76102 | | 817-877-8855 | 817-877-4151 | bforshey@forsheyprostok.com |
| Counsel to University Healthcare, Inc. dba Passport Health Plan ("Passport") | Frost Brown Todd LLC | Attn: Mark A. Platt | 100 Crescent Court | Suite 350 | Dallas | TX | 75201 | | 214-580-5832 | 214-545-3473 | mplatt@fbtlaw.com |
| Proposed counsel for the Official Committee of Equity Security Holders | Gray Reed & McGraw LLP | Attn: Jason S. Brookner, Lydia R. Webb and Amber M. Carson | 1601 Elm Street | Suite 4600 | Dallas | TX | 75201 | | 214-954-4135 | 214-953-1332 | jbrookner@grayreed.com lwebb@grayreed.com acarson@grayreed.com |
| Counsel to BB&T Equipment Finance Corporation | Haynes and Boone, LLP | Attn: El O. Columbus, Matthew T. Ferris | 2323 Victory Avenue, Suite 700 | | Dallas | TX | 75219 | | 214-651-5000 | 214-651-5940 | eli.columbus@haynesboone.com matt.ferris@haynesboone.com ian.peck@haynesboone.com |
| Proposed counsel for the Official Committee of Unsecured Creditors | Haynes and Boone, LLP | Attn: Ian T. Peck, Stephen M. Pezanosky, David L. Staab | 2323 Victory Avenue | Suite 700 | Dallas | TX | 75219 | | 214-651-5000 | 214-651-5940 | stephen.pezanosky@haynesboone.com david.staab@haynesboone.com |
| Counsel to Capital One, N.A. and Capital One Equipment Finance Corp. | Hunton Andrews Kurth LLP | Attn: Gregory G. Hesse | 1445 Ross Avenue | Suite 3700 | Dallas | TX | 75202-2799 | | 214-979-3000 | 214-880-0011 | ghesse@huntonak.com |
| IRS Insolvency Section | Internal Revenue Service | Centralized Insolvency Operation | 2970 Market St. | | Philadelphia | PA | 19104-5016 | | 800-973-0424 | 855-235-6787 | |
| IRS Insolvency Section | Internal Revenue Service | Centralized Insolvency Operation | P.O. Box 7346 | | Philadelphia | PA | 19101-7346 | | 800-973-0424 | 855-235-6787 | |
| Counsel to HeliFleet 2013-01, LLC | Johnston Pratt PLLC | Attn: George H. Barber | 1717 Main Street | Suite 3000 | Dallas | TX | 75201 | | 972-474-1227 | 972-474-1750 | gbarber@johnstonpratt.com |
| Counsel to Banc of America Leasing & Capital, LLC | Katten Muchin Rosenman LLP | Attn: William J. Moore | 1717 Main Street | Suite 3700 | Dallas | TX | 75201 | | 214-765-3610 | 214-765-3602 | William.moore@kattenlaw.com |
| Proposed counsel for the Official Committee of Equity Security Holders | Levene, Neal, Bender, Yoo & Brill, L.L.P. | Attn: David B. Golubchik & Eve H. Karasik | 10250 Constellation Boulevard | Suite 1700 | Los Angeles | CA | 90067 | | 310-229-1234 | 310-229-1244 | dbg@lnbyb.com ehk@lnbyb.com |
| Counsel to Victoria County | Linebarger Goggan Blair & Sampson, LLP | Attn: Diane W. Sanders | PO Box 17428 | | Austin | TX | 78760-7428 | | 512-447-6675 | 512-443-5114 | austin.bankruptcy@publicans.com |
| Counsel to Tarrant County and Dallas County | Linebarger Goggan Blair & Sampson, LLP | Attn: Elizabeth Weller | 2777 N. Stemmons Freeway | Suite 1000 | Dallas | TX | 75207 | | 214-880-0089 | 469-221-5003 | dallas.bankruptcy@publicans.com |
| Counsel to Angelina County, Harris County, Jefferson County, Montgomery County, Galveston County, Fort Bend County | Linebarger Goggan Blair & Sampson, LLP | Attn: John P. Dillman | PO Box 3064 | | Houston | TX | 77253-3064 | | 713-844-3400 | 713-844-3503 | houston_bankruptcy@publicans.com |

**PHI, Inc., et al.**
Core/2002 Service List
Case No. 19-30923-SAG

| DESCRIPTION | NAME | NOTICE NAME | ADDRESS 1 | ADDRESS 2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Counsel to BHP Billiton Petroleum (Deepwater) Inc. | Liskow & Lewis | Attn: Michael D. Rubenstein | 1001 Fannin Street | Suite 1800 | Houston | TX | 77002 | | 713-651-2953 | 713-651-2952 | mdrubenstein@liskow.com |
| Counsel to Airbus Helicopters, Inc. | Locke Lord LLP | Attn: Bradley C. Knapp | 601 Poydras St. | Suite 2660 | New Orleans | LA | 70130 | | 504-558-5210 | 504-910-6847 | bknapp@lockelord.com |
| Counsel to Airbus Helicopters, Inc. | Locke Lord LLP | Attn: Matthew H. Davis & C.Scott Jones | 2200 Ross Avenue | Suite 2800 | Dallas | TX | 75201 | | 214-740-8315;214-740-8761 | 214-740-8800 | mdavis@lockelord.com; sjones@lockelord.com |
| Counsel for Cenergy International Services, LLC | Locke Lord LLP | Attn: W. Steven Bryant | 600 Congress Avenue | Ste. 2200 | Austin | TX | 78701 | | 512-305-4726 | 512-305-4800 | sbryant@lockelord.com |
| Louisiana Attorney General | Louisiana Attorney General | Civil Division | Post Office Box 94005 | | Baton Rouge | LA | 70804 | | | | |
| Counsel to Bastrop County, Bell CAD, Brazos County, Denton County, Calhoun County Appraisal District | Mccreary, Veselka, Bragg & Allen, P.C. | Attn: Tara LeDay | P.O. Box 1269 | | Round Rock | TX | 78680 | | 512-323-3200 | 512-323-3205 | tleday@mvbalaw.com |
| Counsel and Co-Counsel for Citizens Bank | McGuire, Craddock & Strother, P.C. | Attn: J. Mark Chevallier | 2501 N. Harwood | Suite 1800 | Dallas | TX | 75201 | | 214-954-6800 | 214-954-6858 | mchevallier@mcclaw.com |
| Proposed counsel for the Official Committee of Unsecured Creditors | Milbank LLP | Attn: Andrew M. Leblanc | 1850 K Street, NW | Suite 1100 | Washington | DC | 20006 | | 202-835-7500 | 202-263-7586 | ddunne@milbank.com; astone@milbank.com |
| Proposed counsel for the Official Committee of Unsecured Creditors | Milbank LLP | Attn: Dennis F. Dunne, Alan J. Stone, Samuel A. Khalil | 55 Hudson Yards | | New York | NY | 10001-2163 | | 212-530-5000 | 212-530-5219 | skhalil@milbank.com |
| Missouri Department of Revenue | Missouri Department of Revenue | Attn: John T.M. Whiteman | Bankruptcy Unit | P.O. Box 475 | Jefferson City | MO | 65105-0475 | | 573-751-5531 | 573-751-7232 | ndfx@dor.mo.gov |
| Counsel to Delaware Trust Company, as Trustee for Senior Notes, Delaware Trust Company as Indenture Trustee | Norton Rose Fulbright US LLP | Attn: Louis R. Strubeck, Jr., Greg M. Wilkes, Shivani P. Shah | 2200 Ross Avenue | Suite 3600 | Dallas | TX | 75201-7932 | | | | louis.strubeck@nortonrosefulbright.com; greg.wilkes@nortonrosefulbright.com; shivani.shah@nortonrosefulbright.com |
| United States Trustee Northern District of Texas | Office of the United States Trustee | Attn: Meredyth A. Kippes | Earle Cabell Federal Building Room 976 | 1100 Commerce St., Room 976 | Dallas | TX | 75242 | | 214-767-8967 | 214-767-8971 | Lisa.Lambert@usdoj.gov; meredyth.a.kippes@usdoj.gov |
| Counsel to HeliFleet 2013-1, LLC | Orrick, Herrington & Sutcliffe LLP | Attn: Raniero D'Aversa, Esq. & Matthew M. Fechik | 51 West 52nd Street | | New York | NY | 10019-6142 | | 212-506-5000 | 212-506-5151 | rdaversa@orrick.com; mfechik@orrick.com |
| Counsel to Arlington ISD | Perdue, Brandon, Fielder, Collins & Mott, L.L.P. | Attn: c/o Eboney Cobb | 500 E. Border Street | Suite 640 | Arlington | TX | 76010 | | 817-461-3344 | 817-860-6509 | ecobb@pbfcm.com |
| Debtors | PHI, Inc. | | 2001 SE Evangeline Thruway | | Lafayette | LA | 70508 | | | | |
| Claims Agent | Prime Clerk LLC | Attn: Herb Baer | 830 3rd Avenue | 9th Floor | New York | NY | 10022 | | 844-721-3891 | 646-328-2851 | PHITeam@primeclerk.com; serviceqa@PrimeClerk.com |
| Counsel to Blue Torch Capital LP and Blue Torch Finance LLC | Proskauer Rose LLP | Attn: Stephen A. Boyko, Vincent Indelicato, Chris Theodoridis, David M. Hillman | Eleven Times Square | | New York | NY | 10036 | | 617-526-9770; 212-969-3470 | 617-526-9899; 212-969-2900 | sboyko@proskauer.com; vindelicato@proskauer.com; ctheodoridis@proskauer.com; Dhillman@proskauer.com |
| Counsel to Fifth Third Equipment Finance Company | Reed Smith LLP | Attn: Lloyd A. Lim, Rachel I. Thompson | 811 Main Street | Suite 1700 | Houston | TX | 77002-6110 | | 713-469-3800 | 713-469-3899 | llim@reedsmith.com; rithompson@reedsmith.com |
| Counsel to Blue Cross and Blue Shield of South Carolina and Blue Cross and Blue Shield of Louisiana | Robinson Gray Stepp & Laffitte, LLC | Attn: R. William Metzger, Jr., Esquire | P.O. Box 11449 | | Columbia | SC | 29211 | | 803-929-1400 | 803-929-0300 | bmetzger@robinsongray.com |
| Local Counsel for Secured Creditor Thirty Two, LLC | Rochelle McCullough, LLP | Attn: Michael R. Rochelle, Kevin D. McCullough, Shannon S. Thomas | 325 N. St. Paul Street | Suite 4500 | Dallas | TX | 75201 | | 214-953-0182 | 214-953-0185 | buzz.rochelle@romclaw.com; kdm@romclaw.com; kfm@romclaw.com |
| Counsel for Delaware Trust Company as Indenture Trustee | Ropes & Gray LLP | 1211 Avenue of the Americas | | | New York | NY | 10036 | | | | Mark.Somerstein@ropesgray.com |
| Counsel to Aviall Services, Inc. | Ross & Smith, PC | Attn: Neil J. Orleans | 700 N. Pearl Street | Suite 1610 | Dallas | TX | 75201 | | 214-758-7306 | 214-377-9409 | neil.orleans@judithwross.com |
| Securities and Exchange Commission - Headquarters | Securities & Exchange Commission | Attn: Bankruptcy Department | 100 F St. NE | | Washington | DC | 20549 | | 202-942-8088 | | secbankruptcy@sec.gov |
| Securities and Exchange Commission - Regional Fort Worth Office | Securities & Exchange Commission - Fort Worth Office | Attn: Bankruptcy Department | Burnett Plaza | 801 Cherry St. Ste. 1900 Unit 18 | Fort Worth | TX | 76102 | | 817-978-3821 | | NYROBankruptcy@sec.gov; dfw@sec.gov |
| Securities and Exchange Commission - Regional NY Office | Securities & Exchange Commission - NY Office | Attn: Bankruptcy Department | Brookfield Place | 200 Vesey Street Ste 400 | New York | NY | 10281-1022 | | 212-336-1100 | | bankruptcynoticesch@sec.gov |
| Counsel to Christina C. Wray, on Behalf of Herself and All Other Similarly Situated Persons | Singer & Levick, P.C. | Attn: Larry A. Levick, Esq. | 16200 Addison Road, Suite 140 | | Addison | TX | 75001 | | 972-380-5533 | 972-380-5748 | levick@singerlevick.com |
| Texas Attorney General | Texas Attorney General | Civil Division | P.O. Box 12548 | | Austin | TX | 78711-2548 | | 512-475-4868 | 512-475-2994 | |

PHI, Inc., *et al.*
Core/2002 Service List
Case No. 19-30923-SIG

| DESCRIPTION | NAME | NOTICE NAME | ADDRESS 1 | ADDRESS 2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Counsel to Texas Department of Insurance, Division of Workers' Compensation | Texas Attorney General's Office | Attn: Todd B. Headden, Assistant Attorney General | Bankruptcy & Collections Division | P. O. Box 12548- MC 008 | Austin | TX | 78711-2548 | | 512-463-2173 | 512-936-1409 | Todd.Headden@oag.texas.gov |
| Counsel for the Texas Comptroller of Public Accounts | Texas Comptroller of Public Accounts | Attn: Courtney J. Hull, Assistant Attorney General & Sherri K. Simpson, Paralegal | Attorney General's Office, Attorney General's Office | P.O. Box 12548 | Austin | TX | 78711-2548 | | 512-475-4562 | 512-936-1409 | courtney.hull@oag.texas.gov sherri.simpson@oag.texas.gov |
| Texas Secretary of State | Texas Secretary of State | Attn: Bankruptcy Department | P.O. Box 12079 | | Austin | TX | 78711-2079 | | 512-463-5560 | 512-463-0873 | serviceofprocess@sos.texas.gov |
| The County of Loudoun, Virginia | The County of Loudoun, Virginia | Attn: Steven F. Jackson, Assistant County Attorney | One Harrison Street, S.E., 5th Floor | P.O. Box 7000 | Leesburg | VA | 20177-7000 | | 703-777-0549 | 703-771-5025 | steve.jackson@loudoun.gov |
| U.S. Attorney's office | U.S. Attorney's office | Executive Office for United States Attorneys, United States Department of Justice | 950 Pennsylvania Avenue, NW | Room 2242 | Washington | DC | 20530-0001 | | | | |
| Counsel to United States Securities and Exchange Commission | United States Securities and Exchange Commission | Attn: Jolene M. Wise | 175 W. Jackson Blvd | Suite 1450 | Chicago | IL | 60604 | | 312-886-3948 | 312-353-3381 | wisej@sec.gov |
| US Attorney for the Northern District of Texas | US Attorney for Northern District of Texas | Earle Cabell Federal Building | 1100 Commerce Street Room 1254 | | Dallas | TX | 75242 | | 214-753-2000 | | |
| Counsel and Co-Counsel for Citizens Bank | Vedder Price | Attn: Douglas J. Lipke | 222 North LaSalle Street | | Chicago | IL | 60601 | | 312-609-7646 | 312-609-5005 | dlipke@vedderprice.com |
| Attorney for Chubb Insurance Company | Weinstein Radcliff Pipkin LLP | Attn: Gregory M. Weinstein | 8350 N. Central Expressway | Suite 1550 | Dallas | TX | 75206 | | 469-629-5300 | 214-865-6140 | gweinstein@weinrad.com |
| Wells Fargo Vendor Financial Services, LLC | Wells Fargo Vendor Financial Services, LLC fka GE Capital Information Technology Solutions c/o A Ricoh USA Program f/d/b/a IKON Financial Services | Bankruptcy Administration | P.O. Box 13708 | | Macon | GA | 31208-3708 | | | | |
| Counsel to CLECO Power LLC | Wheelis & Rozanski, APLC | Attn: Stephen D. Wheelis | P.O. Box 13199 | | Alexandria | LA | 71315-3199 | | 318-445-5600 | | steve@wheelis-rozanski.com |
| Wells Fargo Equipment Finance, Inc | Winstead PC | Attn: Phillip Lamberson, Annmarie Chiarello | 500 Winstead Building | 2728 N. Harwood Street | Dallas | TX | 75201 | | 214-745-5400 | 214-745-5390 | plamberson@winstead.com achiarello@winstead.com |
| Counsel to Thirty Two, L.L.C., Secured Creditor Thirty Two, LLC | Zach A. Clement, PLLC | Attn: Zach A. Clement, Esq. | 3752 Drummond Street | | Houston | TX | 77025 | | 832-274-7629 | | zack.clement@icloud.com |

Page 3 of 3

**Exhibit "A"**

```
 1                    IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
 2                           DALLAS DIVISION

 3    In Re:                    )  Case No. 19-30923-hdh-11
                                )
 4    PHI, INC., et al.,        )  Dallas, Texas
                                )  April 29, 2019
 5            Debtors.          )  9:00 a.m.
                                )
 6                              )  MOTIONS
      _____)
 7
                           TRANSCRIPT OF PROCEEDINGS
 8              BEFORE THE HONORABLE HARLIN DEWAYNE HALE,
                    UNITED STATES BANKRUPTCY JUDGE.
 9
      APPEARANCES:
10
      For the Debtors:          Daniel M. Simon
11                              DLA PIPER LLP (US)
                                One Atlantic Center
12                              1201 West Peachtree Street,
                                 Suite 2800
13                              Atlanta, GA  30309
                                (404) 736-7800
14
      For the Debtors:          Thomas R. Califano
15                              Michael D. Hynes
                                DLA PIPER LLP (US)
16                              1251 Avenue of the Americas
                                New York, NY  10020-1104
17                              (212) 335-4500

18    Proposed Counsel, Official  Andrew M. Leblanc
      Committee of Unsecured    MILBANK, LLP
19    Creditors:                1850 K Street, NW, Suite 1100
                                Washington, DC  20006
20                              (202) 835-7500

21    Proposed Counsel, Official  Dennis F. Dunne
      Committee of Unsecured    Alan J. Stone
22    Creditors:                MILBANK, LLP
                                55 Hudson Yards
23                              New York, NY  10001-2163
                                (212) 530-5770
24

25
```

2

APPEARANCES, cont'd.:

| | |
|---|---|
| For the U.S. Trustee: | Meredyth Kippes<br>OFFICE OF THE UNITED STATES<br>   TRUSTEE<br>1100 Commerce Street, Room 976<br>Dallas, TX  75242<br>(214) 767-1079 |
| Proposed Counsel, Official<br>Committee of Unsecured<br>Creditors: | Ian T. Peck<br>David L. Staab<br>HAYNES AND BOONE, LLP<br>2323 Victory Avenue<br>Dallas, TX  75219<br>(214) 651-5155 |
| For Thirty Two, LLC: | Zack A. Clement<br>ZACK A. CLEMENT, PLLC<br>3753 Drummond Street<br>Houston, TX  77025<br>(832) 274-7629 |
| For Thirty Two, LLC: | Kevin D. McCullough<br>ROCHELLE MCCULLOUGH, LLP<br>325 N. St. Paul Street, Suite 4500<br>Dallas, TX  75201<br>(214) 953-0182 |
| For Christina Wray: | Larry Alan Levick<br>SINGER & LEVICK, P.C.<br>16200 Addison Road, Suite 140<br>Addison, TX  75001<br>(972) 380-5533 |
| For Delaware Trust Co.,<br>Indenture Trustee: | Gregory Michael Wilkes<br>Louis R. Strubeck, Jr.<br>NORTON ROSE FULBRIGHT US LLP<br>2200 Ross Avenue, Suite 3600<br>Dallas, TX  75201<br>(214) 855-8000 |
| For Delaware Trust Co.,<br>Indenture Trustee:<br>*(Telephonic)* | Mark R. Somerstein<br>ROPES & GRAY, LLP<br>1211 Avenue of the Americas<br>New York, NY  10036<br>(212) 596-9000 |

```
 1    APPEARANCES, cont'd.:

 2    For Wells Fargo Equipment    Annmarie Antoinette Chiarello
      Finance, Inc.:              WINSTEAD, P.C.
 3                                2728 N. Harwood Street
                                  500 Winstead Building
 4                                Dallas, TX  75201
                                  (214) 745-5410
 5
      For Banc of America         William Jarrell Moore
 6    Leasing & Capital, LLC:     KATTEN MUCHIN ROSENMAN, LLP
                                  1717 Main Street, Suite 3700
 7                                Dallas, TX  75201
                                  (214) 765-3610
 8
      For Official Committee of   Jason S. Brookner
 9    Equity Security Holders:    GRAY REED & MCGRAW, LLP
                                  1601 Main Street, Suite 4600
10                                Dallas, TX  75201
                                  (469) 320-6132
11
      For Official Committee of   David B. Golubchik
12    Equity Security Holders:    LEVENE, NEALE, BENDER, YOO &
                                     BRILL, LLP
13                                10250 Constellation Boulevard,
                                     Suite 1700
14                                Los Angeles, CA  90067
                                  (310) 229-1234
15
      For Airbus Helicopters,     Matthew H. Davis
16    Inc.:                       LOCKE LORD, LLP
      (Telephonic)                2200 Ross Avenue, Suite 2800
17                                Dallas, TX  75201
                                  (214) 740-8315
18
      For Regions Equipment       Angela N. Grewal
19    Finance Corporation:        ADAMS AND REESE, LLP
      (Telephonic)                501 Riverside Avenue, Suite 601
20                                Jacksonville, FL  32202
                                  (904) 355-1700
21
      For Fifth Third Equipment   Lloyd A. Lim
22    Finance Company:            REED SMITH, LLP
      (Telephonic)                811 Main Street, Suite 1700
23                                Houston, TX  77002
                                  (713) 469-3671
24

25
```

```
 1   Recorded by:              Shanette D. Green
                               UNITED STATES BANKRUPTCY COURT
 2                             1100 Commerce Street, Room 1254
                               Dallas, TX  75242
 3                             (214) 753-2088

 4   Transcribed by:           Kathy Rehling
                               311 Paradise Cove
 5                             Shady Shores, TX  76208
                               (972) 786-3063
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
              Proceedings recorded by digital sound recording;
25              transcript produced by transcription service.
```

1          <u>DALLAS, TEXAS - APRIL 29, 2019 - 9:00 A.M.</u>

2          THE COURT:  I'll take appearances in the courtroom in

3   PHI, Inc.

4          MR. CALIFANO:  Good morning, Your Honor.  Tom

5   Califano with DLA Piper on behalf of the Debtors.  With me at

6   counsel table are my partners Dan Simon and Michael Hynes.

7          THE COURT:  Welcome.

8          MR. DUNNE:  Good morning, Your Honor.  Dennis Dunne

9   from Milbank, LLP, proposed counsel for the Official Committee

10  of Unsecured Creditors.  I am joined in the courtroom by my

11  partners Andrew Leblanc and Alan Stone.  Thank you.

12         THE COURT:  Welcome to our Court.

13         MR. STONE:  Good morning, Your Honor.

14         THE COURT:  Good morning.

15         MR. PECK:  Good morning, Your Honor.  Ian Peck with

16  Haynes and Boone, proposed co-counsel to the Committee.  I

17  think Mr. Staab is going to join me a little later.

18         THE COURT:  Welcome.

19         MR. CLEMENT:  Good morning, Your Honor.  Zack Clement

20  and Kevin McCullough on behalf of Thirty Two, LLC, secured

21  creditor.

22         THE COURT:  Welcome to you.

23         MR. LEVICK:  Good morning, Your Honor.  Larry Levick

24  on behalf of putative class action plaintiff Christina Wray.

25         THE COURT:  Welcome.

1            MR. STRUBECK:  Good morning, Your Honor.  Louis

2  Strubeck of Norton Rose Fulbright.  I'm here with Greg Wilkes,

3  and we represent Wilmington Trust Company, Indenture Trustee

4  for the senior notes, the $500 million senior notes.  I

5  believe that Mr. Somerstein is on the phone as well, so he'll

6  make an announcement in just a second.  Thank you.

7            THE COURT:  Okay.  We'll take appearances by

8  CourtCall in a minute.

9            MS. CHIARELLO:  Good morning, Your Honor.  Annmarie

10  Chiarello of Winstead, P.C. here on behalf of Wells Fargo

11  Equipment Financing.

12            THE COURT:  Welcome to you.

13            MR. MOORE:  Good morning, Your Honor.  Will Moore

14  from Katten Muchin Rosenman representing Banc of America

15  Leasing & Capital.

16            THE COURT:  Welcome.

17            MR. BROOKNER:  Good morning, Your Honor.  Jason

18  Brookner; Gray, Reed & McGraw; for the Equity Committee, along

19  with David Golubchik, who's over here, from Levene, Neale,

20  Bender, Yoo & Brill in California.

21            THE COURT:  Welcome to our court, sir.

22            MR. GOLUBCHIK:  Good morning, Your Honor.  I didn't

23  know if I needed to show up.  I mean, over here.

24            THE COURT:  Glad to have you.

25            MR. GOLUBCHIK:  Thank you.

1          THE COURT:  Showing up is always a good idea.

2          MS. KIPPES:  So here I am.  Good morning, Your Honor.

3  Meredyth Kippes on behalf of the United States Trustee.

4          THE COURT:  Good morning to you.  I'll take

5  appearances by CourtCall.

6          MR. DAVIS:  Good morning, Your Honor.  Matthew Davis

7  on behalf of Airbus Helicopters.

8          THE COURT:  Welcome.

9          MS. GREWAL:  Good morning, Your Honor.  Angela Grewal

10  on behalf of Regions Equipment Finance Corporation.

11          THE COURT:  Welcome to you.

12          MR. LIM:  Good morning, Your Honor.  Lloyd Lim on

13  behalf of Fifth Third Equipment Finance.

14          THE COURT:  Good morning.  Anyone else wish to make

15  an appearance by CourtCall?

16      For your benefit, we have several representatives of the

17  press listening in.

18          MR. CALIFANO:  Well, I'll try and behave myself,

19  then, Judge.

20      Your Honor, a few things to just inform the Court about,

21  and then I think I have some, hopefully, good news.  And then

22  we can talk about the suggested way of going forward.

23      Your Honor, as you may be aware, on Thursday the Equity

24  Committee was formed.  Okay.  Also on Thursday, the Debtors'

25  management did a presentation of the business plan to the

1  Committee members.  On Friday, we had a call with the Equity

2  Committee lawyers.  And rather than -- you know, I had

3  originally said we were going to bring a motion to disband the

4  Equity Committee.  On second thought, we thought we'd talk to

5  them, see if we could talk -- find a limited scope and

6  duration, and maybe a motion may not be necessary.  So we're

7  trying to see if we can work that out.  So we had a call with

8  their lawyers on Friday.

9       Also on Friday, the Debtors filed the valuation by

10 Houlihan, which is a supplement to the disclosure statement,

11 and the liquidation analysis.

12      On Sunday, Houlihan did a presentation of their valuation

13 to the actual members of the Equity Committee.

14      And then, Your Honor, since that time, the company was

15 able to have Houlihan agree to voluntarily reduce their fees

16 by providing a 30 percent discount for any financing

17 transaction fees.  That happened late in the day yesterday.

18 We didn't get a chance to let everyone know.  It's -- but,

19 basically, the secured financing portion goes from a two

20 percent fee to a 1.4 percent fee.  The unsecured portion,

21 three percent to 2.1 percent.  And for any equity raise, six

22 percent to 4.2 percent.  And that impacts the Houlihan fee.

23      Another thing that impacts the Houlihan fee, Your Honor --

24 and listen, there's a lot of he said/she said going on here,

25 but we try to engage.  We've tried to engage with the

1    Committee to see what their major issues were, and we were

2    unable to do so.  Whether it's our fault or their fault

3    doesn't matter.

4        But in reading their pleadings, it seemed like the two

5    issues that they have with our plan are the rights offering

6    provision and the discounted buyout.  And it seems like they

7    were interpreting that as some way for the existing equity to

8    come back and get a bigger slice of the pie.  And as I

9    informed Mr. Dunne shortly before the hearing, the Debtors

10   have agreed to remove both the rights offering and the

11   discounted buyout provision from the plan.

12       So it simplifies the plan.  You know, we didn't think it

13   was problematic.  We thought it was an investment opportunity

14   offered to the unsecureds.  But instead it's coming out, Your

15   Honor, completely.  And it's going to be a simple equitization

16   under the plan.

17       Now, to get the hopefully good news.  There was a

18   conversation between the financial advisors for the Committee,

19   one of the committee members, Mr. Del Genio, Alan Brass, who

20   is an independent director, chair of the restructuring

21   committee and also on the comp committee, and Mr. Lance

22   Bospflug.  And I believe that a deal on the KEIP, a deal in

23   principle, was worked out on the KEIP.  And right now, Mr. Del

24   Genio and Mr. Zellin are trying to write it up so that we have

25   something we can announce.

1        So that, that is a positive development.  And maybe they

2   were able to make a deal because the lawyers weren't on the

3   phone.  I don't know.

4        But, so we have a number of matters on today, Your Honor.

5   The Debtor has on the ordinary course professionals motion.

6   We've received no objection to that.  We also have the

7   continued hearing on the utilities motion.  We've received no

8   objection to that.  We also have the key employee incentive

9   program motion, which I just mentioned, and hopefully that is

10  resolved.  We have the Houlihan retention application, which

11  has been adjourned from April 15th by agreement of the

12  parties.  And then, finally, Your Honor, we have a mediation

13  motion.  Okay?

14       And then the UCC has filed a motion in limine, and what

15  they call an 1103 motion to put things off.  So my

16  recommendation, and this is what I ran by Mr. Dunne -- and if

17  I've gotten any of it wrong, Dennis, just please let me know

18  -- that, because of the time constraints we have today, I

19  would recommend we put -- with Your Honor's approval, we put

20  on the ordinary course and utilities motions.  There's no

21  objection.  They should go smoothly.  Then we move right into

22  the Houlihan retention so we can get that done.

23       Hopefully during that time, Mr. Del Genio will run into

24  court with a piece of paper saying we have a deal and that we

25  will not need to go into the KEIP.  If we do need to go into

1    the KEIP, we're prepared to go forward on that.

2        And then with respect to the mediation motion, Mr. Dunne

3    and I agreed to just take a break between the hearings, and it

4    might be coincidentally at lunchtime, and we've been talking

5    about a mediation process.  I need to confer with my side, he

6    needs to confer with his side, but we would just ask -- and

7    then after that we, you know, we can have the -- if we need to

8    address, we can address the Committee's 1103 motion.

9        But that would be my recommendation, Your Honor, for how

10    we would proceed today.

11        THE COURT:  All right.  Mr. Dunne?

12        MR. DUNNE:  Good morning, Your Honor.  For the

13    record, Dennis Dunne from Milbank on behalf of the Official

14    Creditors' Committee.

15        And Mr. Califano is correct.  We had a sidebar before the

16    hearing commenced and he informed me of some of the -- of the

17    scheduling issues here.  And I'm generally okay with what Mr.

18    Califano proposed, and he's right that either we're on the

19    cusp of getting to a deal on the KEIP and the KERP, so

20    hopefully with a, you know, a few extra minutes, we can kind

21    of wrap that up and save everybody some time on that.

22        And then we're happy to talk about mediation.  You know,

23    we support mediation as well, and were going to suggest it to

24    Your Honor if the Debtors had not.  So I think having a

25    further discussion about what that -- what the terms and scope

1    of mediation and the duration of mediation looks like would be

2    helpful.

3         That being said, I would like an opportunity at some point

4    today to advise the Court of what we've been doing as the

5    Official Committee as my first appearance in the courtroom

6    before Your Honor, as well as some of the context for what's

7    going on, recognizing -- and I agree with what Mr. Califano

8    said at the outset -- without, hopefully, inciting any kind of

9    incendiary language, you know, going back and forth.  But I

10   would like to do that just kind of matter-of-factly and give

11   some context.  I can do that at any point in the day.  You

12   know, we could do it -- I could do it now in connection with

13   the KEIP, in connection with the 1103 motion or mediation, but

14   just wanted to make the Court aware of that.  That's my only

15   addition.

16        THE COURT:  It might make sense to do it before we

17   start the mediation motion.

18        It also seems to me that putting your adjournment motion

19   after you all talk about the mediation, because I think those

20   kind of dovetail with each other, so --

21        MR. DUNNE:  I agree.  Thank you.

22        THE COURT:  Thank you.  Okay.

23        MR. CALIFANO:  Your Honor, with that, Mr. Simon will

24   address -- oh, I'm sorry.

25        THE COURT:  Don't cut off the U.S. Trustee, Mr.

1   Califano.

2           MR. CALIFANO:  I'm sorry, Your Honor.

3           MS. KIPPES:  That's okay.  Your Honor, just one note

4   with regard to the KEIP.  I have been -- the proposed

5   resolution has been described to me generally, but I haven't

6   seen it.  I'd like to see it, since we've objected, too.  So

7   these guys may have a deal.  I don't know if we have a deal or

8   not yet.

9           THE COURT:  All right.

10          MS. KIPPES:  Thanks.

11          THE COURT:  Mr. Simon?

12          MR. SIMON:  Good morning, Your Honor.  Again, Dan

13  Simon, DLA Piper, on behalf of the Debtors.  I will be very

14  brief.

15          THE COURT:  Okay.

16          MR. SIMON:  Obviously, we have much to get through.

17          THE COURT:  All right.

18          MR. SIMON:  The first matter on the agenda is the

19  final utilities matter.  Your Honor heard this shortly after

20  the first-day hearing.  We did not receive any formal or

21  informal objections.  We have received a handful of additional

22  adequate assurance letters from utilities.  We continue to

23  process them per the procedures laid out in the motion.  We

24  have not received any comments to the order.  We have uploaded

25  a form of order, the only changes of which are simply to

1   update the contact list and the notice parties since we filed

2   it on the first day.

3          THE COURT:  All right.  Just let me ask for the

4   record:  Does anyone wish to be heard on the entry of a final

5   order on utilities?

6      If you would upload that order, I'll sign it upon -- well,

7   I guess we already have it now, so I could -- I may even be

8   able to sign it today.

9          MR. SIMON:  Thank you, Your Honor.

10     The next item on the agenda is the motion to employ and

11  retain professionals in the ordinary course.  We filed this

12  motion, and the procedures split the -- split the

13  professionals into two tiers, Tier 1 and Tier 2, depending on

14  how much we expected them to bill during the case.

15     We have had -- I've had a number of discussions with Ms.

16  Kippes from the U.S. Trustee's Office on this motion.  We've

17  made some changes.  We have reduced the Tier 2 amount from

18  $75,000 per month to $60,000 per month.  We've also provided

19  an aggregate cap of $250,000.  If a professional exceeds that

20  cap, they simply need to file a notice of excess fees.

21     And lastly, what we've done is we've gone through -- we

22  tried to be overinclusive in our exhibit, listing out the

23  professionals, recognizing that, at least in this district,

24  there's not perfectly clear guidelines on who falls under the

25  professionals and who doesn't.  So we have worked with the

1    U.S. Trustee and actually removed some of the professionals as

2    they were probably borderline in the first place, and she

3    wanted some clarification that they didn't fall within the

4    ambit of the professionals.

5        And so we have uploaded that order, and I'll ask Ms.

6    Kippes to confirm that agreement, that it resolves her

7    objection.

8            MS. KIPPES:  Confirmed, Your Honor.

9            THE COURT:  Thank you.

10        For the record, does anyone else wish to be heard on the

11    ordinary course professionals motion?

12        I'll also sign that.

13            MR. SIMON:  Thank you, Your Honor.  Now we can get

14    back to bigger and better things.  Thank you.

15            THE COURT:  All right.  Let me ask, there is a motion

16    in limine that may affect the Houlihan hearing.  Do we need to

17    address that first?

18            MR. CALIFANO:  Well, it's not our motion, so --

19            THE COURT:  I understand, but --

20            MR. LEBLANC:  Your Honor, Andrew Leblanc with

21    Milbank.

22        It is our motion.  I don't know, frankly -- the witnesses

23    that it was directed at, I don't know if they're intended to

24    be witnesses for the Houlihan motion or not.

25            THE COURT:  And that's why I asking Mr. Califano.

1          MR. LEBLANC:  I thought that made sense.

2          THE COURT:  Yeah.

3          MR. CALIFANO:  Your Honor, Mr. Bospflug will testify

4    in support of the Houlihan retention.

5          THE COURT:  All right.  Let's hear the motion in

6    limine first, then, and I'll give you a ruling on that, and

7    then we'll move into Houlihan.

8       And I've had a chance to read it, but I will say that I

9    didn't read it at 3:55 when I think it was filed this morning.

10         MR. STONE:  Yes.

11         THE COURT:  Or at least when it was emailed over

12   here.

13         MR. STONE:  Yes.  Your Honor, it's pretty

14   straightforward.  We asked last week on Thursday the Debtors

15   to tell us if they were going to call any witnesses other than

16   those who had been identified at the hearing today on any

17   topic.  They refused to tell us that.  They said they would

18   answer us in due course.

19      Among other things, they cited a stipulation that we had

20   signed which said that, absent changes in the factual record,

21   we agreed we wouldn't take any more depositions on the

22   Houlihan and KEIP motions.  In fact, after we signed that

23   stipulation, the factual record changed significantly.

24      First of all, when we signed that stipulation, they had

25   produced zero documents to us.  We still only have about 400

1   documents, but, nonetheless, we didn't have any documents at

2   the time we filed the stipulation.

3        In addition, the mere act of putting on additional

4   witnesses changes the factual record, in our view.  And as a

5   result, we don't think that that stipulation that we signed in

6   any way waives our ability to take the depositions of any

7   other witnesses that they would put on in connection with the

8   Houlihan Lokey application or the KEIP.

9        In addition, with respect to the 1103 motion, there was no

10  such prohibition.

11       So, these two new witnesses that they put on, Mr. Bospflug

12  and Mr. Brass, were not identified until Friday.  We promptly

13  asked for their depositions.  That request was turned down.

14  We then issued notices of deposition, which, as Your Honor is

15  aware, when they are directed to a party, they're the same as

16  a subpoena.  So we conducted the depositions yesterday.  We've

17  attached the transcripts of those depositions to the motion.

18  The witnesses did not show up, so there's a certification of

19  nonappearance from the court reporter for each of those

20  depositions.  And as a result, we believe that the witnesses

21  should be precluded from testifying today on any topic.

22            THE COURT:  Thank you, Mr. Stone.  It's nice to have

23  you back in our Court.

24            MR. STONE:  Thank you, Your Honor.  Nice to see you

25  again.

1          MR. CALIFANO:  Your Honor, I think I need to go a

2     little bit into the background of the stipulation.  And you

3     know, frankly, I'm a little embarrassed here, because we

4     entered into this stipulation in good faith because Mr.

5     Genereux, who you may recall who testified at the first-day

6     hearing, was no longer at PJT.  And we were told we need to

7     get a new expert.  So we said, okay, we'll move it -- we'll

8     move it from 4/15 to 4/29, which is when we had time in front

9     of Your Honor.

10         We said, let's see your objection, but you can amend it

11    after you designate your witness.  And they did.  And they did

12    as we agreed.  There's a bunch of other things in here that's

13    unusual.  One thing is they were so afraid of what we might

14    say on April 15th, at the April 15th hearing, that we agreed

15    to limit what we would say and not say anything negative about

16    the Indenture Trustee or about the Committee.  And we didn't.

17    But it was important to us, Your Honor, that we not get hit

18    with depositions, okay?  What I should have anticipated was

19    they were going to use that two weeks to file this so-called

20    1103 motion and then a motion for standing.  And I guess they

21    thought there was some litigation tactic to have those on

22    before we got here today.

23         So that's what I'm embarrassed about.  I should have

24    anticipated that and I should have anticipated that the real

25    reason behind the adjournment was so that they could throw

1    some more paper at us.

2        The factual record has not changed, okay?  And the factual

3    -- they say that the discovery was -- the document discovery

4    had not been produced.  Well, it wasn't due then.  We

5    complied.  They served us with discovery requiring an

6    expedited two-week return.  So we started production, okay?

7    We didn't come back here and say, well, the Local Rules -- the

8    Federal Rules give us 30 days, you've got to get a motion on

9    to shorten time.  We didn't do that.  We voluntarily complied.

10   And we're continuing to comply.  But if they didn't have the

11   discovery, that's their fault, because they set the time frame

12   on it, okay?

13       Additional witnesses:  We didn't -- we didn't designate

14   additional witnesses.  We complied with the Local Rule.  And

15   they probably should have looked at the Local Rule.  The Local

16   Rule requires that you file your witness list three days

17   before the hearing.  We did that, Your Honor.  It also says --

18   9014(1)(c)(2) says it assumes that the Debtors will testify at

19   the hearing.

20       The two witnesses we have are witnesses of the Debtor.

21   One is a, as I said, the head of the special restructuring

22   committee and compensation Committee.  One is Mr. Bospflug.

23   Okay?  Just because we designated witnesses within the Rule

24   doesn't mean that's an additional witness.

25       They didn't serve a 30(b)(6) at any time.  They never

 1    said, and it doesn't say in the stipulation, that they'll get

 2    depositions.

 3         The reason why we entered into the stipulation, part of

 4    the underlying consideration was that the discovery would

 5    stop.  We expressly said, we don't want depositions during

 6    this two-week period.  But unfortunately, it is.

 7         Now, the Local Rule doesn't say that once you file your

 8    witness list you have to make the witnesses available for

 9    deposition, because then every time we have a Monday hearing

10    I'd have to have all my witnesses here on Saturday or Sunday,

11    ready to be deposed.  That's not what the Local Rules hold.

12         So then what happens, where do you go next?  To the

13    Federal Rules?  The Federal Rules don't require that any

14    witness on a motion be available for a deposition, nor does it

15    permit someone to send a notice on a Friday afternoon

16    demanding a deposition on a Sunday.

17         So we didn't comply, Your Honor.  And we told them we

18    weren't going to comply, okay?  It -- we weren't going to

19    change people's travel schedule when they were doing something

20    which was directly contrary to what we had thought about in

21    the stipulation.

22         So they hire -- what did they do?  They bring a court

23    reporter in -- obviously, they don't care about the costs of

24    this case, they don't care about the court reporter's Sunday

25    -- when they knew there wasn't going to be a witness.

1    The two witnesses, they know who they are, Your Honor.

2 They could have had -- they could have served notices at any

3 time.

4    And the other thing about the factual record that's

5 disingenuous, we have witnesses who are going to testify to

6 the facts that are in our motions, okay?  So if the KEIP is

7 not settled, then Mr. Brass will come up and testify to the

8 assertions that are made in our motion about how the comp

9 committee operated and approved these bonuses, okay?

10    Mr. Bospflug, in the Houlihan retention, is going to

11 testify to those facts related to the Houlihan retention in

12 our motion, Your Honor.  Because, you know, we like to have a

13 witness when we try and -- when we put facts forward in a

14 motion.

15    This is a bad faith motion.  This is a motion, another

16 attempt to try and derail this case.  And for them to come in

17 here not having done what they should have done, okay -- I

18 mean, if they were really acting in good faith, this

19 stipulation would have provided for depositions, okay?  It

20 doesn't.  It expressly deals with it.

21    Now, additional facts in the record would be if we filed a

22 supplemental motion, Your Honor, or if we put in a new

23 declaration.  These aren't new facts.  We're not coming in

24 with new facts.  And the fact that a witness is designated for

25 facts we allege, that's just what you're supposed to do.  When

1  you come in here and make statements of fact, you should have

2  a witness.

3      This shouldn't be delayed again, Your Honor.  It was

4  delayed at their request, and it should not be delayed any

5  further.

6      But if Your Honor is willing to entertain this motion at

7  all and if Your Honor disagrees with me that this is just a

8  bad faith attempt to derail us one more time, I would ask Your

9  Honor to allow the witnesses to testify.  And then if there is

10 an additional -- an additional fact, or if any of these

11 witnesses come in with a fact that's not in our motion, then

12 we can deal with it, Your Honor.  But this -- there's no --

13 there is no basis.  First of all, they agreed not to do it.

14 This nonsense about additional facts in the record is just

15 that.  And they had the opportunity if they were sincere.

16 They're not, so they waited until Friday, asked me for a

17 deposition notice.  We complied with the Local Rules, Your

18 Honor.  There's nothing in the Local Rules that allow them to

19 do that.  There's nothing in the Local Rule that says we can't

20 introduce a witness who we haven't made available for

21 deposition.

22     We complied with the Rules.  We complied with our

23 stipulation, Your Honor.  I don't know what the stipulation

24 means if they can just say, well, you put out a witness list.

25 We didn't anti... they had -- these aren't additional

1  witnesses, by the way.  They -- we had never told them who our

2  witnesses were prior, okay?

3     They wanted to depose Mr. Del Genio.  We made him

4  available.  They wanted to depose Mr. Niemann.  We made him

5  available.  So this motion, Your Honor, smacks of bad faith

6  and is just another attempt to get in the way of a debtor who

7  is trying to do what is completely appropriate under the

8  circumstances.  Thank you, Your Honor.

9          THE COURT:  Thank you.  Mr. Stone, you get to go

10  last.

11          MR. STONE:  Your Honor, my first hearing on this

12  case, and I already get accused of bad faith.  It's pretty

13  amazing.

14          THE COURT:  I just -- well, let me just say I have a

15  high degree of respect for you, Mr. Stone.  So, --

16          MR. STONE:  I appreciate that, Your Honor.

17     Your Honor, exactly the problem.  They never told us.  We

18  asked them who their witnesses would be and they didn't tell

19  us.

20     It really -- you know, I haven't practiced before Your

21  Honor in a while, but my recollection is that Your Honor is

22  not in favor of trial by ambush.  And perfectly reasonable if

23  they want to wait until the deadline for disclosing their

24  witnesses to us, but then it's perfectly reasonable for us to

25  get a deposition over the weekend as well before the hearing,

1    so we know what those witnesses are going to say.

2      That's exactly the problem.  They never told us who their

3    witnesses were going to be or what topics they were going to

4    testify.  And we did ask.

5      And I'm not going to get into the back-and-forth on the

6    stipulation.  Suffice it to say that we think that the texture

7    of this case and the factual record changed tremendously

8    because we didn't have document one when we signed that

9    stipulation.  And in terms of what we knew -- what they knew

10    at that time, I'm not going to get into the back-and-forth,

11    but they were certainly aware that we were going to file an

12    1103 motion and that we were contemplating a standing motion

13    as well.

14      So, Your Honor, for all the reasons that we state in our

15    papers, we think this is sort of trial by ambush, and Your

16    Honor shouldn't tolerate it, and these witnesses should be

17    precluded from testifying.

18          THE COURT:  Thank you.

19          MR. STONE:  Thank you, Your Honor.

20          THE COURT:  I'll take a short recess for me to visit

21    with my law clerks and I'll give you a ruling on this.

22      I guess let me say this before we start.  Mr. Dunne sort

23    of touched on it.  We probably need to just stick with the

24    matters that are at hand and avoid the back-and-forth between

25    the lawyers.  I think -- at least everybody that's been

1    practicing in front of me, even you out-of-towners know that I

2    really do not like that, and the locals certainly know that.

3    So, from this point on, I expect a different tone.

4        We'll be in recess.

5            THE CLERK:  All rise.

6        (A recess ensued from 9:29 a.m. to 9:47 a.m.)

7            THE CLERK:  All rise.

8            THE COURT:  Good morning again.  Please be seated.

9    Thank you very much.  Please be seated.  Thank you.

10       On the motion in limine, I'm going to allow the two

11   witnesses to testify in support of the facts in the two

12   motions.  If the testimony deviates from the facts in the two

13   motions, I'll allow the Committee to re-urge its motion in

14   limine at the end.

15       Just a couple thoughts.  I don't really consider this an

16   ambush, as I would have anticipated the Debtor would put on

17   Debtor representatives to testify about the KEIP and Houlihan

18   motions.

19       On the other hand, for lawyers of your caliber, if asked

20   prior to formal designation of witnesses per the Local Rules,

21   if you were asked who you intended to call, I would think that

22   you would provide those names prior to filing a witness list.

23       There is an allegation in Footnote 8 of the motion that

24   documents were late in getting over to the Committee.  I'll

25   reserve that to the time that they're offered.

1      You may call your first witness.

2            MR. CALIFANO:  Yes, thank you.  Your Honor, Mr. Hynes

3  will handled the witness.

4            MR. HYNES:  Your Honor, the Debtor calls Matt

5  Niemann.

6            THE COURT:  Mr. Niemann.  Good morning.  Would you

7  raise your right hand?

8            MR. NIEMANN:  Good morning, Your Honor.

9             MATTHEW NIEMANN, DEBTORS' WITNESS, SWORN

10           THE COURT:  You may be seated.

11           THE WITNESS:  Thank you.

12           MR. HYNES:  Good morning, Your Honor.

13                      DIRECT EXAMINATION

14  BY MR. HYNES:

15  Q   Mr. Niemann, do you see that you have some binders there

16  behind you?

17  A   Oh, I do, yes.

18  Q   Yeah.  Can you put them in front of you, and specifically

19  have Exhibits 29 and 30 as we begin?

20  A   I'm sorry, did you say look at 29 and 30?

21  Q   Yes, sir.  In particular, it would probably speed things

22  along --

23  A   I'm there.

24  Q   -- if you could get to Exhibit 30.  And if you look at the

25  top, there's some typewritten language on the top.  If you

1   turn to 28 of 40, behind Exhibit 30, I think you'll see your

2   name there.

3   A    I'm sorry, 28?

4   Q    Yeah, Page 28 of 30 at the very top.

5   A    I am there.

6   Q    Okay.  Do you see your name there?

7   A    Yes, I do.

8   Q    Okay.  So could you state your name for the record?

9   A    Matthew Richard Niemann.

10  Q    And can you remind the Court where you're currently

11  employed?

12  A    I am a managing director with Houlihan Lokey, Inc.  I'm

13  also employed as a board member with William Lyon, Inc., a

14  public company.

15  Q    Can you share with the Court a brief description of your

16  education?

17  A    Yes.  I spent three years at Loyola New Orleans.  I'm

18  going back to college days, no further.  And then graduated

19  from St. Louis University in St. Louis, my hometown.  Went

20  straight to law school, St. Louis University School of Law.  I

21  also have some advanced education-type stuff, but those are my

22  two primary.  So, I have a BS/BA in finance from St. Louis

23  University and a JD from St. Louis University as well.

24  Q    And can you briefly describe your professional experience?

25  A    Yes.  I started at Bryan Cave as a summer associate,

Niemann - Direct                                    28

1   actually, and then went straight into full-time associate.

2   Was there for seven years, left.  Was briefly at KPMG, then

3   Pricewaterhouse, which then became PricewaterhouseCoopers, for

4   a period of just shy of four years.  Then I joined Houlihan

5   Lokey 19-plus years ago.  I left Houlihan Lokey for three

6   years, give or take, returning September 15, '08.  Just

7   happens to be the day Lehman Brothers filed.

8        When I left Houlihan, I went to Service Capital, started

9   their Chicago operations, and then went into GMAC Res Cap for

10  Service Capital while I was there.  It was a portfolio company

11  of theirs.  And as I said, returned to Houlihan in -- on

12  September 15, 2008, so that's now 11 years ago; is that right?

13  Where are we?  '19?  Yes.

14  Q    So is it fair to say 17 of the last 30 years you've spent

15  with Houlihan?

16  A    Yes, sir.

17  Q    Okay.  Can you go over briefly your titles and

18  responsibilities at Houlihan only?

19  A    I'm a managing director.  We have a -- you know, we're the

20  older guys, if you will, the elders.  There's five of us that

21  are the seniormost MDs in the group, I am one of them, more by

22  age than anything else, in the financial restructuring group.

23  I also co-head what we call our heli, helicopter, investment

24  banking practice.  I've had several other titles and

25  responsibilities over the years.  I am resident in our

1   headquarters in Los Angeles, and really split my time Los

2   Angeles, New York, and, these days, Texas.

3   Q   Can you go over some of your responsibilities that you've

4   had at Houlihan?

5   A   Yeah.  First and foremost is provision of professional

6   services ensuring, I guess, best practices, for lack of a

7   better description.  You know, we're all about reputation and

8   our brand is our reputation.  So my job is to make sure we do

9   the best job possible for our clients.  My job is also to

10  identify and source, if you will, opportunities.  My job is to

11  mentor and shape sort of our future generation of

12  professionals.  It's a very mentored-based practice.  And my

13  job is to get things done for my clients, and, consequently,

14  for the firm, because we are paid when things get done.

15  Q   And you mentioned that you're also currently employed by

16  William Lyon Homes; is that right?

17  A   Yes.  I think it will be for about another month.  I've

18  had a seven-year position there as a board member.  I'm the

19  comp committee chair, have been for seven years.  And I come

20  off at the annual meeting, which I believe is this coming

21  month, May.  And also was co-chair of the IPO committee when

22  we went public six years ago now, and on the audit and

23  governance committees as well.

24  Q   Are you a member of any other boards or other

25  organizations of note?

1   A    I enjoyed five years of what I call guest-lecturing or

2   adjunct at Northwestern University with Professor Shine, Jim

3   Shine, a case study that I would do each year.  That was also

4   a follow-up of the ABI.  It was the MBA competition that we

5   founded.  I want to say it was, gosh, it's probably 15 years

6   ago now.  We, Houlihan, and I particularly, did the first case

7   study, and then taught that for years at Northwestern's

8   Kellogg School of Management.   I also have been on the --

9   what was called disquisition committee.  It's actually to

10  review dissertation candidates for Webster University in St.

11  Louis.  I've also been on the board of my parish, Our Holy

12  Redeemer Parish, parish counsel, as treasurer, as well as a

13  school board, as treasurer.  And the Ronald McDonald Houses.

14  It's technically the St. Louis Oncology Association.  It's the

15  Ronald McDonald Houses of Greater St. Louis there.  I was also

16  on the executive committee and treasurer.

17  Q    And is that an accurate summary of your biography there

18  behind Exhibit 30 at Page 28 of 40?

19  A    Yes, it is.

20  Q    Okay.  Have you -- how many times have you been certified

21  as an expert in restructuring matters?

22  A    I mean, it's -- it's in excess of 23, because literally

23  within months of leaving Bryan Cave I was certified by Judge

24  Barta as an expert, under *voir dire*, in fact.  Never been *voir*

25  *dire'd* since.  And so at least 23 times, and I'd say it's

1    probably more like 50-plus, because at least a couple of times

2    a year.

3    Q    And have you ever -- has a court ever refused to certify

4    you as a proffered expert?

5    A    Not yet.

6    Q    Have you ever testified on behalf of a fee application?

7    A    I've testified on behalf of my own fee applications,

8    Houlihan's.  I have never testified against any others, other

9    than perhaps to opine or support -- like in this case, PJT,

10    for instance, has represented the Committee, so I'm asked my

11    opinion by the board, and at some point I'll probably be asked

12    my opinion in this court.  And so in that respect, but never

13    as an adverse witness, if you will, or a competing expert to

14    challenge another professional's fees.  I just never have been

15    asked to do that.

16    Q    Can you briefly describe for the Court Houlihan's role

17    with PHI?

18    A    It's evolved.  It started in -- as M&A advisor with my

19    partner, Rick Lacher, who was co-leading the engagement with

20    me back in -- really kind of started in August; I think our

21    engagement letter is dated September -- to explore M&A

22    alternatives.  And then it shifted, as we were approaching

23    maturity, into restructuring, and I started taking more point

24    from Mr. Lacher.  Mr. Lacher heads up our public M&A practice.

25    He also co-chairs our fairness committee.

1      So, more recently, if you will, and this, I would say, is

2  after the first of the year, as we were approaching the March

3  maturities, it shifted into restructuring, of doing what we

4  could to engage with the creditors.  And by that, I mean the

5  noteholders as well as lessors.  There's 130 or so of lessor

6  obligations out there that need to be dealt with across 15

7  different lessors.  That's just the ones that are filed.

8  There's a couple of lessors, HN Zed, which we kept out of

9  chapter.  And then, really, to -- how should I say it?  And

10  it's part stylistic.  I view my job as the chief agent for the

11  transaction, whatever is to happen here.  And so it's really

12  to drive a transaction for the benefit of the company and its

13  constituents, and my team is my support for that effort.

14      We've also, as you know, explored and procured financing.

15  We are exploring additional financing to properly capitalize

16  the company on its way out.  Within all of that is the due

17  diligence and the rolling up of the sleeves that's necessary,

18  working with Mr. Del Genio and his team at FTI, working with

19  your firm, working with Jones Walker, working with management,

20  and, ideally, working with Milbank, PJT, and the advisors for

21  the noteholders.

22  Q    Generally speaking, do you play a role in negotiating

23  engagement letters with Houlihan clients?

24  A    Yeah, I probably play a more active role than a lot of my

25  partners.  There are several of us that are former lawyers, if

```
 1  you will, so I directly negotiate and directly document my own
 2  engagement letters.  It's a very important part of what we do
 3  as a firm, and it goes to risk management and making sure that
 4  we, you know, get what we negotiated for, no different than I
 5  do on behalf of a client.
 6  Q    And was your role any different in negotiating the
 7  engagement letters with PHI?
 8  A    The only difference was that I don't negotiate a whole
 9  bunch of public M&A engagement letters, but I was front on
10  that as well, of course, with Mr. Lacher, my partner.  But
11  otherwise, it was pretty much as usual.  It might have been a
12  little more heavily-negotiated than some, but, you know, they
13  all get negotiated.
14  Q    And who participated in those negotiations?
15  A    From Houlihan?
16  Q    Yes.
17  A    Myself.  To a lesser degree, Mr. Lacher.
18  Q    What about from PHI?
19  A    Primarily, Mr. Bospflug -- you swallow the G, I'm told.
20  The -- and then Mr. Gonsoulin and Ms. McConnaughhay.  I'll get
21  to the spelling on that one.  It's Trudy McConnaughhay.  She
22  is the CFO and treasurer.  The bulk of it was Mr. Bospflug and
23  Ms. McConnaughhay.
24  Q    And was PHI represented by counsel?
25  A    Yes, they were.  Jones Walker on the M&A engagement letter
```

1  in September, and then Jones Walker and Mr. Califano's firm in

2  January when we amended and restated our engagement letter to

3  address the restructuring mandate.

4  Q    In connection with that negotiation of the engagement

5  letters, did you provide any information to the company?

6  A    Yes, we did.

7  Q    Okay.  Would you please look behind Tab 35 of the binder?

8  A    Yes, sir.

9        MR. HYNES:  Has the Court -- has the Court had the

10 opportunity to get there?

11       THE COURT:  I have it.

12       MR. HYNES:  Thank you, Your Honor.

13 BY MR. HYNES:

14 Q    Mr. Niemann, do you recognize this document?

15 A    Yes, I do.

16 Q    What is it?

17 A    It's a document that I prepared, with the help of my team,

18 but I physically -- it annoys my team sometimes, but I

19 physically get into the Excel and prepare this specifically

20 based on the information.  It's a two-page document.  Page 3

21 is really comparing the PJT fee as proposed, I believe this

22 was in February, against other debtor advisors to help the

23 board and management understand whether or not PJT's fee is

24 reasonable on an economic basis.  Then the second page, which

25 is Page 4 -- I believe this is out of some board deck -- is a

1    fee study of select debtor engagements, again, to give the

2    board and management perspective on what the market is for

3    similarly-sized and recent vintage.  We don't go back nine or

4    ten years on this.  This market is always evolving.  So we

5    went back through 2015 through 8/18, which is when this, I

6    believe, was posted to the management and the board.  We

7    looked at $300 to $800 million of prepetition debt.  We also

8    included CHC and Waypoint because they're the most recent

9    helicopter deals.  They also happened to have either Houlihan

10    and/or PJT involved, so we thought that was just another sort

11    of relevant data point that the board and management would

12    want to know about.

13    Q    And what is the importance of this document?

14    A    How should I say this?  I guess, as a board member, and

15    management, but I would want to make sure, if I'm retaining a

16    professional that's paid on a contingent fee basis, that

17    there's a market for the fees I'm approving.  And so the

18    purpose of this document is to provide that.

19         I should point out, in particular, on Page 3 -- in fact, I

20    think exclusively on Page 3 -- Page 3 is a collection of

21    comps, if you will.  We actually ran those from $300 million

22    to $700 million.  Some of these are -- and some history is

23    appropriate.  PJT was advising the Ad Hoc Noteholders prior to

24    taking on the representation of the Unsecured Creditors'

25    Committee.  So this was when they came to us and said, we'd

Niemann - Direct                                36

1    like $150,000 a month and a three-and-a-quarter, a $3.25

2    million transaction fee.  We approved it as requested.  No

3    changes, no negotiating.  Approved the economics.  I think Mr.

4    Califano and his team had some tweaking to do on the letter.

5        Some of these comps, not all of them, were provided by

6    PJT.  So, and then others were added by my team to just give a

7    broader sample set and to essentially battle-test.  And based

8    on this, we decided that PJT's fee, relative to Houlihan's

9    fee, was fair, especially when you look at their fee -- or I'm

10   sorry, others, some of theirs, some of ours, relative to

11   debtor-side advisor fees.  That's on Page 3.  We deemed it to

12   be appropriate.

13   Q    And from where did you get the information used to prepare

14   the survey?

15   A    Two sources.  The PJT -- there's another document that's

16   not in front of me right now.  PJT sent us their comp set.  It

17   was a much smaller comp set.  I want to say it was seven or

18   eight.  So we included those, and then we added to it.  So

19   part of the source, if you will, was PJT.

20       I will tell you, I did not have my guys go check their

21   data.  We just accepted it as laid.  And then we added to it

22   from our own database.  We maintain a database on fees:

23   creditor side, Unsecured Creditors' Committees, ad hoc

24   committees, and debtor side.  So it's a combination of those

25   two, if you will, sources.

1    Q    And does this chart fairly summarize the contents of more

2    voluminous records?

3    A    I can't tell you whether it fairly summarizes the

4    information PJT relied on.  We just took it at face value.

5    But it fairly summarizes the information from our database.

6            MR. HYNES:  Your Honor, we would move Exhibit 35 into

7    evidence.

8            MR. LEBLANC:  No objection, Your Honor.

9            THE COURT:  35 is in.

10           MR. HYNES:  Thank you, Your Honor.

11       (Debtors' Exhibit 35 is received into evidence.)

12   BY MR. HYNES:

13   Q    Mr. Niemann, can you please go back to Exhibits 29 and 30

14   in the binder?

15   A    Yes, sir.  29 and 30?

16   Q    Uh-huh.  Once you've had an opportunity to look at those

17   documents, can you tell me what they are, if you know?

18   A    Yeah.  29 -- yes, I'm sorry, yes, 29 is the application of

19   the Debtors to employ and retain Houlihan Lokey Capital, Inc.

20   as investment banker nunc pro tunc to the petition date of

21   March 14, 2019.

22       I am -- let me just make sure.  It also has a proposed

23   order that's been revised, but a proposed order attached to

24   it.  That's what 29 is.

25       Oh, I'm sorry, the Niemann declaration.  That's what I was

1  looking for.  So, my declaration is also part of 29.  And then

2  the exhibits to my declaration, which would be our

3  qualifications of our principal professionals, and then there

4  should be a relationship -- hold on just a second, I'm sorry

5  -- interested party list that we received.  That's Exhibit 3.

6  And then there's a relationship with interested parties,

7  Exhibit 4.  And that is the totality of -- I did.  I went into

8  30.  I'm sorry.  I was -- so that's the totality of the

9  application.

10 Q   Yep.  Just for the record, though, is it fair to say that

11 your declaration is Exhibit -- Trial Exhibit 33, which also

12 serves as Exhibit B to the motion to approve the Houlihan

13 Lokey engagement letter?

14 A   I'm sorry, declaration -- 33 is the declaration of Mr.

15 Lewis, Martin Lewis, in support of the Committee's objection.

16 So that is definitely not mine.

17 Q   Exhibit 30.

18 A   Oh, 30?  I thought you said 33.

19 Q   Uh-huh.

20 A   Yes.  My declaration.

21 Q   Okay.  On Exhibit 30, can you please turn to Page 10 of 40

22 if you're looking at the top right-hand corner of that page?

23 A   I'm there.

24 Q   And what is this document?

25 A   This is our -- I referenced it earlier -- our amended and

1    restated engagement letter, it's dated January 6, 2019,

2    between Houlihan Lokey and the company.

3    Q    Can you turn to Page 26 of 40, please?

4    A    Yes, sir.

5    Q    Is that your signature?

6    A    It is.

7    Q    Okay.  And do you recognize the signature below it?

8    A    It's Mr. Gonsoulin's.  He's the chairman of the board and

9    the chief executive officer of the company.

10   Q    All right.

11           MR. HYNES:  Your Honor, we would move to have Exhibit

12   30 and Exhibit 29 put into evidence.

13           MR. LEBLANC:  No objection.

14           THE COURT:  29 and 30 are admitted.

15           MR. HYNES:  Thank you, Your Honor.

16      (Debtor's Exhibits 29 and 30 are received into evidence.)

17   BY MR. HYNES:

18   Q    Can you, please, Mr. Niemann, turn back to Page 10 of 40?

19   That's the first page of your engagement letter.

20   A    I'm there.

21   Q    Okay.  Could you please walk the Court through the key

22   provisions of your engagement letter?

23   A    Yes.  And I'll just keep it high level.  First is scope of

24   services.  And this was a little different because there was

25   more analytic/advisory/transactional.  Typically, we just lump

Niemann - Direct                              40

1    them all together, you know, ten, fifteen bullets.  This one,

2    it was important that we were able to provide some of the

3    analytic and what I would consider somewhat consultative

4    services for the company, so that they didn't have to hire

5    another specialist, that we could do scoop to nuts.  So one

6    thing that was different about this, as I think about it, was

7    there was more negotiation around scope.  They wanted to make

8    sure we were going to be delivering on what we needed to

9    deliver from an analytic and consultative perspective.

10       The fees are set forth in 3.  The monthly retainer of

11   $200,000 with a credit after I think it's six months.  It's

12   the seventh month and thereafter.  Then the transaction fees.

13   There's a forbearance transaction fee, a financing transaction

14   fee, a recapitalization transaction fee.  That's really a

15   restructuring transaction fee.  We call it recapitalization.

16   Or restructuring, sometimes.  Sale transaction fees.  This was

17   a little more structured since we had the public M&A process

18   underway.

19       The other important aspects of this, certainly from

20   Houlihan's perspective, is the definition of transactions.

21   That's Paragraph 5.  The characterization  of multiple and/or

22   complex transactions, Paragraph 6.

23       There are some provisions here that require that we get

24   retained under 328 of the Bankruptcy Code.  That's important

25   to us and I think any other sophisticated investment banker.

1    We've got some other provisions around financing

2    transactions, and then near and dear to our general counsel's

3    heart is indemnification and whatnot, which is back in

4    Paragraph 18.

5    Q   Okay.  Would you characterize any of these provisions as

6    unusual?

7    A   No.

8    Q   Can I direct your attention to Paragraph 6, please, Mr.

9    Niemann, that you can find that on Page 16 of 40 of the

10   exhibit?

11   A   Yes, sir.

12   Q   Are you with me?

13   A   Yes.

14   Q   Okay.  Can you please explain the treatment of multiple

15   transactions as set forth in the engagement letter?

16   A   Yeah.  This is what's intended by this language.  And I

17   will admit it's not the best-written provision and we've just

18   never got it any better-written.  But the intention here is we

19   can't get paid for the same transaction twice.  It would be

20   inappropriate.  We would never expect to do that.  So if

21   there's some debate as to whether something is, let's say, a

22   sale transaction and a restructuring, then the way that debate

23   is resolved is if it -- if it could be both, okay, and a lot

24   of times it could be, if you're running a sale process at the

25   time you're doing a restructuring, the calculated fee that is

1  the greater is the one we get, but we cannot get both fees.

2  Q    Are you familiar with the Blue Torch transaction?

3  A    Yes, I am.

4  Q    Are you familiar with the allegation made by the Committee

5  that Houlihan Lokey may claim multiple treatment of that

6  single transaction?

7  A    Yeah.  I was surprised by that, but yes, I am familiar

8  with that.

9  Q    Do you consider that a valid concern on the Committee's

10  part?

11  A    The reason I was surprised was because I told them point

12  blank during I think my deposition, so I was under oath, but

13  it doesn't matter, we have no intention, more importantly,

14  we've told the board and management this, we have no intention

15  of procuring an additional fee for the reinstatement, if

16  that's what happens, or impairment, or whatever happens with

17  Blue Torch.  We've been paid on Blue Torch.  We were paid $1.4

18  million prepetition.  We do not intend to receive any further

19  fees with respect to the treatment of the Blue Torch

20  financing.

21  Q    And does that remain Houlihan Lokey's position as you sit

22  here today?

23  A    It will always be our position, yes, sir.

24  Q    Can you please explain the results of your firm's review

25  as to whether any of the relationship set forth in your

1    declaration account for more than a certain percentage of your

2    firm's revenue?

3    A    Yes.  This was actually a request of the United States

4    Trustee here, among other requests, some of which are

5    reflected in the modified order.  But one was to make sure at

6    some threshold, so we went -- I have to say, I think it's the

7    first time I've been asked to do this, so -- but we did go

8    back and check, and I am prepared to represent today, and this

9    was the request of the United States Trustee on the record,

10   that no one relationship constitutes more than 2.5 percent of

11   our annual aggregate revenue.  And that, I believe, is through

12   year-end '19, and we're a March year-end.

13   Q    Thank you.  Is there anything in your declaration or that

14   was filed with the application that you believe is inaccurate

15   or in need of revision?

16   A    No.

17   Q    Okay.

18            MR. HYNES:  Your Honor, I know it may be a little bit

19   unusual, but I understood from the e-mail that the Court sent

20   on Friday that it was interested in streamlining the

21   examination today.  So at this point, although technically it

22   would be rebuttal questions in response to the purported

23   expert put up by the Unsecured Creditors' Committee, I would

24   just as soon get Mr. Niemann's reaction to that report out now

25   and just reserve a small amount of time, if necessary, after

1    the Unsecured Creditors' Committee has put up their witnesses.

2            THE COURT:  Mr. Leblanc?

3            MR. LEBLANC:  I don't think that's appropriate, Your

4    Honor.  If he's going to reserve time anyway, he should just

5    -- if he has something he needs to rebut after cross-

6    examination of Mr. Lewis, he should just put him on.

7            THE COURT:  Sustain Mr. Leblanc's position.

8            MR. HYNES:  Okay.  Thank you, Your Honor.  With that,

9    Your Honor, I have no further questions for this witness.

10           THE WITNESS:  Thank you.  Should I leave --

11           THE COURT:  Cross?

12           MR. HYNES:  Yeah, you can keep them.

13           THE WITNESS:  Oh, cross, sorry.

14           THE COURT:  You may proceed.

15           MR. LEBLANC:  Thank you, Your Honor.  Andrew Leblanc

16   of Milbank on behalf of the -- proposed counsel for the

17   Official Committee of Unsecured Creditors.

18                        CROSS-EXAMINATION

19   BY MR. LEBLANC:

20   Q   Mr. Niemann, I'd like to begin just by calculating the fee

21   that you would earn in this case, for the benefit of the

22   Court, under the plan that's proposed.  I'd like to do that,

23   okay?

24   A   Okay.

25   Q   All right.  So, and let me, before I do that, you filed a

Niemann - Cross                                    45

1  valuation -- the Debtor filed a valuation on Friday and you

2  provided us a report with respect to that valuation yesterday;

3  is that correct?

4  A    They didn't file a valuation.  They put valuation numbers

5  in the disclosure statement on Friday.

6  Q    Okay.

7  A    And we gave you our valuation report that we shared with

8  the board.

9  Q    Okay.  And the valuation, just to round it off, it's

10  around $500 million.  Is that right?  Total enterprise value?

11  A    It's $487.5 million.

12  Q    Okay.  I may use $500 million for the ease of math later,

13  but $487.5 million.  Now, one of the exhibits in your binder,

14  the binder that you have there, is Tab 37.

15  A    I'm there.

16  Q    And, again, I just want to use this for the purpose of

17  seeing if we can agree at least on the math here.  You

18  recognize this document, right?

19  A    I believe this was one, either the original or the revised

20  version of an Exhibit A to Mr. Martin Lewis' declaration.  I

21  don't know if this was the original one.  I think there was

22  some error and it had to be corrected.  So I don't know which

23  of those two it is.  So, but I recognize -- I recognize this

24  generally.

25  Q    Okay.  And the reason -- you didn't include a calculation

1  in your declaration of the fees associated with this plan, the

2  plan that's been proposed, right?

3          MR. HYNES:  Your Honor, objection.  Outside the scope

4  of my direct.  I just offered the Court the opportunity to

5  talk about Mr. Lewis' report.  Your Honor decided that we

6  should put on our witnesses sequentially and then proceed in

7  that manner.  And now the Creditors' Committee is asking Mr.

8  Niemann about the rebuttal report that I wasn't allowed to ask

9  questions about.

10          THE COURT:  Response?

11          MR. LEBLANC:  That's just inaccurate, Your Honor.

12  I'm exploring -- and I was just ask -- asking the question as

13  to why I'm using this document.  I'm exploring the fees that

14  they're seeking approval of today from this Court.  This is an

15  illustration of that that I'm going to walk through with him.

16  This isn't a -- this isn't an opinion of Mr. Lewis'.  It's

17  just the math.

18          THE COURT:  Overruled.

19  BY MR. LEBLANC:

20  Q   Okay.  The question I just asked, Mr. Niemann, was you

21  didn't provide a calculation, a build-up like this of the fees

22  associated with the plan that's now proposed by the Debtors,

23  right?

24  A   I'm sorry.  In -- at what point in time?

25  Q   Well, at the time that you were retained, did you do that?

1  A    We didn't have a plan when I was retained, so no.

2  Q    At any point since then, have you done that?

3  A    I could -- if you're asking me, could I calculate the

4  aggregate fees Houlihan would get under the plan as proposed

5  by the Debtors, the answer is, yes, I could do that.

6  Q    Okay.  The question wasn't could you do that.  My question

7  was, have you done that?

8  A    I probably do it every day, yeah.

9  Q    Okay.  And have you presented that to the board in this --

10  the board of the company?

11  A    Yes, we've discussed it.

12  Q    But have you presented a calculation to the board of the

13  company of what the -- what Houlihan's fees would be under the

14  plan that's proposed?

15  A    If your question is, have I presented in writing a

16  presentation to the board, the answer is no.  Have I presented

17  to the board the quantum of our fees, the answer is yes.

18  Q    Okay.  Now, let's just walk through what you have there in

19  front of you, Exhibit -- Debtors' Exhibit 37.  The first

20  column, let me just use the column on the left.  Do you see

21  that?  Assumes an emergence by September 11, 2019.  Do you see

22  that?

23  A    I don't.  I'm sorry, where?

24  Q    In the black.

25  A    Oh, the black?  I was looking to the left column.

Niemann - Cross                                    48

1  Q    Fees Assuming Confirmation.

2  A    You're saying the far right column is the left.

3  Q    I'm sorry.

4  A    Yeah.

5  Q    The two substantive columns on --

6  A    I see that, yes.

7  Q    Okay.  All right.  And so, just using that, the first item

8  there is prepetition monthly fees, $460,000.  Is that

9  accurate?

10  A    I'd have to go back to my declaration, but it sounds

11  directionally correct.

12  Q    Sure.

13  A    And then $1.4 million for the Blue Torch facility

14  prepetition.  Is that right?

15  A    It wasn't a debt, but yes, there was a Blue Torch

16  prepetition term loan that funded the day before Chapter 11,

17  and we were paid two percent on that $1.4 million.

18  Q    And the, again, the next line is postpetition fees only.

19  Do you see monthlies there of $946,000?  Do you see that?

20  A    I do see that.

21  Q    Does that seem in the right range?  Before crediting?

22  Crediting is down at the bottom.  Before crediting?

23  A    I'm assuming that's six months less crediting, because it

24  would be a round number.  It's two hundred grand times -- I'm

25  assuming 9/11 is 180 days.  I don't like that date, but 9/11.

Niemann - Cross                                        49

1  I'd rather say 9/12 or 9/10.  So I'm assuming what you're

2  doing here or what Mr. Gal -- I'm sorry, Mr. Lewis did was 180

3  days because that's when our pace premium terminates.  So 180,

4  which is roughly six months, times 200 is a million two, so

5  there must be some credits driving it down.  That's what I'm

6  guessing.

7  Q   All right.  We'll let him deal with that.  But, generally,

8  I just want to try to get a sense for the Court of the order

9  of magnitude of the Houlihan fee.  The next line is the

10 recapitalization transaction fee.  Do you see that?

11 A   I do.

12 Q   That's the $6 million requested plus the 15 percent speed

13 premium, right?

14 A   We call it a pace premium, but yes, it's 1.15 times six.

15 Q   Okay.  And so, that is $6.9 million, right?

16 A   That is correct.

17 Q   All right.  And then the next fee is the financing fee for

18 the exit ABL, because the plan contemplates a $150 million

19 exit ABL; is that right?

20       MR. HYNES:  Object to the form of the question.  Your

21 Honor, object to the form of the question.

22       THE COURT:  Do you want to just restate your

23 question?

24       MR. LEBLANC:  Sure.

25 BY MR. LEBLANC:

Niemann - Cross                                          50

1   Q   Does the plan contemplate an exit ABL of $150 million?

2   A   It contemplates that we will explore that raise.  It's not

3   definitive that it will be $150 million.  Could be less,

4   frankly.  But the plan speaks to the potential of $150 million

5   ABL being raised.

6   Q   Okay.  And if you do raise it, at least until this

7   morning, until the 30 percent reduction that was described to

8   Court -- in the court this morning, that $3 million number

9   there, that's an accurate calculation if that ABL is raised,

10  correct?

11  A   That's not correct.  It's 1.4 percent on $150 million.

12  Q   Well, and my -- before you reduced it by 30 percent, the

13  $3 million that was there, it was two percent times 150,

14  correct?

15  A   But it's -- correct, but it's now 1.4 percent.

16  Q   Okay.  And you have -- you agreed to that yesterday; is

17  that what I understand?

18  A   We've been discussing this with the restructuring

19  committee and management, frankly, certainly in earnest over

20  the last week or so since your objection has been pending, but

21  we've always told them, if there's ever a need for us to

22  discuss things, we'll discuss it, as I do with every client.

23  So I don't know, I guess arguably it's been sort of out there

24  as a possibility, not these percentages and with any

25  precision, but the possibility that we would revisit our fee

Niemann - Cross                            51

1   if we ever had to.

2   Q    All right.  But when you say it was out there, it was out

3   there between you and the restructuring committee, right?

4   A    I let every one of my clients know:  If there's ever an

5   issue with our fee, we will discuss it.

6   Q    Okay.

7   A    Because you can't document everything in an engagement

8   letter.

9   Q    Let me just try to -- let me try to cut through it.  We

10  didn't know about it until Mr. Califano announced it in court;

11  isn't that right?

12          MR. HYNES:  Objection.  How could he know that?

13          THE COURT:  Overruled.

14          THE WITNESS:  I attempted to engage with you guys,

15  certainly in earnest over the last month, ever since you

16  indicated that you were going to object to our fee.  Several

17  e-mails, several attempts.  And you chose not to take me up on

18  it.  So I don't know if you knew.  I wanted to share with you

19  the possibilities, but you never took me up on it.

20          MR. LEBLANC:  Your Honor, move to strike as

21  nonresponsive.

22          THE COURT:  Sustained.

23          MR. LEBLANC:  Okay.

24  BY MR. LEBLANC:

25  Q    You didn't tell us that you were agreeing to reduce your

1   fees before it was stated in open court today, correct?

2   A    That's an arrangement between Houlihan and the company.

3   So, no, I did not tell you.

4   Q    Fair enough.  Okay.  So let's just use the numbers that

5   are on the page, which reflect the agreement that we were

6   aware of until 9:15 or so this morning.

7       So the next one is the Blue Torch exit facility, and

8   that's the one that you're saying definitively that you would

9   not take today, correct?

10  A    I think I said definitively during my deposition by Mr.

11  Stone that I wouldn't, but yes, I'm still definitive about

12  that today.

13  Q    Okay.  And then the next line is the rights offering.  And

14  that's the -- under the plan, there's contemplated a $70

15  million rights offering, correct?  And I know it's been

16  apparently withdrawn.  We haven't seen that, but Mr. Califano

17  has said that.  But as of yesterday, there was proposed the

18  possibility of a $70 rights offering, correct?

19  A    It's -- as of yesterday, but not as of today.

20  Q    Okay.  And on that proposed rights offering, if it

21  happened, you would earn a fee of $4.2 million.  Is that

22  right?

23  A    It was six percent.  It's now 4.2 percent.  But, yes.

24  Q    Okay.  And then there's the issue of the crediting of

25  monthly fees.  So, with the exception of the $1.4 million Blue

Niemann - Cross                                            53

1    Torch postpetition financing facility, the calculation here of

2    $16.2 million, that's accurate for the fees that Houlihan

3    would earn, minus the $1.4 million; isn't that right?  Prior

4    to the changes that you made today?

5    A    It's just math, so -- and I haven't spot-checked the

6    credits, you know, so that 946.  But trusting Mr. Galler, I'm

7    sorry, Mr. Lewis' math, this is theoretically possible.

8    Q    Okay.  And similarly -- well, and when you say

9    theoretically possible, this is -- these are the fees that

10   would be earned under the plan that was proposed, at least as

11   of yesterday, both with respect to your fees and the contract

12   in the plan, right?

13   A    I disagree with that.

14   Q    In what way?

15   A    Until we get the capital in, if your clients are providing

16   the capital, they might condition the capital on certain

17   things.  So, you know, there's plenty of cases where,

18   notwithstanding these theoretical fees, that the creditors --

19   if asked the question, I could testify on this -- had asked

20   the advisor, would you consider taking a lesser fee?

21        So we're always -- so this is theoretical.  You know,

22   we're in the business of raising capital for our clients and

23   it's important that capital gets into the client.  And so if

24   there were conditions put on that capital, we'd cross that

25   bridge when we came to it.  But this is theoretically

1    possible.

2    Q    Right.  And if you got Court approval today under 328 of

3    these fees, not only would it be theoretically possible, it's

4    what you would be entitled to under the Court's order; isn't

5    that right?

6    A    Not today, no.

7    Q    If -- if the plan that was -- that proposed yesterday --

8    A    I'm sorry.  I misunderstood the question.

9    Q    Sure.

10   A    Yeah.  I guess if we go back to yesterday, that's

11   theoretically possible.

12   Q    Okay.  All right.  And then the -- I know you dispute the

13   relevance of the prepetition fee component, and we'll talk

14   about that in a bit.  But the $18.1 million, that would

15   reflect the all-in number, including postpetition and

16   prepetition fees, again, minus the $1.4 million, right?

17   A    I'm sorry.  I did not understand your question.

18   Q    Sure.  You see, you see Mr. Lewis has a total fees earned

19   of $18.1 million, right below the $16.2 million?  That

20   includes the pre and the postpetition?

21   A    I see that.

22   Q    Okay.  And so if you take off the second $1.4 million for

23   Blue Torch that we talked about that you're not seeking, that

24   would be $16.7 million, roughly, right?

25   A    I'll trust your math.

Niemann - Cross                                    55

1   Q    Okay.  It's just math, right?

2   A    I mean, do you want me to pull my -- I trust you.

3   Q    No.  Okay.  And is it your testimony that $16.7 million

4   would be an appropriate fee for a company to pay for the

5   services that the loan would provide if that plan were

6   confirmed?

7   A    It's my testimony that our fees are market and these are

8   market fees and the structure allowing these fees are market.

9   Q    Okay.  And $16.7 million -- there's no cap in your fee,

10  right?

11  A    What do you mean by cap?

12  Q    You don't have an agreement as to the maximum amount of

13  fees that you could earn from this engagement, right?

14  A    We do not.

15  Q    And you've seen caps in other cases, right?

16  A    In some cases, yes.

17  Q    Okay.  And there's no crediting of any of the financing

18  fees against the restructuring fees in this case; is that

19  right?

20  A    That is correct.  My only hesitation is effectively it's a

21  discount, not a credit, but the 30 percent that we agreed to

22  with company could be deemed a credit or a discount, however

23  you want to look at it.

24  Q    Okay.  But there's no credit -- you know what I mean by

25  crediting, right?

Niemann - Cross                                   56

1    A    I think I do, yes.

2    Q    Sure.  Where, if you earn -- if you earn one fee, you

3    credit it against another one of your fees.  So, for example,

4    if you earn a financing fee, you might credit that against a

5    transaction.  You understand that?

6    A    I understand it to be let's say there's a million-dollar

7    transaction, financing transaction fee and we give a 30

8    percent credit.  That 30 percent, $300,000, would be applied

9    against the restructuring fee and reduce the restructuring fee

10   by that equal amount.

11   Q    Okay.  Now, have you done a calculation, a similar

12   calculation to what we just did, for the plan as it existed

13   yesterday to the structure that you have now with the 30

14   percent discount?

15   A    I mean, I can.  I haven't.

16   Q    Okay.  All right.

17   A    I could do it right now if you want, but --

18   Q    Well, I think Mr. Lewis is going to cover that, so --

19   A    Okay.

20   Q    -- let's -- well, let me actually ask a couple of

21   questions along that line.  The 30 percent discount that you

22   have, that wouldn't affect the prepetition Blue Torch fee that

23   you've already received, correct?

24   A    No, it would not.

25   Q    And that wouldn't affect the $6.9 million transaction fee

1   that you would receive with the pace premium, correct?

2   A    It only affects the financing transaction fees in our

3   engagement letter.  Postpetition financing transaction fees.

4   Q    All right.  And the company's EBITDA last year was

5   approximately $40 million.  Is that in the right range?

6   A    I'm pausing because I'm not sure it's public, what our

7   LTM.  And all of this is in our valuation report, which we're

8   pretty sensitive about dissemination.  But if you would like

9   me to assume for purposes of this testimony that the company's

10  trailing EBITDA is $40 million, I'll make that assumption.

11  Q    Not trailing.  I was talking about 2018, which I think

12  those numbers -- maybe they're not.  It doesn't matter.  I'm

13  just trying to get a sense, just, again, to compare this.

14  This is something in the neighborhood of a $40 EBITDA business

15  today.  Is that generally directionally in the right way,

16  right direction?

17  A    I'm happy to make that assumption for purposes of this

18  testimony.

19  Q    Okay.  And so is it your testimony that, as it was

20  constructed, before the 30 percent -- yesterday, when the

21  board had approved it originally, that paying $16.7 million in

22  a fee to Houlihan is appropriate for a company with roughly

23  $40 million of EBITDA?  So, paying 40-plus percent of its

24  annual EBITDA to Houlihan as a fee, that that's appropriate?

25  A    Never thought of it that way, candidly.  My testimony is

1   that the rates and structure are market.

2   Q   Okay.  All right.  Now, let's talk about the -- some of

3   the individual components.  And I'm going to use the same

4   exhibit that you used, which I think is Tab 35.  Just let me

5   know, Mr. Niemann, when you have that.

6   A   I'm there.

7   Q   Okay.  So, Tab 35.  This is the fee study that you

8   presented to the board, correct?

9   A   Yes.

10  Q   All right.  And the board didn't have a separate advisor

11  providing them with fee studies to determine what was market

12  for an investment bank, did they?

13  A   I don't understand your question.

14  Q   Sure.  Did they hire a different consultant to opine or to

15  give advice on your fee, or was this the information that they

16  received?

17  A   I don't think I've ever --

18          MR. HYNES:  Sorry.  Object to the form of the

19  question, Your Honor.  It's compound.

20          THE COURT:  Overruled.

21          THE WITNESS:  I don't think I've ever seen a board

22  retain a consultant to negotiate our fees or evaluate, and in

23  this case, they did not.

24  BY MR. LEBLANC:

25  Q   Okay.  And so -- and Mr. Del Genio didn't offer an opinion

Niemann - Cross                                  59

1    on your fees, right?

2    A    I don't know if he did or he didn't.

3    Q    Okay.  Now, the -- you mentioned a minute ago in some

4    direct -- response to some direct questions, the work that's

5    on Page -- what you said Page 3, the first page of Exhibit 35.

6    That was an analysis that you did comparing the PJT fee to the

7    Houlihan fee; is that right, generally?

8    A    The purpose of this page was to provide some level of

9    comfort that the fee that PJT and Milbank asked for for PJT

10   was fair.

11   Q    Okay.  All right.  So the page that was provided to

12   determine whether Houlihan's fee was fair, that's really the

13   second page, Page 4, right?

14   A    Yes.

15   Q    Okay.  Now, so let me just start with the monthly fee.

16   The monthly fee that you've proposed is $200,000 per month,

17   right?

18   A    Yes.

19   Q    And if you look at the -- and I forget, do you remember

20   how many, how many entries you have on this sheet?  I don't

21   need you to count, but do you know?

22   A    There's probably 30 or 40.

23   Q    30 or 40?  Yeah.  In those 30 or 40, there's only one

24   that's listed as having a fee of more than $175,000; is that

25   right?  Before you -- and we'll talk about CHC and Waypoint in

Niemann - Cross                                    60

1   a second.  But before you get there, in your comparable list,

2   there's only one that has a fee of greater than $175,000,

3   right?

4   A    On Page 4 -- we don't have it on Page 3, but -- I don't

5   want to speculate, but perhaps on Page 3 there's some with

6   $200,000-plus, although I do point out that CHC and Waypoint

7   were, in aggregate, well north of $200,000.

8   Q    Okay.  And let me, just to be clear about that, when you

9   say in aggregate, just so the Court understands, you're saying

10  in aggregate because there were actually two different people

11  earning a monthly fee in those cases, right?  Seabury and

12  either your firm or Houlihan -- or PJT, correct?

13  A    Yes.  Seabury was a co-advisor in each of those.  We don't

14  have a co-advisor here.

15  Q    Okay.  But -- and I just looked at Page 3.  I don't see

16  one there, unless I'm missing it, that has a monthly fee over

17  $150,000.  And there's only one on both pages that has a fee

18  of over $175,000, right?

19  A    I think you pointed that out.

20  Q    Okay.

21  A    Yeah, the industrial company that we kept anonymous.

22  Q    Right.  And so -- and I did have a question about that.

23  The industrial company you kept anonymous, why did you keep it

24  anonymous?

25  A    Because it's not a public engagement letter because we

Niemann - Cross                                        61

1    kept that company completely out of Chapter 11 and got 100

2    percent consents.  PJT was the advisor for the company.  I was

3    the advisor for the secured noteholders.

4    Q    Okay.  So that was an example of a company that didn't

5    have to come before a court asking for approval of its

6    investment banker fees, right?

7    A    No, they did not.  We never filed Chapter 11.

8    Q    Okay.  All right.  And so -- and what you do at the bottom

9    -- and, again, at the very bottom, you calculate a market mean

10   implied fees, and you determine what the percent of debt, cost

11   of the monthly fees are for each of these companies, and then

12   you aggregate them in a mean and a median; is that right?

13   A    Yes.

14   Q    Okay.  Now, did you reach a --

15   A    I think we just had mean on this.  Oh, yeah, median is on

16   this, and then we brought the mean down.  But, yes.

17   Q    Okay.  Did you determine that the monthly fees were

18   correlated to the size of the debt?

19   A    That's a way to look at it.

20   Q    Well, but did you -- did you statistically determine that

21   there is a correlation between them?

22   A    There is.

23   Q    Okay.  If you look at it -- as I look at the list, and

24   you've helpfully organized it from smallest to largest on

25   this, right?  That's how it's stacked, right?

Niemann - Cross                                            62

1    A    That's how I organize it, yes.

2    Q    Okay.  And so by organizing it that way, we can see that

3    the smallest company on the chart of -- I -- Everywhere -- I

4    didn't bring my glasses, so I'm going to -- correct me if I

5    get this wrong, but Everywhere Global has a percent of debt of

6    .042 percent and the largest company has a percent of debt of

7    .019, right?

8    A    Correct.

9    Q    And you can see, just by eyeballing it, you can see that

10   the bigger the company gets, the smaller that percentage of

11   fee becomes.  Isn't that right?

12   A    That's the correlation, yes.

13   Q    Okay.  So, in fact, it's not correlated to the size of the

14   debt, though.  Isn't that right?

15   A    I disagree with that.

16   Q    Okay.  Well, if you look at the companies that are

17   comparable in size to what you opine that the prepetition debt

18   here is, if we just look at the companies that are from $750

19   million to $796 million.

20   A    Do you mind if I just -- let me find -- seven hundred --

21   I'm sorry, what was the number?  Seven --

22   Q    $750 million.

23   A    Okay.  I see that.

24   Q    So that's the Woodbridge Company, --

25   A    Yes, sir.

Niemann - Cross                                   63

1   Q   -- down to Aspect.  Do you see that?  And let's -- let's

2   --

3   A   Yeah.  To the bottom one, yes.

4   Q   Let's just exclude -- I mean, you can do with it what you

5   want, but --

6   A   No, I just wanted to know which ones you're talking about.

7   Q   Sure.

8   A   I got it.

9   Q   So, from that list, there's -- if -- the only ones that

10  came before a court asking for approval of a fee higher than

11  $150 million was the Patriot Coal Company, asking for a fee of

12  $175 million, correct?

13  A   My hesitation is I don't know if it was the ask or the --

14  I think these are actual court orders.  So it might have been

15  a higher ask, is my only reservation with your question.

16  Q   Okay.

17  A   But the court order that we reviewed approved a fee of

18  $175,000 a month in Patriot Coal for Centerview.

19  Q   Okay.  And, but for each of the other ones, the orders

20  that you approved -- approved -- the ones that had orders only

21  approved a fee of $150 million, right?

22  A   With the exception of PJT's and the industrial company.

23  Oh, I'm sorry, you're asking in court?

24  Q   In court.  Yeah.

25  A   That is a correct statement on this sample set.

1   Q   Okay.  All right.  And so you determined, in looking at

2   that, that the market was $200,000 a month for monthly fees

3   based upon your analysis; is that correct?

4   A   That's not what I determined and that's not my testimony.

5   Q   Okay.  Is it your testimony that your monthly fee is a

6   market fee?

7   A   My testimony is we are paying -- being paid $200,000 a

8   month.  It is fair for the work we're doing.  And, yeah, I

9   guess I would testify it is market.

10   Q   Okay.  Well, that -- then --

11   A   I misunderstood your question.

12   Q   Fair enough.

13   A   Sorry.

14   Q   Now, I want to talk for a second about the debt

15   calculations that you have on here.  One of the companies you

16   have is -- you do show CHC and Waypoint.  For CHC, you show a

17   debt -- prepetition debt of $1.102 billion.  Do you see that?

18   A   I do.

19   Q   Mr. Del Genio was the CRO in CHC, correct?

20   A   He was.

21   Q   Did you look at his declaration in that case as part of

22   this?

23   A   No.

24   Q   Do you know what his declaration says about the size of

25   the debt?

1   A    I suspect it's $500 million dollars higher, give or take.

2   Q    Okay.  And why do you suspect that?

3   A    Because that's probably the ABL that we, Houlihan, handled

4   on behalf of the company, since we're the new sponsors.  So I

5   am aware that I think it's in the neighborhood of $1.6 billion

6   --

7   Q    Okay.

8   A    -- as opposed to $1.1 billion.

9   Q    Okay.  But you used $1.1 billion for your calculations?

10  A    I did.

11  Q    And if you'd used $1.6 billion, that number would have

12  come down, correct?

13  A    It would.

14  Q    And why didn't you use it?

15  A    Because PJT didn't really handle that part of the case.

16  They handled other aspects of the case.

17  Q    But you're -- you're comparing the amount of debt on the

18  company's balance sheet to -- or the amount of debt on the

19  company to the fees that are earned by its advisors, right?

20  A    Yes.  This is judgment on my part.  For instance, in CHC,

21  Seabury handled the lease negotiations to a point, then we

22  took it over.  In this case, we're handling the lease

23  negotiations, so I include it.

24      I don't know that I made that judgmental decision on any

25  other comp, but CHC I'm familiar with.  I was in CHC.  So I

Niemann - Cross                                            66

1  made that judgmental decision.  But you are correct.  If you

2  used $1.6 billion, it would lower the percentage.

3  Q    Okay.  And -- but you didn't use $1.6 billion, you used

4  $1.102 billion, which was a year-old number, right?

5  A    I don't understand your question.

6  Q    That was -- that was not the number that the company had

7  when it filed for bankruptcy and when it sought approval of

8  its --

9  A    If you exclude the ABL, I think it was.

10  Q    Okay.

11  A    That's my point.

12  Q    All right.  If you excluded some portion of the debt on

13  their balance sheet?

14  A    The portion of the debt that they, frankly, weren't really

15  handling, yes.

16  Q    Okay.  Now, another issue that is addressed here is you

17  actually use, for -- for PHI, you use a prepetition debt

18  amount of $761 million, right?

19  A    Yes, sir.

20  Q    And that includes three components.  One is the $500

21  million prepetition note facility, right?

22  A    Yes, sir.

23  Q    The second is a $130 million Thirty Two loan facility from

24  Mr. Gonsoulin, correct?

25  A    Yes.  I'm sorry.

Niemann - Cross                                    67

1  Q   From Thirty Two Investments.  I'm sure that's what the

2  objection was.

3     And the third, you add to -- you add to PHI's prepetition

4  debt balance the cost of -- the aggregate cost of operating

5  leases for its aircraft.  Is that right?

6  A   It's the nominal amount of the operating leases.  It's

7  actually give or take 130.  We actually -- at the time we did

8  this, we had a couple of other leases, I think, in that

9  ultimately were not part of the Debtors.  So the number is a

10  little less now.  But those are the three primary components.

11  Q   Okay.

12  A   Or three components.

13  Q   All right.  And you know that Mr. Lewis, in his analysis

14  -- and I'm not -- I'm just going to ask you this.  Well, let

15  me actually withdraw that.

16     The Debtors represented to this Court in their first-day

17  declaration that their prepetition debt balance was $630

18  million plus the Blue Torch facility, correct?

19  A   I don't -- I mean, that -- if you exclude the leases, that

20  is the amount.  I don't know what the Debtors represented.  I

21  mean, you'd have to point me to the document you're referring

22  to or --

23  Q   The Debtors' books -- the Debtors' financial reporting,

24  that doesn't report those operating leases as debt of the

25  company, does it?

1    A    I think it's reported as obligations.

2    Q    Okay.  But it's not reported as debt in the same way that

3    the notes are?

4    A    That's correct.  It's not.

5    Q    Okay.  And your fee study, you didn't make any effort to

6    determine what the comparable operating lease obligations were

7    for any of your comparable companies; is that right?

8    A    I only know of CHC as involving a significant

9    restructuring of leases.  I don't know if any of these other

10   30-plus comps had that component of the restructuring.  So I

11   did not go back and check every one of these to see was there

12   a big lease restructuring negotiation.  And, again, like if it

13   was a retailer, I wouldn't do that, because that's -- you're

14   not -- it's not the same type of restructuring.  These leases

15   are very specialized.  This equipment is very specialized.  It

16   takes a very specialized advisor to handle it.  That's why

17   Seabury, for instance, has been in some of these other cases.

18   They have that specialized experience.

19   Q    Okay.  Well, let's just talk about CHC for one second.

20   CHC leased 163 of their 230 helicopters; is that right?  Is

21   that consistent with your recollection?

22   A    It was a high percentage.

23   Q    All right.  And do you know that they reported $1.3

24   billion in nominal value of operating leases?

25   A    I don't know, but I bet it was a big number.

Niemann - Cross                                69

1  Q    And had you included that in addition to the $1.6 billion,

2  that would have been more like $2.9 billion worth of debt in

3  the CHC case; is that right?

4  A    That -- if you're correct on the numbers, I have no reason

5  to doubt you, --

6  Q    Yeah.

7  A    -- then all that math would hold true.

8  Q    All right.  And oil -- and I know this may not -- these

9  may not be your industries, but oil and gas companies, they

10 lease land, correct?

11 A    Yeah.  They purchase leases.

12 Q    Right.

13 A    Whether it's land or under the ocean floor, onshore,

14 offshore, or wherever they're getting them, but, yes.

15 Q    And you didn't go back to determine how much the operating

16 lease -- how much of those operating leases should be included

17 in their debt numbers, right?

18 A    I wouldn't, because those aren't typically a core part of

19 a restructuring.  It's really the funded debt.  So the answer

20 is no, I didn't, but there's a reason.

21 Q    Okay.  And similarly, you mentioned retailers.  Retailers

22 routinely deal with leases in bankruptcies, right?

23 A    Completely different animal, but that's correct.

24 Q    All right.  And you didn't make any effort to include

25 those lease obligations as part of the debt for those

1    companies, right?

2    A    I wouldn't.

3    Q    Okay.  And then, lastly, you were here at the first-day

4    hearing.  I think it was Mr. Califano who said that REFCO was

5    the -- probably the one lease that they're going to reject.

6    Do you recall that?

7    A    Is that Regions?

8    Q    Regions Finance, yeah.

9    A    I remember him saying that, yes.

10    Q    Okay.  And does -- assuming that to be true, whatever --

11    whether it's true or not, is lease adjustment going to be a

12    significant part of the case for the Debtors?

13    A    I would say it's material.

14    Q    Okay.  And thus far the Debtors have filed one motion to

15    reject a helicopter lease, right?

16    A    I think it was Regions, if I'm not mistaken.

17    Q    Right.  And that's one out of 17 helicopter leases, right?

18    A    Yeah.  It's 15 lessors.  I think it's 17 leases.  I think

19    that's correct.

20    Q    But notwithstanding the fact that you didn't -- your study

21    compares the prepetition debt amounts for everybody other than

22    your subject company; is that fair to say?

23    A    I'm sorry, I didn't follow that question.

24    Q    Sure.  Your fee study, what we're looking at here at

25    Exhibit 35, Page 4, it compares the funded debt amounts for

1    each of your subject companies.  Let me just stop there.  Is

2    that right?

3    A    It doesn't compare them.  It has the funded debt amounts

4    as of the petition date --

5    Q    Right.

6    A    -- for each of the comps.

7    Q    Okay.  And, but for PHI, and only for PHI, you also added

8    to the funded debt the nominal value of the lease obligations.

9    Is that right?

10   A    PHI -- yes.

11   Q    Okay.

12   A    And I'm sorry.  I thought you said CHC.  PHI, we added the

13   nominal amount to arrive at $761 million.  That's correct.

14   Q    And you did it only for PHI, the subject of your study?

15   A    Yes, sir.

16   Q    Okay.  And if you hadn't done that, am I right that each

17   of the numbers as to what -- the 204 that you calculated as

18   the market mean implied fee, if you used, instead, 631, and

19   multiplied it -- even if you multiplied by that mean, that

20   would result in a lower number, right?

21   A    Yes.  I could do the math if you'd like me to.

22   Q    Why don't you do the math?  Let's do the math on that one.

23   A    You're using 631?

24   Q    630, but I think -- 630.

25   A    Okay.  I'll use 630, then.

Niemann - Cross                              72

1    Q    Yeah.

2    A    Times the mean, let me find it, of .027.

3    Q    Right.

4    A    That would imply -- I think it's $170,000.  I'm a decimal

5    point off.  $170,100.

6    Q    Okay.

7    A    Does that agree with your math?

8    Q    That does.  Yeah.

9    A    Thank you.

10   Q    Okay.  And similarly, the -- if you did the same exercise

11   with respect to the restructuring fee -- we don't have to do

12   it, just in the interest of time -- that would similarly come

13   down if you excluded the capital lease obligations -- or, I'm

14   sorry, not the capital lease obligations, but the operating

15   lease obligations, right?

16   A    If you lower the constant, which is petition date debt,

17   then the aggregate would go down, because you're applying a

18   fixed -- the percentage is a constant as well.  But, yes,

19   mathematically, it would come down.

20   Q    One of the companies that isn't included on here is

21   Erickson.  Why is that?

22   A    That was a -- I'm trying to think why I excluded it.  I

23   was involved in that as well, as was Judge Hale.  We received

24   the same fee as Imperial, the advisor there.  I want to say it

25   was $2 million for each of us.  We really kind of worked that

Niemann - Cross                              73

 1  deal together, collectively.  We made a lot of progress

 2  prepetition.

 3      And so that deal I would view the aggregate fees -- and it

 4  was a very efficient case, if I remember correctly -- I view

 5  those aggregate fees as sort of the debtor-side fees, even

 6  though we were representing a secured creditor, but it was a

 7  very consensual and efficient case.  And so I don't -- I'm

 8  trying to remember, candidly, whether I purposely said, let's

 9  keep it off.  I think I -- I might have actually applied

10  judgment on that one.  I'd use four million.  I'd use the

11  aggregate of the two.

12  Q   Okay.  There, Erickson was -- I'm sorry, Imperial was paid

13  a monthly fee of $125,000?

14  A   I don't remember.  It sounds directionally correct.  And I

15  don't remember the aggregate debt.  It may not have met the

16  $300 million.  I think it did, but I don't remember if it --

17  Q   Does $561 million sound correct to you?

18  A   Okay.  Then, then it would.  It would fall within this

19  range.

20  Q   Okay.

21  A   Yes, sir.

22  Q   And the -- Imperial's fee there you said was a $2 million

23  transaction fee, right?

24  A   Yeah, with all this -- yes, if I remember correctly.

25  Q   And they also had a cap on the total fees they could earn

1    of $3 million.  Do you recall that?

2    A    I don't recall that.

3    Q    Do you dispute that?  If I represent to you --

4    A    I'd have to look at their engagement letter.

5    Q    Okay.

6    A    But I remember negotiating their fees on behalf of the --

7    their secured lenders.

8    Q    Okay.  Now, I was next going to talk about the

9    restructuring fee, the $6 million fee that you've requested,

10   but I think we've -- that's calculated in the same way that

11   you did the -- that we just walked through on Exhibit 35, Page

12   4.  Is that right?

13   A    It's analyzed the same way, yes.

14   Q    Analyzed the same?  Okay.  And so to the same extent with

15   respect to the -- if you excluded the capital leases where you

16   added the additional debt at CHC, it would have the same

17   effect on the analysis?

18   A    Mathematically, mathematically, you would be using a

19   different debt level.

20   Q    Okay.

21   A    Or obligation level.

22   Q    All right.  Now, let's talk about the financing fees.

23   You, in this analysis that you presented to the board that's

24   reflected in Exhibit 35, you don't include any analysis of the

25   comparable financing fees in other cases.  Is that right?

1   A    Yeah, this did not have that.

2   Q    Right.  And in this case, and we've looked at it through

3   Mr. Lewis' Exhibit A -- 30 -- Page -- Tab 37.

4   A    I'm sorry.  Do you want me to go to another tab?

5   Q    If you want to look at Tab -- I'm just -- I'm reminding

6   you that we talked already about the aggregate fee under the

7   plan, at least as it was formulated yesterday, and your fee as

8   it was yesterday.  Do you recall that?

9   A    Do you want me to go to thirty --

10  Q    Sure.  Go, go to 37.

11  A    I'd rather not try to recall testimony --

12  Q    Oh, no.  That's fine.  Go to 37.

13  A    -- in the midst of testimony, if you don't mind.

14  Q    Go to Tab 37.

15  A    So, yes, I'm at Tab 37.

16  Q    Okay.  And the only reason, the point I wanted to make

17  here is we calculated, if you exclude the Blue Torch facility,

18  a second financing fee on that, an aggregate fee under the

19  plan as proposed yesterday and your -- and the fee as it was

20  approved by the board of $16.7 million.  Do you recall that?

21  A    It is theoretically possible, depending on the capital

22  raised and the length of the case, that you could get to this

23  level of fees.

24  Q    Okay.  Now, and of that component, the financing -- I'm

25  sorry.  The financing fees make up more than half of that

Niemann - Cross                              76

1  total potential fee; isn't that right?

2  A    Well, it's 6.9 million, plus prepetition, plus monthlies.

3  Whatever that equates to.  And the rest are financing fees.

4  Q    Okay.  So, at a minimum, do you see that there's -- for

5  the two, the ABL and the rights offering, there alone there's

6  $7.2 million in fees for those two alone?

7  A    I'm sorry.  You're referring to which two numbers?

8  Q    The $3 million and the $4.2 million.  Those are financing

9  fees?

10  A    $3 million and $4.2 million equals $7.2 million, yes.

11  Q    Okay.  So, that, those fees themselves are higher than the

12  transaction fee that Houlihan is requesting standing alone,

13  right?

14  A    Mathematically, yes.

15  Q    Okay.

16  A    They don't exist anymore, but mathematically, yes.

17  Q    And, but you still -- you didn't present to the board any

18  analysis of the -- in the comparable set of what the financing

19  fees were for those comparable companies, did you?

20  A    The reason I'm pausing, I'm trying to think.  We did

21  present -- it was just M&A fees, because there were two more

22  pages that were presented, I don't know if you guys have it,

23  but regarding public company M&A fees.  I don't think any of

24  our analyses had financing fees laid out.

25  Q    Okay.  And similarly, we talked about this earlier, but

1    you don't have crediting in your engagement letter with

2    respect to financing fees.  You also didn't show how any of

3    the comparable companies, what crediting mechanisms were in

4    place in those cases, did you?

5            MR. HYNES:  Objection.

6            MR. LEBLANC:  Let me, let me rephrase it, if that's

7    all right, Your Honor.

8            THE COURT:  All right.

9    BY MR. LEBLANC:

10   Q    You didn't show the board, in your fee study analysis, the

11   crediting mechanisms in each -- in any of the comparable

12   companies that you included, did you?

13   A    That's not on page -- on the pages we provided the board,

14   no.

15   Q    Okay.  And you know that in some of these cases there are

16   crediting mechanisms, right?

17   A    Yes, I'm aware of that.

18   Q    Okay.  Similarly, you did not show the board any data

19   about the caps that were negotiated in other cases; is that

20   right?

21   A    It's not on the pages that were given to the board.

22   Q    Okay.  And, again, you don't have a cap, but you know

23   there are caps in many of these other cases, right?

24   A    You'd have to define many, but there are caps in some

25   cases.  Yes, sir.

1    Q    Okay.  Now, let's talk for a minute about what you

2    describe as the pace premium.  Have you identified any case

3    that you're not involved in that has a pace premium?

4    A    Yes.

5    Q    What case?

6    A    I believe it's *UCI International*.

7    Q    Okay.

8    A    And -- if I may finish the answer?

9    Q    Sure.

10   A    There are what I would consider effectively pace premiums

11   where, if things are done efficiently out of court, that

12   there's either bonuses or fees are paid prepetition, and, for

13   instance, the restructuring fee might get paid once you get

14   the consents from the holders, even though a Chapter 11 is

15   required to bind the consents.  So a lot of times bankers will

16   get the full fee or some percentage of the fee prepetition,

17   not subject to disgorgement later, whether or not the deal

18   clears.  So that I consider, in some respects, a pace premium.

19   And it's fairly standard.

20   Q    You say a pace premium is fairly standard?

21   A    The structure I just described which I believe is

22   effectively a pace premium is fairly standard.

23   Q    Okay.  But, and you identified at your deposition a few

24   cases that you understood or recalled had pace premiums,

25   right?

Niemann - Cross                              79

 1  A    I'm sorry.  During my deposition?

 2  Q    Yes.

 3  A    Yes, I do recall that.

 4  Q    Okay.  And the Debtors have conveniently attached those.

 5  So if you could look at Page -- Tab 38.

 6  A    I'm there.

 7  Q    All right.  And Tab 38 is an application that was filed by

 8  Houlihan in *Erickson Retirement Communities* with Mr. Califano

 9  as counsel to the Debtor there; is that right?

10  A    Yes, I'm familiar with this and that's correct.

11  Q    Okay.  And the pace premium there is reflected on Page 8.

12  A    Page 8 of the application?

13  Q    Yes.

14  A    I'm there.

15  Q    Okay.  And in Paragraph 17, Sub-bullet D.  Do you see

16  that?

17  A    Yes, sir.

18  Q    Okay.  And so there it says the restructuring transaction

19  fee shall be increased by 15 percent if the company

20  consummates a restructuring transaction on an out-of-court

21  basis or pursuant to a prearranged or prepackaged plan in

22  which the restructuring transaction is confirmed in not more

23  than six months from the petition date.  Do you see that?

24  A    Yes, I do, sir.

25  Q    And so that pace premium there was limited to a case in

Niemann - Cross                                        80

1  which there was a prearranged plan; is that right?

2  A    That's not correct.  You'd have to look at the engagement

3  letter as to the definition of prearranged or prepackaged.

4  The definition is, so long as a plan is confirmed within 180

5  days, the pace premium is triggered.

6  Q    Okay.  So the prearranged or prepackaged as used in that

7  that was presented to Judge Jernigan, that's surplusage?  It's

8  just any plan had to be confirmed within six months?

9  A    You have to actually look at the engagement letter as to

10  what the precise definition is.  This is an application.

11  Q    Okay.  And was -- do you recall whether -- was there any

12  objection to that pace premium?

13  A    I don't recall.  We had 30-some-odd lenders.  They

14  objected to a lot of stuff.  But I don't remember if this was

15  one of it, or one of the things they objected to.

16  Q    Okay.  So, similarly, in -- behind Tab thirty -- and that

17  was -- that pace premium was a case that you were the lead

18  banker on, right?

19  A    Yes, I was the senior officer at Houlihan on that case.

20  Q    Okay.  *Linden Ponds* has the same structure as the -- the

21  same language with respect to prepackaged or prearranged,

22  right?

23  A    I'm sure it does.  You want me to go to it, or --

24  Q    If you want to.  Or do you doubt that that's --

25  A    I believe it did.  This is going back nine or so, ten

 1  years ago, but yes, --

 2  Q    Sure.

 3  A    -- I'm pretty sure it did.

 4  Q    And then the third one that the Debtors have included is

 5  *SandRidge Energy*?

 6  A    Yes, sir.

 7  Q    Okay.  And that one has a premium if the transaction is

 8  confirmed within two and a half months of the filing of the

 9  case; is that right?

10  A    I'd have to go --

11  Q    Sure.

12  A    -- refresh my recollection, but --

13  Q    That's fine.  Tab 42.

14  A    -- I was involved in that.  I'm sorry.  It's 42?

15  Q    42, yeah.

16  A    Yes, sir.  If -- I think it's (b)(1)(A) on Page 7.  I

17  think that's right.  I'd have to take a closer look.  I'm

18  sorry, what's your question?

19  Q    My question is, that -- the pace premium there was a

20  premium payable if a confirmation order happened in less than

21  two and a half months from the filing, right?

22  A    I'd have to go back and figure out what -- well, let's

23  look at --

24  Q    Paragraph 4 on Page 3.

25  A    Does it have a petition date?

1    Q    It does.

2    A    Okay.  So I'm going to trust you, but --

3    Q    May 16th.

4    A    May 16th.  So, by July 1st, there was one level of

5    premium.

6    Q    Okay.  And that was the pace premium that was at issue

7    there; is that right?

8    A    Um, (pause).  My hesitation on this, this was a very

9    negotiated arrangement.  The $1.5 million discretionary was in

10   lieu of pace, but it was made very clear that pace was

11   important.  So they're both really -- there's only one that's

12   a pure pace premium.  The other is a discretionary premium

13   generally, but pace was an important factor.

14   Q    Okay.  Now you mentioned *UCI*, and I'm not going to -- I'm

15   actually not --

16            MR. LEBLANC:  I won't talk about that, because, Your

17   Honor, this gets to one of the document issues that we had.

18   The Debtors' exhibit list identifies this as an application to

19   employ Houlihan Lokey in *UCI*.  And my team literally spent a

20   meaningful amount of time trying to find that, because

21   Houlihan wasn't involved in *UCI*.  So we'll deal with it when

22   they stand up, because we didn't get -- until I walked into

23   court, we didn't get the -- we hadn't received any of their

24   exhibit binders, so we'll --

25            THE COURT:  Okay.

1              MR. LEBLANC:  I won't raise it here, and we'll deal

2    with it on recross.

3    BY MR. LEBLANC:

4    Q    But, so at least as of your deposition, when you

5    identified cases for us that had speed -- pace premiums, the

6    only cases you identified were ones in which Houlihan was

7    available -- was the investment banker, right?

8    A    The only ones I could recall during the deposition, and

9    I'm not sure I recalled every one of them, but were ones that

10   I personally was involved in.

11   Q    Okay.  And you've not seen a fee study done by anybody

12   else that identifies a pace premium as a common feature in

13   investment banker engagements, have you?

14   A    I have not done a survey of the types of premiums.  As I

15   said, there's a fairly standard provision in a lot of

16   engagement letters that pay, from a prepetition perspective,

17   if things are done more efficiently, which is pace to me.  But

18   I have never commissioned that type of a survey.  I've

19   commissioned some work for this particular case, given your

20   objections, but not a broad-based survey of the market for

21   every possible, quote, pace premium, depending on how you

22   define pace premium.

23   Q    Okay.  And the commission of work that you did in

24   connection with this case, you've identified now *UCI*, but

25   other than the three instances that Houlihan has sought in

Niemann - Cross                                    84

1   cases that you were involved in, you've not identified any

2   others besides *UCI* that actually have a pace premium.  Is that

3   right?

4   A   The industrial company that we talked about earlier that

5   PJT was involved in, --

6   Q   Let me limit it to ones that actually filed an application

7   for approval to a court.

8   A   Okay.  Limited to that?

9   Q   Yes.

10  A   I am only aware of *UCI*, which was Moelis, and the Houlihan

11  comparables over the last ten years.

12  Q   Okay.  And so none of them -- had you included a column

13  for ones with a pace premium here on this chart, since those

14  don't appear, or *UCI*, I guess, actually does, only *UCI* would

15  have had a checkmark next to it for having a pace premium.  Is

16  that right?

17  A   I don't know.  I'd have to look at that list.  And I

18  didn't go back and check if any of them had pace premiums.

19  Q   And you didn't -- you also didn't present that to the

20  board, correct?

21  A   That is correct.

22  Q   Now, I want to turn topics for a second off of -- off of

23  your fees.

24  A   Thank you.

25  Q   And -- well, I'm not sure you'll be thanking me, but --

1     And I just want to spend a few minutes.  You -- let me

2     just try to do this in a summary fashion.  You understand that

3     the Committee has raised concerns, I think Mr. Califano even

4     said it earlier today, with the Debtors' plan, right?

5     A   I know in pleadings it's been called coercive, it's been

6     called a death trap.  I take those as concerns.

7     Q   Okay.  And those concerns focus on the treatment of Mr. --

8     they include the treatment of Mr. Gonsoulin's Thirty Two loan,

9     the $130 million loan, right?

10         MR. HYNES:  Objection, Your Honor.  This is outside

11    the scope.  I don't know where this is going, but it doesn't

12    appear to be tied to fee application.

13         THE COURT:  All right.  It's certainly part of the

14    objection that's been filed.  Overruled.

15         THE WITNESS:  I believe in one or more of your

16    pleadings there's some reference to it not being market.

17    BY MR. LEBLANC:

18    Q   Okay.  But --

19    A   So I don't know if that's a concern or not, --

20    Q   Sure.

21    A   -- but I think that's how you've characterized it.

22    Q   But the treatment of that loan in the plan, that --you

23    understand that's a concern of the Committee, the fact that

24    it's being equitized, right?

25    A   I'm just going by your pleadings.  We haven't really had

1    any meaningful dialogue with you about what your actual

2    concerns are, so I'm just going by your pleadings.  I know in

3    your pleading you said -- somebody said -- you don't believe

4    that's market.

5              MR. LEBLANC:  Okay.  Move to strike everything but

6    the last --

7              THE COURT:  Sustained.

8    BY MR. LEBLANC:

9    Q    And you understand we've raised concerns, the Committee

10   has raised concerns about the replacement of Whitney Bank with

11   the Thirty Two loan, right?

12   A    You've referenced that in your pleadings.

13   Q    Okay.  We've also raised concerns, the committee has

14   raised concerns about the Blue Torch facility, correct?

15   A    You reference that in your pleadings, yes.

16   Q    And you understand that part of our position is that those

17   loans, taken together, have created a lot of leverage against

18   the unsecured creditors in this case, right?

19   A    I don't know what your position is on that.  It's not --

20   Q    Okay.

21   A    That's not in your pleadings.

22   Q    All right.  And we've taken the position that Mr.

23   Gonsoulin is, as the friendly lender to the company, is

24   getting better treatment than he should, aren't we?

25   A    I don't know if that's your position.  I haven't read that

Niemann - Cross                              87

1   in the pleadings.

2   Q   Okay.  You also, at the first-day hearing and subsequent

3   to that, you've heard complaints that in the prepetition

4   period Houlihan and the company didn't actually engage with

5   the noteholders themselves, right?

6   A   There are such allegations in your pleadings.

7   Q   Okay.  And you'll recall that we've alleged that the

8   company wouldn't restrict the noteholders in the prepetition

9   period, right?

10  A   I'd have to look at the exact pleading, but there's

11  allegations to that effect.

12  Q   And the allegations include that what the company did was

13  engage with our -- with the advisors and provide some limited

14  diligence to the advisors, but never actually provided it to

15  the noteholders, right?

16  A   I can't tell you what the advisors shared with the

17  noteholders because some of it was not MNPI, so I'm sure any

18  good advisor would share what they could.  PJT meets my

19  standard of a good advisor.  So I don't know what the

20  noteholders got.

21  Q   Okay.  But you understood that the noteholders were never

22  restricted in the prepetition period to receive MNPI from the

23  company, right?

24  A   My reservation is I wasn't involved in the refinancing

25  effort that was led by UBS and Royal Bank of Canada.  I know

1   there was some click-through confidentiality for the existing

2   holders that were part of that process.  So I don't know if

3   there was any restriction in there.  So, other than that,

4   which I can't really speak to, we certainly, not on my watch,

5   if you will, was there any confidentiality agreement with the

6   existing holders.  It wasn't until the bylaws which provide

7   confidentiality, --

8   Q    Okay.

9   A    -- which was postpetition.

10  Q    All right.  And you were involved in recommending to the

11  company the course of action with respect to how it would

12  engage with the noteholders; isn't that right?

13  A    I was among the advisors, yes.

14  Q    And you were also involved with recommending to the

15  company how to deal with the Whitney Bank facility and the

16  upsizing of the secured facilities, right?

17  A    I don't really understand that question.  I'm sorry.

18  Q    All right.

19  A    It sounded like two questions.

20  Q    All right.  Let me show you a document.

21  A    Can I put this away?

22  Q    Sure.

23  A    Make room?

24          MR. LEBLANC:  May I approach, Your Honor?

25          THE COURT:  Sure.

1          THE WITNESS:  Thank you.

2          THE COURT:  You can just bring it straight up here.

3    Thank you.  Thanks a lot.

4          MR. LEBLANC:  Your Honor, for the benefit of the

5    Court, the only exhibit I'm going to look at at this point

6    with Mr. Niemann is one that the Debtors originally marked

7    professionals-eyes-only.  They have de-designated that as

8    confidential.  I don't know -- we have exhibit binders here.

9    I don't know who's signed a confidentiality agreement, so I'm

10   -- I would hesitate to offer it to everybody, but I am going

11   to ask him questions, and if they have issues or concerns

12   about the questions, they can certainly raise it.

13         THE COURT:  All right.

14   BY MR. LEBLANC:

15   Q    Now, Mr. Niemann, before we turn to the exhibit in the

16   binder, you were engaged by the Debtors in September, early

17   September 2018, correct?

18   A    Houlihan Lokey was.  Yes, sir.

19   Q    And, but prior to that, Houlihan Lokey had been subject to

20   a confidentiality agreement with the company for more than a

21   year, right?

22   A    I believe that's correct.

23   Q    And you had, over time, provided the company with advice

24   over time during that one-year period that you were subject to

25   a confidentiality, notwithstanding the fact that you weren't

 1  engaged; is that right?

 2  A    I'm just careful with the use of the word advice.  We were

 3  spending time with the company and giving thoughts on certain

 4  things.  I don't really consider it advice until we're sort of

 5  formally engaged --

 6  Q    Sure.

 7  A    -- and indemnified.

 8  Q    Your general counsel will be very happy to hear you say

 9  that.

10  A    Exactly.

11  Q    That's not my issue.  I want to focus on a couple of weeks

12  before you were engaged, you provided the company with an

13  analysis of certain strategic alternatives, right?

14  A    We provided several analyses, and so if you have something

15  you want me to look at --

16  Q    Sure.

17  A    -- and it's dated a couple of weeks before we were hired,

18  I'm happy to look at it.

19  Q    Okay.  Then why don't you turn to Tab 1 in the binder I

20  just handed you?

21  A    I'm there.

22  Q    All right.  And that document, just to identify it for our

23  record, that's a strategic alternatives proposal from Houlihan

24  Lokey dated August 22, 2018, right?

25  A    It appears to be what we presented.  I'm looking at -- it

Niemann - Cross                                       91

1   looks like it printed a little funny on the font.  But this

2   appears to be a presentation we gave on or around August 22nd.

3   Q    Okay.  And if we skip over the Houlihan Lokey overview and

4   go just to the --

5   A    Which most clients do.

6   Q    If you turn to Page 23 of this document.

7   A    Yes, sir.  I'm there.

8   Q    And this is -- you -- this is entitled, the slide here is

9   entitled "Overview of Strategic Alternatives."  Do you see

10  that?

11  A    Yes, I do.

12  Q    And I want to focus you for a second just on the fourth

13  one, Papa's Big Brother.  Do you see that?

14  A    I do see that.

15  Q    All right.  Papa, that's Houlihan's code term, code name

16  for this engagement.  Is that right?

17  A    It's the maritime sign for P.

18  Q    Okay.

19  A    Papa.

20  Q    Okay.  So Papa's Big Brother was one of the alternatives

21  that you presented, and that was to find -- it's titled Upsize

22  Revolver.  Do you see that?

23  A    Yes, I do.

24  Q    And the first recommendation there was to find a friendly

25  source of capital to take out Whitney and potentially upsize

1   the revolver up to $260 million.  Do you see that?

2   A    I do see that.

3   Q    Use for either liquidity or as a carrot/stick coercion

4   against notes.  Do you see that?

5   A    I do see that.

6   Q    Now, you did find a friendly -- the company did find a

7   friendly source of capital to take out the Whitney financing,

8   right?

9   A    That is not correct.  I'm sorry.  Oh, the company, not

10  Houlihan?

11  Q    Correct.  I said the company, yes.

12  A    Okay.  I'm sorry.  I -- yes.  Yes, the company found a

13  friendly source of capital.

14  Q    Right.  And then ultimately the company did upsize,

15  through the Blue Torch facility, the senior secured facility,

16  right?

17  A    To $200 million, not $260 million.

18  Q    Okay.

19  A    Yes, sir.

20  Q    And at the time that it did the Blue Torch facility, the

21  capacity you concluded the company had was $70 million, right?

22  Under their -- under the indentures, to comply with the

23  indentures?

24  A    In talking to the lawyers and everything, we decided it

25  wasn't actually $260 million, it was $200 million.

Niemann - Cross                                93

1   Q    Okay.  So you -- and at the time you presented this on

2   August 22, 2018, you believed it to be $260 million, right?

3   A    Based on our review of the indentures, we thought there

4   might be actually additional room, and upon further analysis

5   and work with lawyers -- I think it was Jones Walker at the

6   time -- we concluded that it was $200 million.

7   Q    Right.  And then at the bottom, the sort of analysis of

8   that is, Dust settles.  New sheriff in senior secured

9   position.  Could prove helpful later.  Upsize capacity may be

10  useful currency.

11       Do you see that?

12  A    I don't even need to look.  Yes, I'm familiar with it.

13  Q    Okay.  And that new sheriff was a combination of Thirty

14  Two and Blue Torch, right?

15  A    No, it was not.

16  Q    Okay.

17  A    This was August, sir.

18  Q    Right.  And the --

19  A    Whitney was still in the position.

20  Q    Right.  And Mr. Niemann, you're recommending to the

21  company, as a strategic alternative, find a friendly source of

22  capital to take Whitney out.  Right?

23  A    I wouldn't view these as recommendations.  These are

24  simply among the alternatives available to the company.

25  Whitney was being unfriendly, so my suggestion to the company

 1   at the time was you're better off to find somebody that's more

 2   friendly.

 3   Q    Right.  And the new sheriff that's referred to in the

 4   bottom line where the dust settles is the person who's more

 5   friendly that would come in to the Whitney position, right?

 6   A    And/or upsizing it.  Yes, sir.

 7   Q    Okay.  And so, in that case, the -- it's the combination

 8   of the Thirty Two loan from Mr. Gonsoulin and the Blue Torch

 9   facility that upsized it?  Those -- that combination is the

10   new sheriff in town, right?

11   A    That's -- that's not how I thought of this when I wrote

12   that.

13   Q    Okay.  All right.  Now, you also have, under Liability

14   Management Alternatives -- do you see that?

15   A    I do.

16   Q    All right.  And there you have an approach with the

17   noteholders that you call that Papa's New Friends?

18   A    I'm familiar with it.

19   Q    Okay.  And the first recommendation is ignore the notes

20   until February 2019.  Right?

21   A    I see that.

22   Q    Second alternative is to engage with the notes to calm

23   them down, prepare for standstill upon maturity.  Do you see

24   that?

25   A    Yes, I do.

1    Q    And those are steps that you, in fact, that the company,

2    in fact, took on your recommendation, right?

3    A    That is not correct.

4    Q    Okay.  Well, let's look at a little bit more detail behind

5    both of them.  If you turn with me to Page 40.

6    A    I'm sorry.  Page 40?

7    Q    40.  Yeah.

8    A    I'm there.

9    Q    And that's the page that is -- gives more detail on the

10   idea reflected on Page 23 of the strategic alternative of

11   upsizing the revolver, right?

12   A    Yes.

13   Q    And the assumptions and considerations here, the last one,

14   the last bullet on the right-hand column, says, "While

15   upsizing the revolver."  Do you see where I'm reading?

16   A    I see it, yes.

17   Q    Okay.  "While upsizing the revolver only provides an

18   interim solution, it will provide significant leverage when

19   negotiating with the noteholders."  Do you see that?

20   A    Yeah.  It's underlined, in fact.

21   Q    Right.  And you wanted -- that was important.  That's why

22   you underlined it, right?

23   A    I typically underline or bold for emphasis.

24   Q    Okay.  So that's something you wanted to emphasize to the

25   company?

1    A    Yeah.  I thought it was important.

2    Q    Right.  And that's, in fact, what the company did, right?

3    Upsized the revolver, brought in a new friendly source of

4    capital?

5    A    It did that.  I'm not sure it provided significant

6    leverage in negotiating with the noteholders, --

7    Q    Okay.  Well, --

8    A    -- to be honest with you.

9    Q    -- it did -- the upsizing portion of it happened, as

10   you've said, on the day before the petition date, right?

11   A    That is when it happened, yes.

12   Q    Yeah.  So the leverage from that is I guess yet to be

13   seen, right?

14   A    Um, --

15   Q    I'll withdraw --

16   A    I don't think in terms of --

17   Q    I'll withdraw --

18   A    I don't sit around every day thinking about how are we

19   going to get negotiating leverage.  This was an observation at

20   the time.

21   Q    Okay.  Now, turn forward to Page 42 in that same deck,

22   which is our Committee Exhibit 1.  This is the discussion of

23   Papa's New Friends, the liability management alternative,

24   right?

25   A    No.

1    Q    Okay.  What is it, if not that?  I'm sorry.

2    A    Well, you have to go back.  I'm sorry.  What page were we

3    on before?

4    Q    23 was the summary.

5    A    Yeah.  There were two columns.

6    Q    Sure.

7    A    One's Papa's New Friends.  The other is Papa's New Papas.

8    What we actually did was -- or try to do was column -- the far

9    right, #6.  This page, on 42, lays out both of those columns,

10   if you will, in a certain way, and then gets into

11   descriptions, advantages and disadvantages.

12   Q    Okay.  I want to focus on the first two lines or the first

13   two sub-bullets there.  "The company has three alternatives"

14   -- at the very top -- "in engaging with the noteholders."  Do

15   you see that?  Do you see where I'm reading?

16   A    I see it, yeah.

17   Q    Okay.  "The first is ignore them until the March 2019

18   maturity."  Do you see that?

19   A    Yes, I see that.

20   Q    The second one is, "Keep them warm.  Encourage noteholders

21   to organize more formally, engage with their advisor, and

22   allow advisor to review limited due diligence materials."  Do

23   you see that?

24   A    I see that.

25   Q    And that's what the company did, isn't it?

1   A    I'm not sure I'd call it limited, but we did encourage and

2   they did get organized.  We engaged with -- I'm talking about

3   Houlihan and the company -- engaged with their advisors.  You

4   and, I'm sorry, Milbank and PJT.  And we allowed you to review

5   due diligence.  I wouldn't call it limited.

6   Q    Okay.  But the "keep them warm" means you're not actually

7   engaging with the noteholders themselves, right?

8   A    That's not what it means, no.

9   Q    Okay.

10  A    That's not what was intended when I wrote that.

11  Q    All right.  But that's, in fact, what happened?  We

12  already covered that, right?

13  A    I don't think I testified.  No, that is not what happened.

14  Q    Okay.  You --

15  A    It's not at all what happened.

16  Q    You didn't engage with the noteholders with any

17  confidential information, correct?

18  A    We provided their advisors -- you, I'm sorry, Milbank --

19  Q    Uh-huh.

20  A    -- and PJT, with material non-public information and

21  material information, not limited.

22  Q    Okay.  But you didn't ever restrict the noteholders to

23  engage in discussions directly with them on an MNPI basis,

24  right?

25  A    At least two noteholders, we tried to restrict as far as

1    the M&A process, unsuccessfully.  They chose not to.  That

2    would be Q and Oaktree.  Don't recall if we asked any others

3    individually.  And there was no further -- there was no -- we

4    testi... we went over this.  There was no restriction

5    prepetition.

6    Q    And just to be clear, when you say you tried to restrict

7    them as part of the M&A process, not in their capacity as

8    bondholders but as potential purchasers of the company.  Is

9    that right?  Or certain of the company's assets?

10   A    As -- I'm not sure I understood your question, but I think

11   I can answer it.

12   Q    Sure.

13   A    We attempted to restrict who we understood to be the two

14   largest holders.  And I'm going to blank on the time, but it

15   was probably in October or so, maybe November.

16        When I think of M&A, I think of all alternatives.  So one

17   alternative was to get an anchor, if you will, out of the

18   bondholders, one of the larger holders, whether that be Q or

19   Oaktree, to participate in the M&A process.  They both chose

20   not to.  And I'm sure they had good reasons.  I'm not saying

21   there's anything untoward about that.  But there was an

22   attempt made and there was no -- there was an NDA I know at

23   least sent to Q.  I don't recall if we sent one formally --

24   Oaktree might have said, don't even bother sending it.  I

25   don't recall precisely.

1    Q    Okay.

2    A    But we certainly sent one to Q, and they declined to sign

3    it.

4    Q    Right.  But that was in connection with the M&A process,

5    not in connection with a restructuring of the notes?

6    A    The discussion was about an equitization of their debt

7    position as they held it back then, so that, to me, is M&A.

8    M&A includes restructuring.

9    Q    Okay.  Okay.  The last topic I want to just cover with

10   you, Mr. Niemann, is I understand with respect to -- and let's

11   go back to Tab 35 in the other -- the big binder.  I

12   apologize.

13   A    I'll do that.  Thank you.  And I am there.

14   Q    I'm sorry.  Tab 37.  I apologize.  Which is Exhibit --

15   A    Yes, sir.

16   Q    Debtors' Exhibit 37.

17   A    Got it.

18   Q    This is the calculation of the fee.

19   A    I'm there.

20            THE COURT:  Mr. Leblanc, which exhibit are we in?

21            MR. LEBLANC:  37, Your Honor.  I apologize.

22   BY MR. LEBLANC:

23   Q    Now, we calculated -- we've talked about the fees.  And,

24   again, I don't -- we concluded the number, the math would show

25   $16.7 million theoretically possible.  I'm not trying to

1  restate that testimony.  Just trying to orient you.  Okay?

2  A    Yes, it's theoretically possible.

3  Q    Okay.

4  A    I'm not sure you and I concluded anything, but yes, --

5  Q    All right.

6  A    -- it's theoretically possible.

7  Q    Now, to the extent that a plan was proposed that would

8  take out the Thirty Two loan facility, then Houlihan would

9  expect to earn an additional fee on that, right?

10  A    If we raised $130 million?  Is that your question?

11  Q    Yes.

12  A    We would get the percentages Mr. Califano articulated this

13  morning with respect to that capital, unless the provider of

14  that capital insisted on some other fee and it was a barrier

15  to getting the capital.  So, theoretically possible.  Yes,

16  sir.

17  Q    Okay.  And the -- and so if -- let's just say there's $200

18  million of secured debt here, right?

19  A    Yes, sir.

20  Q    Okay.  And if the -- let me take one half-step backwards.

21  We talked about your valuation, your valuation of $487.5

22  million.  That means you're opining that the future owners of

23  this company are the unsecured creditors of this company,

24  right?

25  A    The plan provides for the equitization of all debt except

1   Blue Torch.

2   Q    Okay.  And the -- under your valuation, the fulcrum

3   security is the unsecured creditor security, right?

4   A    If your definition of fulcrum is where the value runs out,

5   yes, it runs out in the unsecured class.

6   Q    All right.  And so if that fulcrum security raised the

7   capital to take out that secured debt, $200 million, then you

8   would earn a fee, even under the revised adjustments?  If they

9   did that in equity, that's an $8.4 million fee on top of the

10  other fees that we talked about here.  Is that right?

11  A    4.2 percent times $200 million I think is $8.4 million.

12  Q    And that would be on top of the transaction fee, the

13  monthly fees, any other financing fees, the Blue Torch

14  prepetition fee?  On top of all of that, right?

15  A    There are no credits and there are no caps.

16  Q    And even if the fulcrum security raised that capital as a

17  debt facility, that still would earn you a fee of --

18  A    1.4 --

19  Q    One point --

20  A    -- or 2.1, depending on what that one is.

21  Q    Okay.  What kind of debt it is.

22  A    That's right.

23  Q    So let's assume it's unsecured debt.  It would be $4.2

24  million on top of all these fees.  And if it's secured debt,

25  it would be $2.8 million on top of all these fees.  Is that

1   right?

2   A    I think that's accurate, if there were no conditions

3   placed on the provision of that capital.

4   Q    And, again, just so we're clear, you're asking for

5   approval under 328, not 330, right?

6   A    That is correct.

7   Q    Okay.

8            MR. LEBLANC:  Your Honor, if I could just have a

9   moment, I think I'm done.

10           THE COURT:  Sure.

11       (Pause.)

12           MR. LEBLANC:  I have no further questions, Your

13  Honor.

14           THE COURT:  Thank you, Mr. LeBlanc.

15           THE WITNESS:  Thank you.

16           THE COURT:  Does anyone else have any questions of

17  this witness?

18           MS. KIPPES:  No, Your Honor.

19           THE COURT:  Redirect?

20           MR. HYNES:  Yes, Your Honor.  May I have five

21  minutes?

22           THE COURT:  Yes.  We're going to stop at noon, but

23  you can have five minutes.  We'll come back in in five

24  minutes.

25           MR. HYNES:  Thank you.

1          THE COURT:  Mr. Niemann, don't speak with anyone

2    about your testimony.  Do you understand that?  And that

3    includes the lawyers.

4          THE WITNESS:  Yes, I do, Your Honor.  Thank you.

5       (A recess ensued from 11:29 a.m. until 11:37 a.m.)

6          THE CLERK:  All rise.

7          THE COURT:  Please be seated.  Thank you.

8       (Continued chatter.)

9          A VOICE:  Shh.

10          A VOICE:  Excuse me.  Excuse me.

11          THE COURT:  Mr. Niemann, you don't want me to hold

12    you in contempt, do you, back there?

13          THE WITNESS:  I'm sorry, Your Honor.

14          THE COURT:  That's all right.

15          THE WITNESS:  No, sir.  That would be a first.

16          THE COURT:  You may proceed.

17          THE WITNESS:  Thank you.

18          MR. HYNES:  Thank you, Your Honor.

19                    REDIRECT EXAMINATION

20    BY MR. HYNES:

21    Q    Mr. Niemann, you were just asked about your communications

22    with the noteholders.  Do you recall those questions?

23    A    I do.

24    Q    And do you recall your communications with the noteholders

25    coming up in the objection filed by the Unsecured Creditors'

1    Committee?

2    A    I do.

3    Q    Did you endeavor to do any research after reading that

4    objection?

5    A    I did.

6    Q    What did you do?

7    A    I went back through my diary, went back through my

8    electronic communications, which these days are e-mails and

9    texts, and also went back just from my own recollection to try

10   to really decipher what the level of interaction was, what

11   efforts were made with these noteholders and their advisors.

12   Q    Did you memorialize the results of that effort in

13   anything?

14   A    I did.

15   Q    Okay.

16        MR. HYNES:  Your Honor, for demonstrative purposes,

17   I'm providing to the noteholders and to the Court, if it will

18   accept it, a schedule that Mr. Niemann just referred to.

19        MR. LEBLANC:  Your Honor, this is literally the first

20   I'm seeing of it.  I don't know that we have -- we're going to

21   deal -- talk about this later in the 1103 issue, about the --

22   we have 456 documents produced by the Debtors.  Zero text

23   messages from Mr. Niemann.  Less than 200 e-mails, or around

24   200 e-mails in total.

25        I don't know what this is.  We have not seen it.  No

1  opportunity to cross-check it.  And it's not a proper summary

2  under 1104 because the documents haven't been provided to us,

3  under Federal Rule -- I think it's Federal Rule of Evidence

4  1104.  It's not a proper summary of documents because we don't

5  have them.

6         MR. HYNES:  Well, that might be an objection, Your

7  Honor, if I was offering it into evidence at this time, but

8  I'm not.

9         MR. LEBLANC:  It's -- Your Honor, it's no -- it's not

10 meaningfully -- that's -- a demonstrative is for that purpose.

11        THE COURT:  I'll sustain the objection.

12        MR. HYNES:  Okay.

13 BY MR. HYNES:

14 Q   Mr. Niemann, do you recall delivering a straw man

15 restructuring proposal to Milbank and PGT [sic] on or about

16 February 22, 2019?

17 A   Yes.

18 Q   Can you describe that?

19 A   It was a --

20        MR. LEBLANC:  Your Honor, I object.  The last time we

21 were here, the last time I was here, on the first-days, there

22 was strenuous objection to any mention by me of settlement

23 discussions.  He's now describing a prepetition settlement

24 negotiation that they had with the Ad Hoc Committee of

25 Noteholders.

1          THE COURT:  Are you going to go into terms of

2   settlement?

3          MR. HYNES:  I'm happy to avoid the actual terms of

4   the settlement, Your Honor, but this goes directly in response

5   to the unfounded allegation that the Unsecured Creditors'

6   Committee were kept out of the loop and not provided with due

7   diligence for nefarious reasons.

8       But I will -- I will keep -- stay out of the actual terms

9   of the straw man proposal in response to my adversary's

10  objection.

11         THE COURT:  The objection is then overruled.

12         MR. HYNES:  Thank you, Your Honor.

13  BY MR. HYNES:

14  Q   Mr. Niemann, do you recall the straw man restructuring

15  proposal that was provided?  And I ask that question

16  specifically not asking you to disclose the terms.

17  A   Yeah.  It was shared with Mr. Genereux.  It was a -- I

18  want to say a seven or eight-page document.  It was a very

19  formal term sheet with very formal terms.  I won't get into

20  the details of the terms, but it was a comprehensive plan

21  support agreement, what I would call -- we call them straw

22  men, so they can't technically be formal proposals, but it was

23  a very formal, detailed straw man.

24  Q   And did that communication come out of the blue?

25  A   No, sir.

1    Q    Can you explain?

2    A    It was, my way of thinking, my best attempt, with counsel

3    and all the other advisors and management and the

4    restructuring committee and the board, to put on the table

5    that which I thought might resonate with the noteholders based

6    on my several months of interaction with at least two of the

7    noteholders and their counsel and their advisor.

8    Q    Are you familiar with the term blowout?

9    A    Yes, sir.

10   Q    And what does that mean?

11   A    The way I think of it, and I'm sure I'm taking some

12   liberties, but is that when you share material nonpublic

13   information -- in this case, with the noteholders, let's say

14   -- at some point they are able to, quote, blow it out into the

15   market, so you put it out in the public domain, typically

16   through an 8-K of some sort, some sort of SEC reporting, so

17   that that information is now in the public domain, it is no

18   longer nonpublic.

19   Q    And to your knowledge, did the company have blowout

20   concerns in connection with the straw man restructuring

21   proposal that was provided?

22   A    Yes.

23   Q    Can you explain those concerns?

24   A    Frankly, it's the very concerns we raised at the first

25   day, and in some respects I think what Mr. LeBlanc is getting

1   at, is we -- we don't want bid-ask floating around in the

2   market.  We want to be able to negotiate and know that, you

3   know, there's not going to be a public blowout of, for

4   instance, that straw man or the analytics that go into that

5   straw man or the business plan or the things that would go

6   into underwriting that straw man.

7       So, that's sacred information that we want to keep as

8   nonpublic as possible for as long as possible.  Typically.

9   Q    And in your experience, is it -- does whether the parties

10  are close to a deal influence the blowout concern?

11  A    It always does.

12  Q    And what was the case here?

13  A    The best way I could --

14  Q    Without -- without disclosing any --

15  A    No, no, I wasn't going to.  I use a football field

16  analogy, Your Honor.  So, say 40-to-40.  Then I'm comfortable

17  we're in the -- it's not really the red zone.  I think that's

18  the 20-yard-line.  But 40-to-40.  And I think I actually said

19  this to the board.  I believed we were at or around the 40,

20  maybe we're at the 38, to be candid.  And the response we got

21  from Mr. Genereux, which was an oral response, if that's the

22  right way to say it -- it wasn't a written response; it was a

23  phone call that described what they might be willing to do --

24  I viewed as kind of down on their 20-yard-line.  So we never

25  got to the point where I could tell the board and the company,

1  you know what, I'm comfortable we're within striking distance,

2  or at least getting into a position of 40-to-40, 35-to-35.  We

3  never got to that point.  And so it was a concern to share

4  information subject to blowout when the likelihood of a deal

5  was low.

6  Q    Do you recall how close to the filing date it was when Mr.

7  Genereux responded orally?

8  A    I want to say maybe two weeks.  I don't remember the exact

9  date.

10 Q    And did that influence the company's ability to share

11 information with the Unsecured Creditors' Committee?

12 A    It was the Ad Hoc Committee, Group, I guess, at the time,

13 formally.  How should I answer that?  We weren't concerned

14 about Mr. Genereux -- he's a, again, he's a capable guy; his

15 team is capable -- sharing that information.  You kind of have

16 to thread the needle on this stuff, share what you can, guide

17 as much as you can.

18      But we were concerned giving material nonpublic

19 information that we would not want blown out into the market

20 if we never got to a deal.  And so there was, if I recall

21 correctly, a fair amount of discussion around whether or not

22 we should restrict, and if so, on what terms.  It's always a

23 heavily-negotiated point.

24 Q    Thank you.

25           MR. HYNES:  Your Honor, I'd like to go to Exhibit 1

1   that my adversary marked at Page 23.

2   BY MR. HYNES:

3   Q    Could you please pull that page out of the binder?

4   A    Of the -- of Mr. LeBlanc's binder?

5   Q    Exactly.

6   A    I've got it.  I just didn't know which binder.  I prefer

7   to call him Mr. LeBlanc as opposed to an adversary.

8   Q    Old habit.  We -- we actually haven't met.  At Page 23, do

9   you recall the questions you were asked on the overview of

10  strategic alternatives?

11  A    I do, sir.

12  Q    Okay.  What's the first one called again?

13  A    On Page 23?  Let me get there.  Papa's Crown Jewels?

14  Q    Yes, sir.  Can you explain that potential strategic

15  alternative?

16  A    Yeah.  Yes, sir.  Again, this was August, and so we didn't

17  have the level of information we had in September, October,

18  November.  As we go deeper, we get more information, kind of

19  going from 50,000 to 40,000.  We were probably at 35,000 feet.

20  But I like to get down to maybe 20,000 or 15,000 feet.  So

21  we're far -- a long way from that.  But we certainly viewed

22  Air Medical as not subject to the same volatility and trough

23  that we're in vis-à-vis Oil & Gas.  Air Medical has got its

24  own challenges, mind you, and it's a complicated business in

25  its own right.  But from the outside looking in at this point,

1   back in August, we thought that that's an attractive asset

2   that certain -- certainly, strategic investors -- *i.e.*, other

3   air medical operators -- would have a high degree of interest

4   in.

5        I also believe -- this is just a view, one man's view --

6   that but for Air Medical, we might have had to explore

7   restructuring of PHI a long time ago.  Just like CHC, just

8   like Erickson, just like Waypoint.  So it's provided a hedge.

9   So Papa's Crown Jewel was, if we can't get anybody interested

10  in the whole thing, maybe we can sell Air Medical and pay off

11  the bonds.  Maybe we can sell it for $500 million plus.  Even

12  if we can get to $500 million, maybe we could sell it for

13  enough with maybe some upsizing that we can actually pay off

14  the bonds and not have to worry about the maturity.  That --

15  and I don't -- I could go through the bullets, but that was my

16  thought process when I wrote this.

17  Q    Do you know whether Houlihan Lokey or the company pursued

18  that strategic alternative?

19  A    Yes.  Aggressively.

20  Q    And what became of it?

21  A    We -- and I'm going to be a little careful with how I say

22  this.  It's in the valuation report.  I shared this with the

23  Equity Committee yesterday.  Happy to share it in detail with

24  the Creditors' Committee.  We got more than one preliminary

25  indication of interest -- I'm not saying whether it was two or

1   ten, but you should assume it's closer to one than ten -- from

2   two, two or more strategics, and they were preliminary

3   indications of interest for the Air Medical assets.  We did

4   not get any indications of interest for the total company or

5   for Oil & Gas.

6   Q    Thank you.  So you pursued Strategic Alternative 1 with

7   the company, correct?

8   A    Yes.  Aggressively.

9   Q    What's #2 here?

10  A    Papa's New Partner is a merger of the entire enterprise,

11  Oil & Gas and Air Medical, with another strategic.  And, in

12  fact, we identify -- it's all public.  People know who these

13  people are.  Air Methods and AMGH are air medical operators.

14  They're owned -- they're sponsor-backed, if you will.  I

15  believe American Securities and KKR are the two, respectively,

16  the sponsors.  I believe Air Methods at one time was public.

17  CHC, Babcock, CD&R, et cetera.  Those are all the O&G

18  strategics.  CHC being obvious.  Babcock perhaps a little less

19  obvious.  It's a helicopter operation within a much bigger

20  conglomerate that they acquired.  CD&R is an equity sponsor

21  that has clearly displayed interest in this sector by virtue

22  of the fact that they were the CHC sponsor and they, for lack

23  of a better description, fought hard to hold onto their equity

24  position against what were then my clients, which were led by

25  Bain, Alliance Bernstein, and others, who are now the majority

1  equity holders of CHC.

2      So, go talk to those guys about maybe a total company deal

3  that either pays off the bonds or we have something to talk to

4  the bonds about.  I'm sorry.  Notes.  These are notes, not

5  bonds.

6  Q    Were any actions taken to explore Strategic Alternative

7  #2?

8  A    Yes.  We aggressively explored it.

9  Q    What is Strategic Alternative #3?

10 A    And by the way, if I may, within that is what I was

11 talking about earlier, per Mr. Leblanc's questioning.  We did

12 talk to others than are on this page, including, without

13 limitation, QNO, Prius, Potential, sort of new sponsors, given

14 their current debt position in Papa, in PHI, and our

15 understanding of their debt position in other strategics, if

16 you will.  I'll just leave it at that.

17     Papa's New Shoes.  3.  Just go refinance the existing

18 debt.  Existing debt being the existing notes.

19 Q    Did Houlihan or the company explore the possibility of

20 Strategic Alternative 3?

21 A    The company did.

22 Q    And what was the outcome?

23 A    There was a failed refinancing effort led by UBS, and I

24 think the co- or maybe, say, lead left, whatever it was.  But

25 Royal Bank of Canada was a co-advisor in that, and it was a

1  failed refinancing effort to provide a secured loan to the

2  existing noteholders, effectively.  Don't know if Q was an

3  existing noteholder at the time.  I think this failure -- or

4  this, I'm sorry, I shouldn't -- this attempt was July into

5  August, if I'm not mistaken.  Don't know exactly when the

6  roadshow was.  And then there was an exchange offer that sat

7  out there for a while and was ultimately abandoned.  I think

8  in September, if I'm not mistaken.

9      So basically it would be the existing noteholders getting

10  a secured loan in lieu of their unsecured loan, and the

11  pricing and the terms got to a point that the secured

12  noteholders, as I understand, were demanding, market demands,

13  that it would effectively not be supportable by the company.

14  They dodged that bullet only to walk into another bullet, you

15  know, nine, twelve months later.

16  Q   So is it fair to say the company pursued all those market-

17  based alternatives?

18  A   Yes.  We were only involved in the first two.

19  Q   Mr. Niemann, --

20  A   We, Houlihan.  I'm sorry.

21  Q   You --

22         MR. HYNES:  I'm mindful of the time, Your Honor.

23  BY MR. HYNES:

24  Q   Mr. Niemann, you were asked about the leases on your

25  cross-examination.

Niemann - Redirect                          116

1    A    Yes, sir.

2    Q    Do you recall that?

3    A    I do.

4    Q    Are the leases part of the Debtors' capital structure that

5    needs to be renegotiated?

6    A    Yes.

7    Q    Are you involved in the renegotiation, or your team?

8    A    We are.

9    Q    And can you tell me what that entails?

10   A    The way I describe these restructurings, these helicopter

11   restructurings, is they're multiple restructurings.  So we're

12   restructuring a lease portfolio.  Frankly, Seabury, given

13   their competencies, handled that to a degree in CHC, then we

14   kind of jumped in because we were the new sponsor.  But you've

15   got to -- to really underwrite new money into these deals,

16   you've got to know what the run rate EBITDA is.  To know what

17   the run rate EBITDA is, or, you know, what kind of costs can

18   Mr. Bospflug and his team take out of this company, what kind

19   of costs can he take out of this company includes, without

20   limitation, if we can get concessions out of these lessors and

21   we have, let's say, I don't know, $10 million a year in lease

22   costs now, but thanks to the Bankruptcy Code and negotiating

23   against that and what's happened in other cases, *CHC* in

24   particular, and there's other large operators out there that

25   are not doing so well, so maybe, just maybe, you can get

Niemann - Redirect                    117

1   lessors to be a part of the going-forward fleet on more market

2   terms.  Because all of these leases, spare perhaps the HN Zed,

3   are arguably well above market.  So if we could cut that ten

4   -- and I'm not saying it's $10 million.  I'm just giving a

5   hypothetical.  If we can cut that $10 million down to $5

6   million and then apply a multiple to that, that's enterprise

7   value.  So that unto itself is its own restructuring, above

8   and beyond the notes and all the other stuff you've got to do.

9   Q    And how -- remind me how long you've been working with

10  PHI.

11  A    I mean, I've -- I've known Lance and then Mr. Gonsoulin --

12  Lance Bospflug -- for three-plus years.  Our work in earnest

13  started in, I guess, August into September.  It feels like

14  we've been working for five years in that period of time.  So,

15  you know, certainly since September.

16            MR. HYNES:  One minute, Your Honor?

17            THE COURT:  Sure.

18       (Pause.)

19            MR. HYNES:  No further questions, Your Honor.

20            THE COURT:  Thank you.  Mr. Leblanc, are you going to

21  have questions of the witness?

22            MR. LEBLANC:  I'm sorry, Your Honor?  I didn't hear.

23            THE COURT:  Are you going to have more questions of

24  the witness?

25            MR. LEBLANC:  Just a -- I'll be done by 12:00.

Niemann - Recross                              118

1          THE COURT:  Sure.

2          THE WITNESS:  Thank you.

3          THE COURT:  Good.

4                     RECROSS-EXAMINATION

5    BY MR. LEBLANC:

6    Q    Mr. Niemann, you were asked some questions on redirect

7    about a proposal from late February.  Do you recall that,

8    those questions?

9    A    The straw man, you mean?

10   Q    Yes.

11   A    Yes, sir.

12   Q    And there's no dispute, we couldn't share that straw man

13   proposal with our clients, right?  The noteholders in that

14   case, in that instance?

15   A    I shared aspects of it with them.  So you couldn't share

16   the document, but you could certainly share aspects.  They

17   were the aspects of that that are nonmaterial nonpublic

18   information, and I shared it directly with at least two of the

19   noteholders.

20   Q    Okay.  But if the information that was -- if the

21   information was material and it was nonpublic, then we

22   couldn't share it?  So we could only share if it was public or

23   if it was immaterial, correct?

24   A    If it didn't meet the material nonpublic information

25   standard, --

1  Q    Right.

2  A    -- then it shouldn't be shared.

3  Q    And in response to a question just a minute ago about the

4  leases, I didn't get -- you were talking pretty fast so I

5  didn't get all of it, but I think you said to really invest

6  new money you need the run rate EBITDA.  Do you recall that?

7  Just --

8  A    That is generally the case.

9  Q    Okay.  And at the time you made that proposal, you had not

10  provided a business plan to the noteholders, correct?  The

11  straw man proposal, right?

12  A    I don't know if that's the case.  I know we had provided a

13  high -- Mr. Del Genio provided a high-level business plan two

14  days after we met with the noteholders, all the noteholders,

15  in person, in Houston.  They didn't want to come to Lafayette.

16  Mr. Gonsoulin, Mr. Brass, Mr. Bospflug, the entire management

17  team, advisors.  Sam was there from your shop.  PJT.

18  Certainly, Mr. Singh was there.  And then two days later we

19  provided a high-level, what I call an executive level, Mr. Del

20  Genio provided.  And then I want to say a week or so later we

21  provided the detail.

22      I don't recall if that was before or after the straw man.

23  It was sometime around the same time.

24  Q    All right.  But, again, with respect to that, that was not

25  public information, correct?

1    A    Again, not everything that's in a business plan is

2    material.  And so, for instance, if I was your advisor, --

3    Q    Okay.  I mean, --

4    A    -- I would look at it and I would say, some of this we can

5    share, some of it we can't.  You've got to thread the needle

6    on this.  So I can't answer your question that way.

7                MR. LEBLANC:  Move to strike, Your Honor.

8                THE COURT:  Sustained.

9    BY MR. LEBLANC:

10   Q    The first meeting that the company has had with any

11   unsecured creditors -- meaning, not with their advisors but

12   with unsecured creditors -- to go over a business plan

13   happened last Thursday.  Is that right?

14   A    There was -- you know, I disagree with that.  The

15   discussions Mr. Gonsoulin had with the senior executives at Q,

16   the discussions Mr. Gonsoulin had with senior executives at

17   Oaktree, while somewhat social, there was discussion around

18   prospects for the industry -- sector, I should call it -- and

19   then we presented information during that first meeting as far

20   as -- and they asked a lot of good questions.  In particular,

21   I remember, well, both Mr. McCarty from Q, what's his --

22   Jonathan Sacks, I think it was, from Stonehill asked a lot of

23   good questions around prospects for the business.

24         So, you know, that was a business plan discussion.  It

25   wasn't MNPI, but it was a discussion around the planning on

1    the business.

2        As far as formal business plan, it was what Mr. Del Genio

3    provided in two increments.

4    Q    And those two increments prepetition were not provided to

5    the creditors themselves?

6    A    I can't tell you what PJT and you provided to your

7    clients.  I would have expected that some part of it that's

8    not MNPI would have been provided, but that's --

9    Q    But only --

10   A    That's just how -- I don't know what you guys did.

11   Q    Only a confidential version of that was provided to us,

12   right?  One that was not -- we weren't able to disseminate to

13   creditors, right?

14   A    All I can tell you is, if I got that, I would not share

15   the document but I would actually share that which is not MNPI

16   to educate as much as possible to try to narrow the 40-to-40.

17   That's what I would have done.

18   Q    Postpetition -- let me see if you'll agree with this, at

19   least.  Postpetition, the only -- the first time the company

20   shared a projection of its go-forward EBITDA in a business

21   plan with creditors was on Thursday of last week.  Is that

22   fair?

23   A    I don't know if we shared it with lessors that are under

24   confidentiality.  And we shared it with Blue Torch, who's

25   under confidentiality.  And obviously, Thirty Two.  So that's

Niemann - Recross                          122

1   not correct.  We shared it with certain creditors.  If you're

2   talking about --

3   Q    I said unsecured --

4   A    -- your clients, --

5   Q    I said unsecured creditors, but let's limit it to --

6   that's fine.  You met with our clients --

7   A    Well, lessors are unsecured.

8   Q    You met with our clients; last week was the first time we

9   had a business plan meeting.  Is that right?

10  A    First time we could get you in a room, yes.

11  Q    You -- is it your testimony, Mr. Niemann, that we were the

12  ones that asked for -- to delay a business plan meeting until

13  last Thursday, that we wouldn't meet -- our clients wouldn't

14  meet earlier on a business plan?

15  A    My testimony is we have made multiple attempts to get your

16  clients in a room and we have been rebuffed.

17  Q    And on a business -- you're saying that it was our clients

18  who pushed a business plan meeting until last Thursday?

19  A    I --

20  Q    Or did our clients ask for a business plan meeting earlier

21  than that and it couldn't happen from the Debtors?

22  A    I don't know who asked for what.  I know Mr. Del Genio and

23  Mr. Bospflug hosted a management presentation for the

24  Creditors' Committee last Thursday.  That's all I know.

25  Q    Okay.  All right.

1   A   I don't know who asked for what or all that stuff.

2   Q   Okay.  So that's all you know, is there was a meeting last

3   Thursday?

4   A   Well, I mean, I heard it went well, but, I mean, --

5   Q   Okay.

6           MR. LEBLANC:  I have no further questions, Your

7   Honor.

8           THE COURT:  Thank you.

9           MR. LEBLANC:  I apologize.  12:02.

10          THE COURT:  That's okay.  Does anyone else have any

11  questions of Mr. Niemann?  You may step down, sir.  Thank you.

12          THE WITNESS:  Thank you, sir.

13      (The witness steps down.)

14          THE COURT:  Can the Debtor preview me on you have

15  another witness from the Debtors' side; is that right?

16          MR. CALIFANO:  Yes, Your Honor.  That would be Mr.

17  Bospflug.

18          THE COURT:  All right.  And then the Committee has a

19  witness, or more?

20          MR. LEBLANC:  Just, we have a witness live.  There's

21  a page of Mr. Del Genio's deposition that we can either call

22  him to admit or just read it to the Court.  We're fine doing

23  it as efficiently as we can.

24          THE COURT:  All right.  We'll be in recess until

25  1:30.  You can leave your stuff where it is.  This is all we

1   have going today.  That's an understatement, I think.  And I

2   think you all will be visiting over the lunch hour about some

3   of the matters that we talked about at the beginning; is that

4   right?

5            MR. CALIFANO:  Yes, Your Honor.

6            MR. HYNES:  Yes.

7            MR. CALIFANO:  We talked about the mediation.

8            THE COURT:  Okay.  And anything on KEIP that is --

9            MR. CALIFANO:  I think that -- I believe that --

10  that's one of the things I was running out with Mr. Simon.  I

11  think that we're done on that.

12           MR. SIMON:  I think we have a deal as well.

13           MR. CALIFANO:  I think we have a deal, so we've just

14  got to --

15           MR. LEBLANC:  To be clear, I think the U.S. Trustee

16  still has reservations, but --

17           MR. CALIFANO:  We have a deal.

18           MR. LEBLANC:  Yeah.

19           THE COURT:  Okay.  Well, if you all would visit with

20  the U.S. Trustee over the lunch hour on KEIP also.

21           MS. KIPPES:  Your Honor, I have asked them to put on

22  evidence that it is an incentive plan versus a retention plan.

23  That's their burden anyway under the statute.

24           THE COURT:  Uh-huh.

25           MS. KIPPES:  And I believe Mr. Del Genio has agreed

1   either to testify or maybe there will be a proffer.

2           THE COURT:  Okay.  Thank you.

3           MS. KIPPES:  Thank you.

4           THE COURT:  Mr. Simon, were you going to add to that?

5   Were you going to add to that, Mr. Simon?

6           MR. SIMON:  I was just going to confirm that.  We'll

7   be prepared either at the -- at 1:30 or sometime thereafter --

8           THE COURT:  Uh-huh.

9           MR. SIMON:  -- to read the settlement into the record

10  and put a proffer of Mr. Del Genio on.

11          THE COURT:  We're right in the middle of Houlihan.

12  It does not matter to me if you all want to stop that and go

13  into KEIP first.  It doesn't matter.  Whatever you all think

14  is the most efficient way of handling that, that's fine.  All

15  right.  But I do think if you talk about mediation, it will

16  also --

17          MR. CALIFANO:  We will, Your Honor.

18          THE COURT:  -- dovetail some into the adjournment

19  motion.

20          MR. CALIFANO:  We will.

21          MR. SIMON:  Yes.

22          THE COURT:  All right.  We'll be in recess.

23     (A luncheon recess ensued from 12:04 p.m. until 1:31 p.m.)

24          THE COURT:  Please be seated, you all.  Thank you.

25          MR. CALIFANO:  Your Honor, if I may?

1          THE COURT:  Sure.

2          MR. CALIFANO:  I just wanted to say this at the

3    outset, because, you know, I know we have time constraints

4    today:  Happily, we have an agreement on mediation going

5    forward that will move the -- and at the end of the hearing,

6    we'll give you the details -- but that means the 1103 motion

7    is now off.  And we have a deal on the KEIP, and I would just

8    suggest that we save ten minutes or so at the end.  Mr. Simon

9    will read the KEIP into the record and then put the proffer on

10   that the U.S. Trustee has asked for.

11         THE COURT:  All right.  Mr. Levick, did you need to

12   --

13         MR. LEVICK:  Yes, Your Honor.  And Your Honor, I

14   represent Cynthia [sic] Wray, a putative class action

15   plaintiff.  And I had some comments about the mediation

16   motion.  Would you like me to speak now, --

17         THE COURT:  I think when --

18         MR. LEVICK:  -- or speak later?

19         THE COURT:  When we get to it, I think.

20         MR. LEVICK:  Okay.  Thank you, Your Honor.

21         THE COURT:  Yes.  Is there a lawyer for Debtor and

22   Committee that might speak with Mr. Levick while we're going

23   on the Houlihan?

24         MR. CALIFANO:  Sure.

25         THE COURT:  Or have you all already spoken?

1              MR. LEVICK:  I have spoken to Debtors' counsel --

2              THE COURT:  Oh, you have?  Okay.

3              MR. LEVICK:  -- and didn't quite get my way, so I

4    wanted to speak to the Court.

5              THE COURT:  Oh, okay.

6              MR. LEVICK:  Thank you.

7              MS. KIPPES:  And Your Honor, just to be clear on the

8    KERP/KEIP motion, the U.S. Trustee may have cross after the

9    proffer.  We're going to hear what the proffer says first.

10             THE COURT:  That's fine.

11             MS. KIPPES:  Thank you.

12             THE COURT:  All right.  So, did I understand we just

13   keep going with the Houlihan motion?

14             MR. CALIFANO:  Yes.  Yes, Your Honor.

15             THE COURT:  All right.

16             MR. HYNES:  Yes, Your Honor.

17             THE COURT:  All right.  You may call your next

18   witness.

19             MR. HYNES:  Your Honor, the Debtor calls Lance

20   Bospflug.

21             THE COURT:  Please raise your right hand.

22                LANCE BOSPFLUG, DEBTORS' WITNESS, SWORN

23             THE COURT:  You may be seated.

24             MR. HYNES:  Thank you, Your Honor.

25                        DIRECT EXAMINATION

1  BY MR. HYNES:

2  Q   Mr. Bospflug, would you mind taking the binder that's

3  behind you out?  All of the exhibits that we will be showing

4  you will be marked 30 and below.  That will be the first

5  binder.

6  A   I've got Volume I, Volume II, Chapter 11.

7         A VOICE:  This volume right here.

8         THE WITNESS:  Okay.

9         MR. HYNES:  Thank you.

10 BY MR. HYNES:

11 Q   Would you mind re-introducing yourself to the Court, sir?

12 A   Yes.  My name is Lance Frank Bospflug.

13 Q   And can you remind the Court of your position with the

14 company and how long you've been part of it?

15 A   I'm president and chief operating officer, and I've been

16 with the company since late 2000.

17 Q   And do you serve on the Board of Directors?

18 A   I do.

19 Q   How long have you served on the board?

20 A   Since 2001.

21 Q   Are you familiar with Houlihan Lokey?

22 A   Yes, I am.

23 Q   And who are they?

24 A   Investment banker, advisor, that we retained.

25 Q   Are you familiar with Matt Niemann?

1    A    Yes, I am.

2    Q    He just testified, right?

3    A    Yes.

4    Q    When did you first become introduced to Houlihan Lokey?

5    A    I met -- was introduced to Mr. Niemann in late 2016 by a

6    mutual acquaintance from Sikorsky that is now with Houlihan.

7    Q    And what was your impression of Houlihan Lokey at the

8    time, if any?

9    A    Well, initially, I didn't know them, and subsequent to

10    late in the year we started talking.  And the first thing was

11    that they produced a -- one of the most extensive reviews of

12    the rotorcraft industry that I've ever seen.  So that

13    impressed me right away.  We get pitched a lot, and not too

14    many people really understand our industry, but they did.

15    Q    And did you have any impression of Mr. Niemann at that

16    time?

17    A    I did.

18    Q    And what was it?

19    A    Smart.  Aggressive.  Very knowledgeable.  Experienced in

20    our industry, representing -- or, involved with CHC, Waypoint,

21    and Erickson.

22    Q    So, back then, you didn't retain Houlihan at that point in

23    time, did you?

24    A    No, we didn't.|

25    Q    When was the next time you had a chance to interact with

1    Houlihan and Mr. Niemann?

2    A    It was --

3              MR. LEBLANC:  Your Honor?

4              THE WITNESS:  It was the following year, at HAI.

5              THE COURT:  Hold on a just a second.

6              MR. LEBLANC:  Your Honor, this gets back to the

7    motion in limine.  I've gone through and I took the

8    opportunity at the lunch break to go back again through the

9    Debtors' motion, and there's nothing that would put us on

10   notice of any Debtor witness intending to testify.  There's

11   not -- you -- they can't tie -- and I'm fine with these

12   background questions, but we're already at an area that is

13   well beyond what's in their motion.  And if that was the basis

14   upon which Mr. Bospflug could testify today, we're already

15   outside that.

16       And I just worry where we're going now.  Because I've read

17   it again.  It's as sparse a motion as you can see.  It doesn't

18   even mention anything about the board, the company, anything

19   that would be relevant, that would tie to these line -- this

20   line of questioning.

21             THE COURT:  Do you want to respond to that?

22             MR. HYNES:  It doesn't sound like there's an

23   objection, Your Honor.

24             THE COURT:  Do you --

25             MR. HYNES:  It sounds like he's threatening to make

Bospflug - Direct                     131

1   an objection.

2              THE COURT:  Do you --

3              MR. LEBLANC:  I object, Your Honor.

4              THE COURT:  Do you want to respond to his comments?

5              MR. HYNES:  Yes, Your Honor.  The motion was to

6   appoint the investment banking firm by the Debtor.  Mr.

7   Bospflug is here on behalf of the company to explain the

8   engagement and the execution of the letter.  All we're talking

9   about is background here, Your Honor.

10             THE COURT:  Well, okay.  I think you ought to move

11  along into the motion, then, all right?

12             MR. HYNES:  Okay.  Thank you, Your Honor.

13  BY MR. HYNES:

14  Q   Could you turn to Exhibit 29, Mr. Bospflug?  Do you

15  recognize that document?

16  A   Yes, I do.

17  Q   And what is it?

18  A   Well, it's the -- it's the application to retain Houlihan.

19  Q   Okay.  And can you look at Exhibit 30 as well?

20  A   This is Mr. Niemann's declaration.

21  Q   Uh-huh.  And does Mr. Niemann's declaration also include a

22  copy of the engagement letter?  I'll give you a hint.  Look at

23  Page 10 of 40.

24  A   Yes, it does.

25  Q   Okay.  Is that the engagement letter that the company

1    entered with Houlihan Lokey?

2    A    Yes, it is.

3    Q    Okay.  Were you involved in the negotiation of that

4    letter?

5    A    Yes, I was.

6    Q    Okay.  Can you tell me about the negotiation?

7            MR. LEBLANC:  Objection, Your Honor.  There's nothing

8    in the motion that talks about any of the negotiation of this.

9    We deposed Mr. Del Genio, the signatory to the motion.  We

10   deposed Mr. Niemann, the declarant on the motion.  And we

11   didn't -- we got no information about the negotiation of it.

12   Had we known -- and, again, when we were told that Mr.

13   Bospflug would testify, we asked for his deposition.  We

14   weren't granted it.

15           THE COURT:  Overruled.

16   BY MR. HYNES:

17   Q    You can answer the question, or would you like me to

18   repeat it?

19   A    Would you repeat it, please?

20   Q    Sure.  Can -- what do you recall about the negotiation of

21   the engagement letter at issue here today with Houlihan Lokey?

22   A    So, it was -- it was really three of us that negotiated

23   this.  It was myself, Trudy McConnaughhay, our chief financial

24   officer, and Al Gonsoulin, our CEO.  And we also had the

25   advice of our local counsel, Jones Walker.

Bospflug - Direct                        133

1  Q    And did the board ultimately approve this engagement

2  letter?

3  A    Yes, they did.

4  Q    Do you believe, as you sit here -- well, strike that.  Did

5  you hear Mr. Niemann's testimony earlier today?

6  A    I did.

7  Q    Did you hear the cross-examination that was delivered?

8  A    I did.

9  Q    Did you hear the statement from Mr. Califano about the

10  discounts Houlihan Lokey is offering?

11  A    Yes, I did.

12  Q    And as you sit here today, do you believe that the

13  retention of Houlihan Lokey is in the best interests of the

14  company?

15  A    Yes, I do.

16  Q    Why?

17  A    Well, not only were they the most knowledgeable about our

18  industry, but they stepped in at first and did a lot of heavy

19  lifting in terms of financial analysis, presented us with

20  alternatives.  Then we moved to the M&A process, and we ran

21  through the complete M&A process.  I felt that we had good

22  exposure on that and that we drove it all the way to the end

23  of 2018, looking for a way to monetize part of the company in

24  order to take care of the bonds.  It didn't work out.  And

25  then we shifted into the restructuring discussions .

1          MR. HYNES:  I'll pass the witness, Your Honor.

2          THE COURT:  Mr. Leblanc?

3          MR. LEBLANC:  Your Honor, I have no questions.

4          THE COURT:  You may step down, sir.  Thank you.

5          THE WITNESS:  Thank you, Your Honor.

6      (The witness steps down.)

7          THE COURT:  Does the Debtor have any more witnesses?

8          MR. HYNES:  No further witnesses on this motion, Your

9  Honor.

10         THE COURT:  All right.  The case switches over to

11  you, Mr. Leblanc.

12         MR. LEBLANC:  All right.  Yes, Your Honor.

13         MR. HYNES:  Sorry.  Sorry, Your Honor.  Mr. Califano

14  wanted to make sure that I reminded the Court that I reserved

15  some rebuttal time at the end.

16         THE COURT:  Yes.

17         MR. HYNES:  Thank you, Your Honor.

18         MR. LEBLANC:  Your Honor, we have two witnesses, one

19  of which will be by designation.  We've talked to the Debtors.

20  And what I propose, Your Honor, it's just a page:  Rather than

21  put somebody up there, I'll just read it to the Court.

22         THE COURT:  That's fine.

23         MR. LEBLANC:  It's literally a page of the --

24         THE COURT:  If it's a page, you can just read it into

25  the record.

1    MR. LEBLANC:  Yeah.  And I'll -- so, and just to

2    gives you a preview of our case, this will be Mr. Del Genio's

3    testimony by double designation, and then my partner, Mr.

4    Stone, will present Martin Lewis to the Court as a --

5    THE COURT:  All right.

6    MR. LEBLANC:  -- as an expert.  And Your Honor, this

7    comes from the deposition of Robert Del Genio taken on April

8    10, 2019.  Page 75, Line 14.  And I appreciate Your Honor

9    doesn't have it, but I'll just read the question and answer

10   into the record.

11       "Q   Do you know who signed the engagement letter for

12       PHI engaging Houlihan?

13       "A   No.

14       "Q   Was there a -- you did sign the application to

15       employ Houlihan, right?  That was filed with the Court.

16       "A   As part of the first-day?

17       "Q   Yes.

18       "A   Yes.  I signed.  I signed almost everything for

19       the first-day, yes.  So I do, I do remember signing

20       that as part of the first-day motions, yes.

21       "Q   Did you, as the chief restructuring officer,

22       exercise your business judgment in determining to

23       employ Houlihan postpetition?

24       "A   Well, within my scope, I don't have the authority,

25       but I was supportive of their retention.

1      "Q   Did you review the terms upon which they were

2      retained?

3      "A   I was -- I saw their engagement letter, but that

4      wasn't my responsibility to negotiate the economics of

5      that.  That was done with the company and the board.

6      "Q   Okay.  Did you ever look at the economics that

7      were contained in their engagement letter?

8      "A   There's a -- there is lots of permutations, like

9      in every other investment banker's engagement letter.

10     Sometimes I think you need a PhD to figure that out,

11     those out.  I was sure -- I was more focused on, to be

12     honest with you, the cash flow forecast and business

13     plan and getting the company ready for Chapter 11."

14          MR. LEBLANC:  That ends the designation, Your Honor.

15          THE COURT:  Thank you.

16          MR. LEBLANC:  And with that, Your Honor, I'll cede

17     the podium to Mr. Stone.

18          THE COURT:  And let me ask you.  Do you have a hard

19     copy of that, too, that I can have?

20          MR. LEBLANC:  I will get you one --

21          THE COURT:  You can --

22          MR. LEBLANC:  -- that doesn't have notes on it, Your

23     Honor, --

24          THE COURT:  That's fine.  Yes.

25          MR. LEBLANC:  -- in just a moment.

1          THE COURT:  That's fine.  Mr. Stone, you may call

2     your witness.

3          MR. STONE:  Good afternoon, Your Honor.  The

4     Committee calls Martin Lewis.

5          THE COURT:  Mr. Lewis?  Would you raise your right

6     hand?

7      MARTIN LEWIS, UNSECURED CREDITORS' COMMITTEE'S WITNESS, SWORN

8          THE COURT:  You may be seated.

9                         DIRECT EXAMINATION

10    BY MR. STONE:

11    Q    Mr. Lewis, could you introduce yourself to the Court,

12    please?

13    A    Yes.  My name is Martin Lewis.

14    Q    What do you do for a living?

15    A    I have my own company called Gower Advisors, which is an

16    advisory firm that is involved in both restructuring advice

17    and investment -- analyzing investment opportunities.

18    Q    Would you tell the Court about your educational

19    background?

20    A    Yes.  I have a master's degree from Oxford University in

21    the United Kingdom and I trained and qualified as a chartered

22    accountant in the U.K. with Coopers & Lybrand .

23    Q    And if you could step through your employment history

24    after becoming a chartered accountant.

25    A    My first banking role was at the Rothschild Bank in

1    London, and then I came to the United States in 1986 with

2    Chemical Bank, primarily involved in capital markets and

3    financing activities.  I joined Chemical Bank's restructuring

4    and reorganization business under a gentleman called Art

5    Newman in 1989.  We moved as a group to Blackstone in 1991,

6    and we were the founding members of Blackstone's restructuring

7    business in 1991.  I was a managing director there, and then I

8    became a partner at Wasserstein Perella in their

9    restructuring/investment banking business in 1998.  And I was

10   a founding member, a founding partner of the firm that spun

11   out of Wasserstein Perella that was called then Miller

12   Buckfire Lewis, which is now known as Miller Buckfire.  And

13   through that time, my primary activity was as an investment

14   banker managing and running large complex bankruptcy cases and

15   out-of-court cases.

16       I then spent some time in 2004, '5, and '6 working with a

17   private equity firm in an attempt to set up a merchant banking

18   business, which didn't work out.  Then I came back into the

19   restructuring advisory business in 2007 when I became a

20   managing director of Greenhill in New York, and I spent seven

21   years with them as a managing director, again, involved

22   primarily in investment banking advisory business for mostly

23   companies.

24       And since 2013, when I left Greenhill, I have had my own

25   firm, Gower, in which I split my time between assisting a

1  family fund in New York looking for investment opportunities

2  in the middle market and providing advice in the restructuring

3  world, slightly different from the type I used to do in

4  investment banking but more strategic, high-level advisory

5  business.

6  Q    Now, through the course of your career, starting when you

7  were at Chemical Bank, did you have occasion to be involved in

8  the negotiation of engagement letters for your firm as an

9  investment banker?

10 A    Yes, I did.

11 Q    Tell me about that.  What is your experience in

12 negotiating engagement letters?

13 A    Pretty much in every case since I became a senior member

14 of teams, which would have been in Blackstone in the mid-'90s,

15 from that point my role is primarily running cases, advisory

16 cases, and I would have been the person responsible for

17 negotiating those engagement letters on behalf of the company

18 I was working for.  And so I was intimately involved in the

19 engagement letter process throughout the whole of my career

20 when I was with large investment banks.

21 Q    And when is the last time that you can recall being

22 involved in the negotiation of an engagement letter?

23 A    So, the last -- specifically, the last engagement letter I

24 was involved with for a company that was -- for the company

25 side involved in a restructuring was for NCI in 2010.

1  Q   Okay.  And have you negotiated any engagement letters

2  since then?

3  A   I have negotiated various engagement letters connected

4  with restructurings for myself as -- on behalf of creditors

5  and other potential interested parties.  I have not negotiated

6  a debtor-side engagement letter --

7  Q   And --

8  A   -- since then.

9  Q   -- what other things, if any, have you done to stay

10 abreast of the market for fees for investment bankers in the

11 restructuring area?

12 A   I was involved in, this last December and January, in a

13 situation where I was asked to review a set of engagement

14 letters for debtor advisors in a case called *David's Bridal* in

15 Delaware on behalf of a lender group.  And in that process, I

16 provided something similar in the declaration and analysis I

17 did here, which was a review of about 25 debtor-side cases,

18 2017 and 2018, a review of all the aspects of those engagement

19 letters, with the same analysis, which was to understand

20 whether they appeared -- whether the objection that was being

21 raised about somebody's engagement letter was reasonable in

22 light of the market of engagement letters.

23 Q   In the *David's Bridal* matter, did you end up testifying?

24 A   I didn't actually get up on the stand in the end.  It was

25 settled in the courtroom minutes before I was asked to the

1  stand.

2  Q   Okay.  Did you ever, on any other occasion, testify about

3  investment banker fees?

4  A   I did testify once in a case called *Fleetwood Industries*,

5  in which I did the investment banker, where there was an

6  objection to our fees in that case.  That was in California.

7  And I testified on the reasonableness of our fee, engagement

8  letter, then.

9  Q   Okay.

10 A   That was 2009.

11 Q   So, in either of the *David's Bridal* case and the *Fleetwood*

12 case, were you formally offered as an expert on fees?

13 A   I am not sure of the answer to that.  I know I gave

14 testimony in *Fleetwood* on the stand.  My recollection was that

15 I thought I might have been accepted as an expert, but it

16 might have been just as a -- as a witness for my engagement

17 letter.  And again, on *David's Bridal*, I had thought I might

18 -- I was going to be put on the stand as an expert on those

19 things, and then I didn't get up on the stand in the end.  And

20 so I don't know really the answer technically to that

21 question.

22 Q   Okay.  What were you asked to do in this matter?

23 A   I was asked to do a similar review of reviewing the

24 Houlihan engagement and give an opinion as to whether I

25 thought that the overall terms of that engagement were

1    reasonable in light of the size and complexity of the case

2    involved.

3    Q    And what did you do to come to that opinion?

4    A    I -- as I mentioned, I had already prepared an analysis

5    for the *David's Bridal* case that had a number of company

6    cases, about 20 of them, and I was provided with a schedule

7    that had been developed by Houlihan Lokey that I think was

8    presented earlier that reflected cases in 2015 and 2016.  And

9    so I took all of those cases and I took the cases I had

10   reviewed in '17 and '18 and I reviewed all the details of the

11   engagement letter, from the actual engagement letter through

12   the application, the final order, and then the final fee

13   applications for all those engagement letters.

14   Q    Okay.  Did you add or subtract any companies from the list

15   of comparables that you received from the Houlihan document

16   that you saw?

17   A    Yes, I did.

18   Q    What did you do?

19   A    Well, there -- as I said, I had prepared something for

20   this other situation which included some companies in the $400

21   to $800 million debt range that weren't on the Houlihan list,

22   and I had about six of them, I think, that were -- that fit

23   the same parameters, which was companies that filed in 2017

24   and 2018 that had prepetition debt somewhere in the $300 to

25   $800 million range.  So I added the ones that I had that

1   weren't on the Houlihan schedule, I added those to our

2   schedule.

3   Q    And did you take any off?

4   A    I took the one off that was unidentified, I think it was

5   called Unidentified Company, because I couldn't verify what it

6   was.  It had no indication of what the company was.  It wasn't

7   public.  And I -- there was a duplication of one of the

8   entries.  And then I made some adjustments to some of the

9   entries on the debt side in particular that was on the

10  Houlihan schedule, just to make sure that all the numbers were

11  consistently treated.

12          MR. STONE:  Your Honor, at this time I would like to

13  offer Mr. Lewis as an expert in financial advisor's fees in

14  restructuring matters.

15          MR. CALIFANO:  Your Honor, I object.  I don't see how

16  this witness has anything -- any specialized knowledge that

17  fits within Rule 702.  There's -- all he's said is that he's

18  gotten publicly-available documents and ran them through some

19  sort of grid.  702 says clearly an expert qualified by

20  knowledge, skill, experience, training, or education, and I

21  don't see how any of that relates to professional fees.

22          THE COURT:  That objection --

23          MR. CALIFANO:  May I *voir dire*?

24          THE COURT:  That objection is overruled.  Goes to the

25  weight to give the witness' testimony.  He may testify as an

1    expert.

2              MR. STONE:  Thank you, Your Honor.

3    BY MR. STONE:

4    Q    Mr. Lewis, if you would turn to Debtors' Exhibit 33, which

5    is in one of those big notebooks behind you.

6    A    Oh.  Is it Volume I or Volume --

7    Q    Should be Volume I, I think.

8    A    Volume I?  I'm sorry.  Say again.  Thirty -- what number?

9    Q    Thirty-three.

10   A    Thirty-three?  Yes, I have it.

11   Q    Do you recognize that document?

12   A    Yes, I do.

13   Q    And what is that document?

14   A    This is my declaration, including the analysis that I

15   developed in support of the objection.

16   Q    Okay.  And is that your signature on Page 11?  Did you

17   execute the document?

18   A    Just check that it was.  Yes.  Yes, I did.

19   Q    And do you continue to believe that everything in this

20   declaration is true?

21   A    Yes, I do.

22   Q    Okay.  Could you describe for the Court generally how

23   investment bankers are compensated in restructuring matters?

24   A    Yeah.  It's been a pretty standard arrangement for

25   investment bankers since probably the mid-'90s, I think, of

1  the engagement letter being a combination of a monthly fee

2  that might change in different ways, but it's usually a fixed

3  monthly fee.

4      There's usually a restructuring or transaction fee at the

5  completion of the case.  There is usually a sale fee if either

6  the company is sold in full or if there are assets of the

7  company sold in 363 sales.  There are usually a set of

8  financing fees that relate to raising money.  And they're --

9  and those are usually identified as percentage fees relating

10 to different types of financings.

11     There is usually a monthly credit involved, at least in

12 the monthly -- the monthly fees set off against the

13 restructuring fee, and that can take the form of a number of

14 different ways of doing it.  There is very frequently a

15 crediting of some of the financing fees against restructuring

16 fees.

17     There's usually -- it's pretty normal to have, as I think

18 Mr. Niemann has testified, the sale or the restructuring fee

19 being either one or the other.  Usually banks don't take both

20 a transaction fee and a sale fee if it's for the whole

21 company.

22     There's often involved in these terms reduced fees if the

23 money in the financing section is provided by creditors

24 already involved in the case.

25     And then, in the technical side, there's always been --

1   328 has always been a part of the engagement letters that

2   certainly I have experienced over my time as an investment

3   banker, that's a normal part of the request, as is the

4   indemnification request that is always part of the -- always

5   part of the engagement.

6   Q    Please turn to Exhibit A in your declaration.

7   A    Yeah.  I have it.

8   Q    And you were in the courtroom this morning when Mr.

9   Niemann was testifying?

10  A    Yes, I was.

11  Q    And so there was some -- some discussion of this document.

12  But can you describe generally what you did in this particular

13  document?

14  A    Excuse me.  Yes.  This was meant to try to quantify what

15  we thought could be the overall quantum of fees that were

16  possible to be earned under the engagement letter, given that

17  there were no caps and credits involved in the letter.

18       We tried to look at what the total fees that Houlihan

19  could earn from the beginning of their engagement through to

20  completion of a transaction, of confirmation of a plan.  Given

21  that there was a premium for getting the plan confirmed within

22  180 days of the filing, we prepared two potential scenarios.

23  One was a filing just prior to that, so that they would earn

24  their premium, and one was an assumption of a confirmation I

25  think three months later, at the end, in December, so that

1  that could be an example of what they might earn without the

2  premium but with the additional monthly fees.

3  Q    Okay.  Now, you heard the representations made to the

4  Court this morning about a 30 percent discount to the

5  financing fees.  Do you recall that?

6  A    Yes, I do.

7  Q    Have you had a chance to figure out what the effect of

8  that 30 percent discount would be on this particular exhibit?

9  A    I've just had an opportunity to do a back-of-the-envelope

10  calculation of what that would look like, yes.

11  Q    And what is your back-of-the-envelope calculation?

12  A    Well, if -- nothing changes in the first four lines,

13  obviously.  If the financing fee of -- on the ABL would be at

14  70 percent, that I think would be 2.4.  I understand from

15  Houlihan that they are agreeing not to take any fee at all on

16  any Blue Torch exit facility.  This was done purely in the

17  four corners of the reading of the engagement letter.  There

18  was no clear statement in the engagement letter that that fee

19  couldn't be earned.  And the disclosure statement had a clear

20  object of potentially a revised Blue Torch exit facility, and

21  it wasn't clear that that might or might not be charged.

22      So, obviously, on the representations of Mr. Niemann, that

23  would come out in its entirety.

24      And then the $4.2 million, I've heard this morning that

25  there may or may not be a rights issue involved.  If there

Lewis - Direct                              148

1   isn't, then obviously that fee doesn't come.  If there is a

2   rights issue of some nature, I've heard Mr. Niemann I think

3   say he would get whatever 70 percent of six percent would be

4   from whatever source of financing that rights issue came from.

5       So I don't have it -- and the monthly credit would be the

6   same, I think.  So, I think I calculated that the -- if there

7   was no rights issue and no Blue Torch, I think the total

8   quantum of fees in this middle column would be somewhere in

9   the $11 million range.  I believe that's how I calculated it.

10  Q    Okay.  The number at the bottom, as percentage of

11  prepetition debt, says $630 million.  How did you come to that

12  number?

13  A    The $630 million was the -- was taken from the first-day

14  declarations of the company.  It's the $130 million of Thirty

15  Two revolving credit and the $500 million of senior notes.

16  Q    You were in the courtroom this morning when there was some

17  discussion on Mr. Niemann's cross-examination about the

18  inclusion of operating leases.  Do you recall that?

19  A    Yes, I do.

20  Q    Why did you not include the operating lease payments in

21  the prepetition debt?

22  A    For two reasons.  One is that there was -- there's no

23  disclosure of any capital leases involved in this company.

24  All these leases are operating leases.  So, in the first-day

25  declarations, though, there's no quantification at all of the

Lewis - Direct                              149

1    obligations of the leases.  There's certainly nothing in the

2    disclosure statement.  They are noted as a footnote in the

3    10-K of the company, which is a review of cash obligations

4    going forward.  But it's not on the balance sheet of the

5    company and it's not capital leases.  So, on that basis, we

6    didn't have any indication of whether there was a capital

7    obligation to include in debt.

8        And then, second -- and to the extent that it's an

9    operating lease, the 45 companies that we had as comparables,

10   many of those companies would have similar situations where

11   they would have operating leases.  And the analysis was done

12   purely on prepetition debt.  And there's a number of retail

13   companies where the negotiation of leases, for example, would

14   be a very fundamental part of the activities of the investment

15   banker.

16       But in no case have I ever seen an analysis where

17   operating leases are capitalized onto this type of analysis to

18   be included in debt.  I've just never seen it done.

19   Q    Okay.  Why don't you flip over one page, to Exhibit B?

20   Could you describe generally for the Court what Exhibit B is?

21   A    Yes.  B is a summary of what I regard as the salient

22   features of every engagement letter that we reviewed.  They

23   start from the company and the jurisdiction it was filed in,

24   the date it was filed, the banker involved.  And then it goes

25   through the columns of -- of Funded Debt are the prepetition

1  funded debt done on a consistent basis for every company, so

2  it's adjusted to, for example, exclude unpaid interest at the

3  filing date.  It includes letters of credit that are

4  outstanding.

5      Sometimes, in first-day declarations, you can get a number

6  of different ways of reflecting those numbers, so these are

7  all calculated on the same apples-to-apples basis.

8      Then there's a monthly fee, indication of what the monthly

9  fee is and an indication of both the amount of monthly that is

10  credited and the number of months after which that crediting

11  takes place.  And then there's something we shortly call the

12  RX Fee, which saved me from rewriting Restructuring Fee a

13  hundred times.  But that's the transactional completion fee in

14  dollars, and then the next column is the restructuring fee

15  quantified as a percentage of the prepetition debt.

16      And then we take from the engagement letters just the

17  straight percentages of fees on the financings for both DIP,

18  if it's separated, if it's shown separately in the engagement

19  letter, or secured debt, unsecured debt, and equity.

20      And then, finally, on the right-hand side, there are four

21  columns which are more qualitative, which is to say where in

22  the engagement -- do these engagement letters have any element

23  of limitation of the overall quantum of those fees through the

24  mechanisms such as either lower fees paid to existing

25  creditors who provided the financing, a specific credit that

Lewis - Direct                              151

1  might have taken place, such as a percentage of the financing

2  fees offset against a restructuring fee?  In many of them,

3  there was a cap, which served to limit the overall quantum of

4  the fee.

5      And the final column was that there were several cases

6  where there were voluntary reductions made by the investment

7  banker at the end, following, I think, objections to their

8  fees.

9  Q    So, for example, this column that says Lower Fee/Exclusion

10 for Existing Lenders, this shows that the vast majority of the

11 companies that you looked at had some kind of a credit?

12 A    Yes.  I think it's fair to say it's a very normal part of

13 engagement letters that if the funding is provided by -- and

14 this could be debt -- this could be DIP finding, a rights

15 issue, it doesn't necessarily mean equity, but it could be any

16 type of funding.  It's very frequent that if that's provided

17 by the existing creditor group, then the fees are either lower

18 or forgiven.

19 Q    Okay.  Let's step through a few of these numbers at the

20 bottom.  What did your analysis show about the proposed

21 monthly fees to be charged by Houlihan?

22 A    So, we -- we have a median, average, high, and low, just

23 to show the range of data points.  The median being,

24 obviously, 50 percent above, 50 percent below.  Median and

25 average come out pretty close.

1      But this one told you that the highest monthly we had in

2  this data point was $175,000 a month.  The lowest was $50,000.

3  On average, it was about $150,000 a month on -- on the average

4  debt of about $546 million.

5  Q   What did your analysis show with respect to the

6  restructuring fee?

7  A   So, the restructuring fee came out, on average, about .78

8  percent of prepetition debt, with a low of .3 percent and a

9  high of 1.02 percent.

10 Q   Okay.  And how does that compare to what Houlihan was

11 proposing to charge?

12 A   So, the Houlihan fee is below, based on the $630 million,

13 obviously, of denominator, Houlihan's fee just on the

14 restructuring fee is 1.1 percent of the prepetition debt.

15 Q   All right.

16 A   Assuming the $6.9 million, which is the -- with the

17 premium.

18 Q   And what did your analysis show with respect to the

19 financing fees that were proposed by Houlihan before today?

20 A   So, I made the observation that Houlihan's fees of two

21 percent for debt, three percent for unsecured, and six percent

22 for equity were basically on the high side of the range of any

23 of these data points that we see.  So, in particular, the

24 equity of six points, that's the highest.  And I'm not even

25 sure -- there is one, sorry, two data points in which there

Lewis - Direct                              153

1    was a six percent fee.  So my observation was that their range

2    of financing fees were all at the high end of the comparable

3    range.

4    Q    If you'll look at Exhibit C.  What is this exhibit?

5    A    This was a -- we call it a scattergraph, which just puts

6    the data points on a graphic basis.  I think it helps to

7    identify where you might believe the market is for the general

8    number of cases involved.

9         This has, as the horizontal axis, this is the size of

10   prepetition debt, between $200 million and a billion.  And the

11   vertical axis is the percentage of the restructuring fee as a

12   percentage of prepetition debt.  And it lays out all the data

13   points on the Exhibit B beforehand, and I think it shows the

14   clustering of a large number of cases somewhere certainly

15   below one percent, but it shows a large clustering around the

16   average of .78 percent.

17   Q    Great.  And this one is limited to the restructuring fee;

18   is that right?

19   A    This is just the restructuring fee as a percentage of

20   debt, yes.

21   Q    All right.  Okay.  Turn over to Exhibit D.  What is

22   Exhibit D?

23   A    So, Exhibit D is all the same cases, but in this case we

24   looked at -- for most of them, they were transactions that had

25   been completed, so we looked at what the bank -- what the

1    banker had actually earned from the beginning of his

2    assignment, usually from the engagement letter that related to

3    the restructuring.  That might have been prepetition, usually

4    was prepetition.  And this was meant to identify all the fees

5    that the banker earned:  the monthly fee, the restructuring

6    fee, or a sale fee, the financing fees.  And then it reflected

7    the credits that were received or applied to those fees or the

8    cap that was provided.

9         So that at the right-hand side, there was a Total Fee

10   column, which is the column before the last column, which was

11   the total quantum of fees that were earned by the banker for

12   that restructuring.  And the final column was the percentage

13   of that fee as expressed as a percentage of prepetition debt.

14   Q    So what documents did you rely on to get the data for

15   Exhibit D?

16   A    For both exhibits, we relied primarily on the first-day

17   declarations in order to establish the debt that was -- that

18   should be included.  We looked at the application made by the

19   banker for employment.  We looked at the final order, since a

20   number of the orders did change the terms under which the

21   engagement was to be approved.  And then we looked at the

22   final fee applications, which pretty much invariably laid out

23   pretty clearly all the fees that the banker had earned, both

24   prepetition and postpetition.  So those were the documents.

25   And we, in some cases, we did refer to the disclosure

Lewis - Direct                                    155

1  statement, just to prove up the debt numbers.

2  Q    And what did you conclude about the all-in fees proposed

3  by Houlihan before today as it compares to the data that you

4  collected?

5  A    Well, this chart, on the bottom right, you can see the

6  average of the total fees.  The median is 1.02 percent of

7  total fees to debt.  The average is 1.1 percent of the total

8  fees to debt.  The highest number, and it was only one -- I

9  think one item that was high, it was two percent of total fees

10  to debt, and the lowest was .52 percent.

11      But this directed me to regard a reasonable level of fees

12  as being somewhere in the 1.1 percent of total debt range.

13  That would be the average of the data points of the 45 cases

14  that we looked at.

15      And if you look at the PHI -- the Houlihan case,

16  obviously, based on the earlier analysis, which included a

17  number of fees that I understand will be adjusted, but on that

18  basis this was almost three percent of -- 2.9 percent, and no

19  cap that might have limited any change to the plan if

20  something else changed from the plan.

21  Q    And then what is Exhibit E?

22  A    And Exhibit E is just the same scattergraph showing those

23  data points, those all-in costs as a percentage of prepetition

24  debt, compared, again, to the -- the same axes as in the first

25  graph.  And this, again, was just to show the predominance of

1  deals in the -- around the average, and it showed how far off

2  market the Houlihan all-in fee was, if they were going to earn

3  all the fees that were potentially possible under that

4  engagement letter.

5  Q   Now, you heard Mr. Niemann testify this morning about the

6  -- what he calls a pace premium.  I think we called it a speed

7  premium.

8  A   Yes.

9  Q   Have you seen that kind of premium before?

10 A   I have not -- I have not seen it as a typical element of

11 engagement letters.

12 Q   And did you look with respect to the 45 comparables that

13 are on your Exhibits B and D to see whether they had so-called

14 pace premiums?

15 A   It didn't -- yes, I did look.  It hadn't immediately --

16 there were none on this list, as I was aware.  I did go back.

17 I heard Mr. Niemann say this morning that *UCI* had a pace

18 premium to it, and so I actually went back and reviewed the

19 engagement letter in that.  In that engagement letter,

20 actually, the premium was simply a $500,000 additional fee for

21 a prepackaged arrangement.  It didn't -- it wasn't a premium

22 related to the time in which a case was completed.  It was

23 just a premium for doing a prepackaged, which would have had

24 the agreement of all the creditors and thereby would have

25 limited the time spent in bankruptcy, which that is a normal

1    -- it's not abnormal for banks to be motivated to try to do a

2    prepackaged or pre-arranged deal to limit the amount of time.

3    But that's normally done in the form of a -- maybe a slightly

4    higher transaction fee.  But the idea of a pace premium is not

5    anywhere in any of these examples that we looked at.

6    Q    Okay.

7            MR. STONE:  I'll pass the witness.

8            THE COURT:  Thank you.  Mr. Califano?

9            MR. CALIFANO:  Your Honor, if we could just take a

10   five-minute break?

11           THE COURT:  Sure.

12           MR. CALIFANO:  Thank you.

13           THE COURT:  We'll take five minutes.

14           THE CLERK:  All rise.

15           THE WITNESS:  May I step down?

16           THE COURT:  You may step down.  During your

17   testimony, don't -- excuse me.  During the break, don't speak

18   with anyone about your testimony.

19           THE WITNESS:  Yes, sir.

20      (A recess ensued from 2:17 p.m. until 2:23 p.m.)

21           THE CLERK:  All rise.

22           THE COURT:  Good afternoon.  Please be seated.  Thank

23   you very much.

24      Mr. Califano?

25           MR. CALIFANO:  Yes, Your Honor.  Thank you.  I'll be

1   right there.

2                        CROSS-EXAMINATION

3   BY MR. CALIFANO:

4   Q    Good afternoon, Mr. Lewis.

5   A    Good afternoon.

6   Q    Now, how did you come to be hired by the Creditors'

7   Committee to opine on the Houlihan fee?

8   A    I was approached by Oaktree initially, who I had done some

9   work for, as I mentioned, on another case.  And we had been

10  successful in that case.  And so Oaktree had this situation

11  and called me up and asked me if I was willing to provide

12  testimony on this one.

13  Q    And who called you from Oaktree?

14  A    Initially, Grant Nachman e-mailed me, and then a gentleman

15  called Mahesh Balakrishnan, I think is his name, called me.

16  Q    Did you produce that e-mail?  Was that e-mail produced?

17  A    Yes, I did.

18  Q    Okay.  Now, when you spoke to Oaktree, what did they tell

19  you about the Houlihan fee?

20  A    They outlined a little bit of their views of what the fee

21  -- what they thought the quantum of the fee was.  I think it's

22  in the -- it's in the e-mail that they sent.

23  Q    I can look at your deposition.  Now, you were deposed by

24  my partner, Mr. Hynes, correct?

25  A    Yes.

Lewis - Cross                                159

1   Q    On April 24th?

2   A    Yes, sir.

3   Q    And he asked you the same question I asked you, "What did

4   he tell you about the Houlihan fee?"  And this was your

5   answer.  "He told me what was in the application and told me

6   that Oaktree thought it was too high."

7   A    Yes.

8   Q    "That was it."  So, before you were retained, you knew

9   that your putative client had formed an opinion about where

10  -- where you should come out, correct?

11  A    Well, he asked me, he -- he gave that information and he

12  asked me if I would review --

13  Q    Well, he told you, he said it was too high, correct?

14  A    Yes.

15  Q    Okay.

16  A    Yeah.

17  Q    So you were told by the person who was going to hire you

18  on behalf of the Committee that he believed it was too high,

19  --

20  A    Yeah.

21  Q    -- correct?

22  A    Yes.  Correct.

23  Q    So did that indicate to you at all where your opinion

24  should come out?

25  A    He asked me to review the application and --

1    Q    That's --

2    A    -- asked if I --

3    Q    That's not my question.

4    A    May I answer --

5          MR. STONE:  Your Honor, if he could allow him to

6    finish his answer, I'd appreciate it.

7          MR. CALIFANO:  But it's non -- I'm --

8          THE COURT:  Well, then you need to say nonresponsive

9    so I can rule on that.

10         MR. CALIFANO:  Okay.  Thank you.

11         THE COURT:  I sustain on nonresponsive.

12         THE WITNESS:  I'm sorry.  Can you ask the question

13   again?

14   BY MR. CALIFANO:

15   Q    The question was -- I forgot what the question was now.

16   What was the question?

17         THE COURT:  I'm afraid our system doesn't work like

18   that, Mr. Califano.  You'll have to go back and --

19         MR. CALIFANO:  No.  We'll just go through it again.

20         THE COURT:  Yeah.

21   BY MR. CALIFANO:

22   Q    So, Oaktree -- and this is from your deposition testimony.

23   We can read it again if we have to.  But they complained to

24   you that there was no crediting mechanism, correct?

25   A    I'm not sure.  They just --

Lewis - Cross                                    161

1    Q    Well, I can just go to your deposi...

2    A    They said that it was a high level of fees.  And I don't

3    recall if they specifically said there was no credit.

4    Q    Okay.

5    A    But they were concerned with the total quantum of fees,

6    yes.

7    Q    Is it -- this is a question that Mr. Hynes asked you on

8    April 24th.  "Is it fair to say that Oaktree was the first one

9    to complain that the Houlihan fee application had no crediting

10   mechanisms?"  And your answer was yes.

11   A    Okay.  Yes.

12   Q    Okay.  So that didn't influence the way you came out on

13   your opinion at all?

14   A    As I was about to say, I was asked to review the motion

15   and then asked if I would give the opinion based on my review

16   of Houlihan's fee letter, which I did independently of

17   Oaktree's comments.

18       If I had thought it wasn't a reasonable thing to provide

19   testimony, I wouldn't have done it.  So I understood where

20   Oaktree was coming from, but that didn't -- that didn't bias

21   my response.  I looked at the motion and the application; then

22   I took my own decision as to whether I thought it was a high

23   fee and therefore whether I would accept the assignment.

24   Q    Okay.  So the fact that the person who contacted you to

25   come into this case told you that it was too high and pointed

Lewis - Cross                                162

1  to the crediting mechanism, that had no bearing on what you

2  did?

3  A    No, it had no bearing on my decision to accept the

4  assignment and --

5  Q    It --

6  A    -- and then the work that I did.

7            MR. CALIFANO:  Move to --

8  BY MR. CALIFANO:

9  Q    It had no bearing on the work you did?  So, what would you

10 have done if you did your analysis and said, you know what,

11 this comes right within what I think is reasonable?

12 A    If I had -- I wouldn't have accepted the assignment to

13 begin with.  I would have looked at it -- I wouldn't have

14 accepted the assignment if I had thought there was not --

15 because we had just finished on *David's Bridal* something very

16 similar and had concluded a similar issue.

17 Q    Okay.  So let's just step -- what -- so, what analysis did

18 you do before you accepted the assignment?  Because you said

19 if you didn't agree you wouldn't have accepted the assignment.

20 So what did you do?

21 A    Well, I had already completed -- the assignment that we

22 did for *David's Bridal* had pretty much all these companies --

23 all the companies for 2017 and '18, I had already analyzed for

24 a prior case.  And so I was fully -- I was fully aware of the

25 comparables that we used in the *David's Bridal* case.

1      So when I looked at the Houlihan situation and I took a

2   shot at trying to understand the quantum of their fees myself,

3   and on the basis of what I had understood in *David's Bridal*, I

4   had concluded that I was likely -- it was likely to be that

5   those fees were going to be high, I was going to find that

6   they would be high, and therefore that's why I accepted the

7   case.

8   Q    Is this -- so, what was your role in *David's Bridal*?

9   A    I'm sorry?

10  Q    What was your role in *David's Bridal*?

11  A    I worked for the lender group in the objection to

12  Evercore's fees in that case in Delaware.

13  Q    Okay.  And is there any difference between this case and

14  *David's Bridal*?

15  A    Generally, no.  It was about an 800 -- it was a slightly

16  larger case, about $800 million of debt.  And the fee there

17  for Evercore was about $13 million, and it was reduced to $10

18  million on the settlement.

19  Q    Now, you said the last time you were involved as a debtor

20  professional was in 2010 and the last time you testified on

21  behalf of an engagement was in 2009, correct?

22  A    Yes.

23  Q    Okay.  Have things changed at all since 2009?

24  A    As I mentioned earlier, the structure of engagement

25  letters hasn't changed at all, but the economics of them

Lewis - Cross                                 164

1  obviously change over time based on the competitive

2  environment of investment banking.  But, so the fee levels

3  change over time, and because I had reviewed 25 of those in

4  2017 and '18, I had a pretty good sense of where the current

5  market was for the general level of fees on these types of

6  engagements.

7  Q    But how --

8           MR. CALIFANO:  See, it's difficult because I don't

9  want to interrupt the witness, but he keeps pausing, so it's

10  tough for me, Your Honor.

11  BY MR. CALIFANO:

12  Q    But, overall, have fees gone up or down since 2009?

13  A    I think fees have actually gone down since 2009.

14  Q    Really?

15  A    I was surprised, actually, at the level.  When I look at

16  these overall fees, I was surprised at how many of them came

17  in within the $3 to $5 million range for companies of this

18  size.

19  Q    And --

20  A    And I thought that was -- in general, my experience and

21  memory was that fees were somewhat higher in those days.

22  Q    Really?  So the only thing that hasn't been affected by

23  inflation is investment banker fees?

24  A    It's a competitive environment and people -- there are

25  quite a large number of investment banks out there competing

Lewis - Cross                                    165

1   for the same business, so --

2   Q    And there wasn't any competition in 2009?

3   A    Less.

4   Q    Okay.  Now, so in the *Fleetwood* case, do you remember what

5   the monthly fee was that you were seeking to have the Court

6   approve --

7   A    Yes, I do.

8   Q    -- in 2009?

9   A    Yeah.

10  Q    And what was that?

11  A    So, the package was an initial retainer fee of a million

12  dollars prepetition, no monthly fee for the first two months,

13  $200,000 for the next -- for after the first two months, with

14  crediting --

15  Q    So $200,000 wasn't too high in 2009, but it's too high

16  now?

17  A    The case in *Fleetwood* was a very unusual case.

18  QA   That's --

19  A    May I --

20  Q    I didn't ask you for the difference.  But in 2009 -- in

21  2009, $200,000 a month was fine, but now you're saying

22  $200,000 a month by Houlihan is too much?

23  A    I'm saying the $200,000 in the case of *Fleetwood* was a

24  structured fee because it was extremely -- it was extremely

25  timely and we didn't think we would earn -- and it was

1   potentially going to liquidation and we didn't think we would

2   earn any of the final fee.  We weren't sure of that.  So we

3   had a higher monthly, I agree that it was a high monthly, but

4   that was structured because we weren't sure whether we would

5   even get the transaction fee or the sale fee, because it could

6   have gone to liquidation.

7   Q   Well, actually, the first two months are at $500,000 a

8   month, right?  Because you got a million for up to the first

9   two months?

10  A   Prepetition, there was another two months.

11  Q   Right.  But those are --

12  A   So the million --

13  Q   -- for the two months?

14  A   -- covered four months, I think.  The million was at least

15  a month and a half prepetition.

16  Q   All right.  So then if -- so then it was three and a half?

17  A   Yes.  It was --

18  Q   What's it, three and a half, four?  It's still --

19  A   Yeah.  We were looking --

20  Q   It's still more than $200,000 a month, and then it dropped

21  to $200,000 a month?

22  A   We were looking to be sure that we were compensated for a

23  significant amount of work on both DIP, M&A, and potential

24  plan, in a case where we might have not got past three or four

25  months and we might have not got anything else.

1    Q    Well, --

2    A    So, yes, we -- we frontloaded it to ensure that we had

3    good compensation in case it didn't go to a final plan.

4    Q    So is it your expert testimony that it is appropriate to

5    charge higher fees if you don't know where the case is going?

6    Is that what you're saying?

7    A    No.  I'm saying that in the specific case of *Fleetwood* it

8    was a -- it was at the bottom of the financial recession.  It

9    was extremely hard to find financing.  And our judgment at

10   that time was that we weren't sure whether we were going to

11   make any money on the case.  And so we requested a fee

12   structure that was compensating us for a very intensive

13   process which we felt would have been fair in a case where it

14   might have ended up in liquidation.  We would have made a

15   million dollars or something out of it.

16   Q    All right.  Let's -- we'll talk about comparing that case

17   to this case in a second, but do you recall what the unsecured

18   financing fee was in that case to your firm?

19   A    Yes.  I believe it was two --

20   Q    And what was it?

21   A    I believe it was two percent, yes.

22   Q    And two percent is -- you've said is too high for Houlihan

23   in this case?

24   A    I said that based on the comparables we had for the

25   current market, two percent was at the high side of the range,

1   yes.

2   Q    And what was the fee for unsecured?

3   A    In--?

4   Q    In your case.

5   A    *Fleetwood*?

6   Q    *Fleetwood*.  Your last case.

7   A    I actually don't recall.

8   Q    It was five percent.

9   A    Five?

10  Q    Would that shock you?

11  A    No, I think it was three --

12  Q    Oh, I'm sorry.

13  A    It was three percent, and five percent for equity, yeah, I

14  think.

15  Q    Right.  And what are the fees for Houlihan?

16  A    They're six percent for equity and four percent for

17  unsecured.

18  Q    Didn't they reduce them, though, today by 30 percent?

19  A    My analysis -- yes.

20  Q    Okay.  So, with the reduction -- and by the way, do you

21  think the fees are reasonable now that they've been reduced?

22  A    I would -- so, I -- I think the issue that we have is that

23  -- that I have is --

24  Q    And --

25  A    -- that I don't think it's reasonable.  On the -- on the

Lewis - Cross                                        169

1    proposal that has been made, my opinion would be that the

2    normal crediting of financing fees is higher than 30 percent,

3    when it's provided.

4    Q    Provided by whom?

5    A    The normal fees --

6    Q    Provided by whom?

7    A    Provided by existing creditors.

8    Q    Okay.

9    A    That when you have a rights issue provided by noteholders,

10   in the cases that we presented, I think about five of those

11   cases had rights issues, and the fees were well below two

12   percent.  So a 30 percent credit on six percent would still be

13   -- would still result in a very high fee for a rights issue

14   provided by existing creditors.

15   Q    But that's out of the plan, right?  It's out of the plan

16   now, the rights offering?

17   A    Yes.  But my point would be if that -- if the engagement

18   letter comes and says that Houlihan will not get any fee for

19   any sort of rights issue whatsoever, that would be fine, but

20   they're not saying that.

21   Q    That'd be fine?

22   A    They're not -- if there was a cap or a credit that said

23   Houlihan agrees that under no circumstances would they earn a

24   fee for a rights issue provided by existing creditors, that

25   would be a factor.

1  Q    And is that, you believe, market, that there should be no

2  fee for existing creditors?

3  A    The market, the five cases that we had in our comparable,

4  all five of them have a fee that's below two percent, so --

5  Q    Okay.  And how many cases involved rights offerings in the

6  last --

7  A    Well, --

8  Q    Since you -- in 2009, how many -- how many cases had

9  rights offerings since 2009?

10  A    I couldn't -- I couldn't put a number on it.

11  Q    So do you think it's fair to pull five out?

12  A    I'm saying that -- no.

13  Q    You pulled out five.  You said you had five in your

14  sample.

15  A    I said that in the 45 of all the cases between $400

16  million and $800 million, there was specifically five cases in

17  which rights issues were done with money provided by existing

18  creditors.  Many of the cases that we looked at had reduced

19  fees.  I'm just pointing to the ones that actually had a

20  rights issue that was implemented with noteholder money.  But

21  --

22  Q    Let me ask you a question.  When you were comparing the

23  fees in your charts here, right, --

24  A    Yeah.

25  Q    -- did you compare -- you said you compared the Houlihan

1  potential fees to the actual fees granted by the courts,

2  correct?

3  A    Yes.

4  Q    All right.  Now, isn't it true that in almost every

5  investment banking letter there's a number of fees, not all of

6  which apply?  And we've heard Mr. Niemann testify before that

7  he clarified, if a transaction has more than one potential

8  fee, he's only going to seek one.  How would your charts

9  change if you compared apples-to-apples?  That is, if you

10  compared potential fees to the potential fees that each one of

11  these bankers could get?

12  A    Well, first of all, I'd have to go back and compare each

13  plan.

14  Q    So you didn't do it?  You didn't do it?

15  A    We didn't, because the --

16  Q    That's all I need.  All I need is that you did not do it.

17  Thank you.  Can we turn back to Exhibit A?

18          THE COURT:  And we're in 33; is that right?

19          MR. CALIFANO:  Yes.  I'm sorry.  Exhibit A to his

20  declaration, Your Honor.

21          THE COURT:  Uh-huh.

22  BY MR. CALIFANO:

23  Q    Okay.  So that's the calculation of potential fees.

24  A    Yes.

25  Q    And you have a total number of prepetition debt, right, of

1    $630 million?

2    A    Yes.

3    Q    Now, that number carries through every other chart,

4    correct?

5    A    Correct.

6    Q    So if that number is wrong, then every other chart has to

7    be adjusted, correct?

8    A    I'm sorry.  In terms of the chart, Exhibit B?

9    Q    Well, all your -- what do you call these?  The bunching

10   together?  What do you call those charts?

11   A    The scattergraphs?

12   Q    The scattergraphs.  The scattergraphs.  So all your

13   scattergraphs would have to change, correct?  They all assume

14   --

15   A    No, the scattergraphs wouldn't.  The only number that

16   would change would be the Houlihan number.

17   Q    Right.  So, where they were placed in the --

18   A    Yes.

19   Q    -- scattergraph would change?  So that's everything.

20   A    Well, where the Houlihan, which is the triangle, where the

21   Houlihan would --

22   Q    Right.  But all we care about, right, is where Houlihan --

23   A    Yeah.

24   Q    -- falls on this chart?

25   A    Yes.

1   Q    Right?

2   A    Yep.

3   Q    So you say only that would change:  That's changing

4   everything, right?

5   A    I'm sorry.  I --

6   Q    Because nobody here really cares about --

7   A    I'm --

8   Q    -- some of the other cases.  We're here about this case

9   and the Houlihan retention.  So that would have to change if

10  your number on total funded debt changed, correct?

11  A    Yes, correct.

12  Q    All right.  So you have $630 million, which is the notes,

13  right?

14  A    Yes.

15  Q    And the Thirty Two, LLC loan, correct?

16  A    Yes.

17  Q    Did you put any unsecured debt in there?

18  A    No.

19  Q    Any trade?  No?  Okay.  You didn't include the Blue Torch.

20  Now, that was funded and owed by the company as of the filing.

21  Whether or not your clients like it or thought it was right,

22  that's for another day, but that was debt that existed as of

23  the petition day, correct?

24  A    Yes.

25  Q    So why didn't you include it?

Lewis - Cross                            174

1    A    Because it was, per my notes, it was effectively a DIP

2    financing.

3    Q    What does that mean, effectively a DIP?

4    A    Well, the preamble of the Blue Torch facility said that it

5    was done in contemplation of a filing promptly after the loan

6    and that it was put in place to fund the costs of liquidity of

7    a Chapter 11 case.  So that's basically a DIP financing.  The

8    company chose to do it two days before filing.  That's fine.

9    Q    But if it was out three months before, would it make a

10   difference?

11   A    That might have made a difference, yes.

12   Q    Why?  It's still the money --

13   A    Well, it might not have been -- it might not have been in

14   specific expectation of a filing.  I don't know.

15   Q    But what does -- how does that influence whether or not

16   the debt -- the debt still needs to be dealt with in a plan,

17   correct?

18   A    Yes.

19   Q    Okay.  A DIP doesn't, because a DIP requires that it's

20   paid off at confirmation, so it's different.  And you don't

21   deal with a DIP in a reorganization because the DIP has to be

22   paid off, correct?

23   A    Yes.

24   Q    Okay.  So this is not that.

25   A    The analysis was of fees to be earned as a percentage of

1   prepetition debt, and in all these --

2   Q    That's still pre -- that is prepetition debt, though.

3   A    Yes.  But in all these cases, there were -- many of these

4   cases had DIP loans.  And if I had wanted to do apples-to-

5   apples, I would have had to have added the DIP loan to every

6   case that was comparable --

7   Q    No, you would not.

8   A    -- in order to show --

9   Q    No, you would not.

10  A    Because this was a DIP loan in my mind.

11  Q    It's not a DIP loan.

12  A    I understand you --

13  Q    It's prepetition.  And a DIP loan, there is nothing to do

14  about it.  Right?  Because it has to be paid off at

15  confirmation.  This still needs to be dealt with.  So, in

16  fact, --

17  A    There's --

18  Q    Let me ask you another question.  In those cases with the

19  DIP loans, would that investment banker have been able to

20  charge a different -- an additional fee for obtaining that

21  DIP?

22  A    Well, you'd see from the comparables that there are --

23  there are -- it's all over the place.  There are DIPs that did

24  have a fee, DIPs that didn't have a fee, so I --

25  Q    Do you know how many of them?

1    A    I would have to go through and detail them specifically.

2    Q    All right.  *Philadelphia Energy*, that was one of your

3    cases, right?  That's in your chart.

4    A    Okay.

5    Q    Okay.  Did PJT -- was PJT entitled to a DIP fee in that

6    case?

7    A    If you don't mind, I would -- I would refer to the notes

8    that were also Exhibit F.  So, on that one, there was a 50

9    percent of the DIP fee was credited against any capital raise

10   fee applicable to financing of a first loss position that was

11   done with an affiliate.  Otherwise, the DIP fee of $1.2

12   million was earned and paid prepetition.  So, yes, there was a

13   -- there was a DIP fee paid to PJT.

14   Q    Okay.  So, *VER Technologies*, okay, another PJT case, was

15   there a DIP fee in that case?

16   A    In fact, under the final retention papers on -- *VER

17   Technologies*?

18   Q    *VER Technologies*.

19   A    PJT actually agreed to take no financing fee on the

20   approved restructuring --

21   Q    Really?  I have the -- I have the engagement letter right

22   here.

23   A    But I have the final fee -- that would have come from the

24   final fee application, where they --

25   Q    But I thought you were comparing potentials, not final

1    fee.

2    A    And the --

3    Q    I thought you were comparing potentially -- that's what

4    you would -- oh, I'm sorry.  That's what you're doing for

5    Houlihan.  I forgot.  I apologize.  It's only for Houlihan

6    that you're comparing, right, the potential fees.

7    A    So, in the -- I believe --

8    Q    In the letter, though, there was a right to a fee, wasn't

9    there, in the PJT letter?

10   A    I would have to go back and look.  I know that on my --

11   Q    Well, I can help you out.  Can we have that?  Can I have

12   the *VER Technologies*?

13              MR. CALIFANO:  Your Honor, may I approach?

14              THE COURT:  You may.  Thank you.

15   BY MR. CALIFANO:

16   Q    Can you please turn to the bottom of Page 2?

17   A    Yes.

18   Q    Okay.  And the carryover paragraph, Romanette III, the

19   carryover paragraph?

20   A    Yes.

21   Q    Okay.  Does that help you with respect to whether or not

22   they could be entitled to a DIP fee?

23   A    Yeah.  This looks like that they would be entitled to a

24   one percent --

25   Q    Okay.

1  A   -- fee on senior debt, yes.

2  Q   So, in your chart, you really effectively penalized

3  Houlihan twice, because you took the Blue Torch $70 million

4  out and then you also tried and credit against them their

5  prepetition fees, correct?  Excuse me.

6  A   I'm sorry.  I was just reading the remainder of the

7  paragraph where there was a reduction of the fee when provided

8  by creditors, but I --

9  Q   Well, is Blue --

10 A   I'm not sure if that relates to this case or not.

11 Q   Yeah, it doesn't, does it?  Because Blue Torch was not a

12 creditor --

13 A   Yeah.

14 Q   -- at the beginning.

15 A   That's correct, yes.

16 Q   So, okay.  So, do we have to go through all of these?  But

17 if I -- would you take my representation that one, two, three,

18 four, five, six, seven, eight, nine of your comps had DIP fees

19 in the engagement letters, so we don't have to go through each

20 one of them?

21 A   I'm sorry.  Just DIP fees on their own that were charged?

22 Q   That the engagement letters --

23 A   Yeah.

24 Q   -- had DIP fees?

25 A   Yeah.

Lewis - Cross                                        179

1   Q    Okay.

2   A    Right.  That seems reasonable.

3   Q    So you're penalizing Houlihan twice here by taking the $70

4   million out of the base that you calculate and then crediting

5   -- and arguing that they -- not giving them credit for another

6   fee that they would have gotten as a DIP, correct?

7   A    I don't think so.

8   Q    Okay.  Well, I do.  You talked -- *David's Bridal*.  What

9   kind of business was that again?

10  A    I'm sorry.  Say it again?

11  Q    What kind of business was *David's Bridal*?

12  A    Oh, *David's Bridal*?

13  Q    Yes.

14  A    A retail --

15  Q    Okay.  Retail?

16  A    Retail bridal business.

17  Q    Is a retailer different than a helicopter company?

18  A    Yes, of course.

19  Q    Okay.  And are retail leases different than helicopter

20  leases?

21  A    Yes.

22  Q    Okay.  Do you think that helicopter lease restructuring --

23  that lease restructuring is important in a helicopter case?

24  A    Yes, I might, yes.

25  Q    Okay.  Do you -- would you -- now, in *CHC*, are you

Lewis - Cross                          180

1  familiar with the fact that CHC hired another firm, Seabury,

2  to do the lease restructuring, correct?

3  A    Correct.

4  Q    And Houlihan is doing that here.

5  A    But it's a totally different number of, as we said, *CHC*

6  has a billion three of operating lease obligations compared to

7  $140 million in PHI, so there's a totally different level of

8  activity, I think, in *CHC* than Houlihan would have here.

9  Q    It's still part of the obligations --

10  A    Yes.

11  Q    -- that Houlihan needs to deal with, right?

12  A    Well, it's still part of the activities, for sure.   In

13  every other case,  --

14  Q    But it's still an obligation.   You said $130 million.   An

15  obligation that Houlihan has to deal with.

16  A    My answer would be that on all the other cases that -- for

17  example, you talk about retail.   The investment banker would

18  spend a lot of time also negotiating and thinking about

19  rejecting and assuming retail leases.   So in all of these

20  comparables where there are operating leases, it would be

21  fairly normal for the banker to be actively involved in the

22  analysis and negotiation of leases.   There may be different

23  types of leases, and I agree that helicopter leases --

24  Q    But you think the analysis is the same dealing with a

25  retail store lease as opposed to restructuring a multimillion

1   dollar helicopter lease, when you need the helicopter to

2   operate?  I mean, you think it's the same thing?

3   A    Well, I think there's --

4   Q    I'm just asking you if you think it's the same thing.

5   A    It's not -- obviously, it's not the same thing.

6              THE COURT:  Let --

7              MR. STONE:  Your Honor, again, if he would --

8              THE COURT:  I'm about to --

9              MR. STONE:  -- just allow him to answer, it would

10  really be --

11             THE COURT:  I think I was about to say the same

12  thing, Mr. Stone.

13             MR. STONE:  Yeah.

14             MR. CALIFANO:  Okay.

15             THE COURT:  If you would, Mr. Califano, let him

16  finish his answer.

17             MR. CALIFANO:  Yes, Your Honor.

18  BY MR. CALIFANO:

19  Q    When you prepared Exhibit A, why did you put the

20  prepetition fees in that top line?

21  A    Because my analysis on Exhibit B, my -- the way I think

22  the best -- this is best analyzed is to look at all the fees

23  that are earned in -- under one engagement letter, whether

24  it's pre or post, partly because there's a lot of these cases

25  where there's quite a bit of crediting of prepetition fees.

Lewis - Cross                          182

1   So, in order for it to be, I think, a good, useful analysis,

2   my view is that you look at the all-in fees earned from the

3   beginning of the engagement letter forward, so --

4   Q    Did you look at that for all your comparables?

5   A    Yes, I did.

6   Q    You did?

7   A    Yes, I did.

8   Q    You went back and you went --

9   A    Yeah.  That's what I --

10  Q    -- through every one of them?

11  A    That's what I did.

12  Q    Okay.  Now, what do you base -- now, if a court is looking

13  -- a bankruptcy court is looking at the reasonableness of the

14  fees, do they typically look at prepetition fees?

15  A    I'm -- yes, because I think in the -- in a lot of the

16  declarations, there's always a declaration of how much has

17  been earned prepetition, and I'm sure that the courts must

18  take into account what the banker has earned prepetition as

19  well as what he expects to earn postpetition, particularly

20  when there are credits involved in the postpetition agreement

21  versus prepetition fees, for example.

22  Q    Can you cite to a bankruptcy court decision when the --

23  where the court took into account --

24  A    I can't cite a decision, no.

25  Q    Can you cite to any treatise where --

1    A    No.

2    Q    Okay.  Can you cite to any, any source for your

3    specialized knowledge as an expert in fees that --

4    A    It was just my judgment of doing it for 30 -- 25 years,

5    that those were the types of considerations we took into

6    account.

7    Q    And who is we?

8    A    I, as the investment banker, in Greenhill, Miller

9    Buckfire, Blackstone, and Wasserstein Perella.

10   Q    Okay.  So how did you take it into account in your role as

11   an investment banker?

12   A    I'm sorry.  How did I take what into --

13   Q    How did you take it into -- how did you take it into

14   account in --

15   A    The total of prepetition --

16   Q    Yeah.  How did you?

17   A    Oh.  I'm sorry.  That most of these engagement letters

18   were done -- would have been done several months or maybe a

19   number of year before you ended up filing.  So engagement

20   letters were usually a total fee that you were going to earn,

21   some of it prepetition, some of it postpetition.  And the

22   negotiation that took place would have incorporated all of the

23   fees that you were going to earn, some of them prepetition and

24   some of them post.

25   Q    Let's talk about the pace premium or what you would call

Lewis - Cross                                184

1  the speed premium.  Why is that not reasonable?

2  A    I think I -- I had said I thought that there was

3  sufficient incentive for the investment banker to generally

4  get the case done on a rapid basis, both because his fee is a

5  fixed fee generally, and so the quicker that he can earn his

6  fee the better it is for them, and usually the monthly

7  crediting was the manner in which bankers were incentivized to

8  move a case along, because after a certain period you would

9  start getting credits, as in this case.  Your monthly would be

10 credited.  And so the longer it went on, the less you earned

11 on the monthly.

12      So, in general, I felt that in most cases you didn't need

13 to have an incentive to the banker to move quickly because he

14 was already incentivized to do that.

15 Q    Well, I think in your calculation on Exhibit A to 33, you

16 have them earning $600,000 more in monthlies, okay, so --

17 A    But overall I have them earning less.

18 Q    But that's because of the pace premium, --

19 A    Yeah.

20 Q    -- right?  Okay.

21 A    Yeah.

22 Q    So, absent the pace premium, --

23 A    All right.

24 Q    -- there wouldn't be an incentive to move things quickly?

25 A    This happens to be the way the monthly crediting worked,

1   yes.

2   Q    Okay.

3   A    And --

4   Q    So the pace premium does have a role here, correct?

5   A    It potentially has a role here to move it --

6   Q    Okay.

7   A    -- forward.

8   Q    What would be -- if the case comes out within the pace

9   premium time, how much more would Houlihan earn?

10  A    Well, they didn't -- I mean, the restructuring fee is

11  $900,000 more.

12  Q    So, it'd be nine --

13  A    And what do you comparison against?

14  Q    What would -- what would -- okay.  So, say if the case

15  lasts five months and 29 days, how much more do they make than

16  if the case lasts six months and one day?

17  A    Yeah, that's pretty much what we tried to lay out, was

18  they --

19  Q    Yeah.  So what is that number?

20  A    They would earn about $600,000 more.

21  Q    Six hundred thousand?

22  A    Under this analysis, yes.

23  Q    All right.  So do you -- what do you think the monthly

24  administrative expenses are for this case?

25  A    I'm sure they are substantially more than that, yes.

Lewis - Cross                          186

1    Q    Do you think they exceed $600,000?

2    A    I don't know, but I know these cases are expensive.

3    Q    If you look around this room, you probably have $600,000

4    today, probably.

5    A    I'm sure.  Yeah.

6    Q    So, and is there wear-and-tear on a company for being in

7    bankruptcy?

8    A    Yes, I agree.

9    Q    Okay.  And there are higher costs, other than professional

10   fees?

11   A    I would -- yes, I imagine so.

12   Q    Okay.  And is it disruptive to the company and their

13   relationship with customers?

14   A    In general, it, depending on how it's managed, yes, it can

15   be disruptive.

16   Q    Okay.  And does it cause problems with employees?

17   A    Yes.

18   Q    Okay.  So do you think that all those problems, plus the

19   administrative expenses, right, for my firm, for Milbank, for

20   Milbank's local counsel, for the rest, do you think that the

21   total sum of that, if the case goes seven months, is more or

22   less than $600,000?

23   A    I agree.  It's probably -- the expenses, I'm sure, would

24   be more than $600,000, yes.

25   Q    Okay.  So there's a benefit?

1    A    Yeah.

2    Q    Okay.  And the benefit is increased the sooner they're

3    out?

4    A    I agree.

5    Q    Right?

6    A    Yes.

7    Q    Okay.  And the longer we're in, the less -- the more it

8    costs the company, correct?

9    A    Yes, I agree.

10    Q    So, looking at it that way, do you still think the premium

11    is unreasonable?

12    A    Well, my comment was that the premium was unusual because

13    there's no other cases that have it.  But I agree that it's

14    not unreasonable to have a motivation to move --

15    Q    There's a lot that's unusual in this case, but unusual

16    doesn't always mean improper, does it?

17    A    Not necessarily.

18    Q    Okay.  But here, there is a benefit?  You will admit there

19    is a benefit if they meet the pace agreement?

20    A    Uh, --

21    Q    There's a tangible dollar benefit?

22    A    Yeah.  I agree.

23    Q    Okay.  Now, when was the last time you testified in court?

24    A    It would have been on the *C&J Services* matter.

25    Q    Okay.

1    A    In Houston.

2    Q    And what happened in that case?

3    A    We were seeking a motion for an equity committee, and that

4    motion was rejected.

5    Q    Okay.  That was before Judge Jones, right?

6    A    Yes, it was.

7    Q    Okay.  And you were there as the valuation expert,

8    correct?

9    A    Yes.

10   Q    What did Judge Jones think of your testimony?

11   A    He didn't think much of it.

12   Q    Yeah.  He was highly critical of it, wasn't he?

13   A    He was critical without us understanding what he was

14   critical of, but yes, he was critical of it, yes.

15   Q    He was critical of your testimony in particular, correct?

16   A    I think he was critical of the whole process.

17   Q    All right.  This is from Judge Jones' oral opinion in *CJ*

18   *Holding Company* on November 4, 2016.  And he stated on Page

19   204, "I also read the expert report.  And while I didn't

20   choose to exercise the right that I had to ask questions, I

21   could have, and I will tell you there are things in that

22   expert report that bother me a great deal.  There are

23   conclusions that could not possibly have been reached.  There

24   are conclusions that the witness was not qualified to give."

25   Is that --

Lewis - Cross                              189

1    A    That's the statement.  Yes, that's from the transcript.

2    Q    Isn't that really what's happened here?  Didn't you get

3    hired by Oaktree, being told they had a problem with the fees,

4    didn't you compare actuals versus potentials, didn't you

5    deduct numbers arbitrarily to fit this thing within your chart

6    that I can't remember the name of?  Isn't that what happened

7    here?

8              THE COURT:  Hold on, Mr. Lewis.

9              MR. STONE:  Your Honor, I object.  It's argumentative

10   and compound.

11             THE COURT:  Compound.

12             MR. CALIFANO:  Okay.  I think I made my point.  Thank

13   you, Your Honor.  I don't have any further questions.

14             THE COURT:  Does anyone else have any questions of

15   the witness before Mr. Stone gets the witness?

16        All right.  Mr. Stone, your witness.

17                     REDIRECT EXAMINATION

18   BY MR. STONE:

19   Q    Mr. Lewis, you were asked about the *Fleetwood* matter.

20   What were the circumstances of your retention in that case?

21   A    That case was a case we were asked to be involved in where

22   the company was rapidly running out of cash.  It had about

23   three or four months of cash left.  And this was in the depths

24   of the financial crisis in 2008, early 2009.  And we were

25   asked to step in and try to figure out a way to save the

1  company, either to sell it in parts or whole, or potentially

2  to try to restructure it, but that was highly unlikely.  And

3  every indication was that, if we couldn't do that, it would

4  move into liquidation pretty quickly.

5  Q   Okay.  And why were the fees structured the way that they

6  were?

7  A   So, as I said, we structured it because we thought that we

8  might spend two or three months in extremely active work.  We,

9  as a firm, don't bill by the hour, so we, like all investment

10 banks, billed monthly.  So, in that circumstance, we felt that

11 we wanted to structure it so that if we spent three months of

12 highly-active work but then it turned out that we couldn't

13 save the company and it was liquidated, we wanted to be

14 compensated in some way for that extreme press of work that we

15 would have done.

16     So we front-ended the agreement where we had a million

17 dollars paid prepetition.  And that ran through the -- into

18 the third month of postpetition without any other fees, and

19 then we went into a monthly fee thereafter.  A hundred percent

20 of those monthly fees were credited against any final fee, and

21 the total fee was capped at $3 million on a business that had

22 $320 million of debt.  So our total fee was basically $3

23 million on $320 million, about one percent of debt.

24 Q   And what was the environment like in 2009 when you did the

25 *Fleetwood* case, in terms of the supply and demand for bankers?

Lewis - Redirect                        191

1    A    Well, it was pretty active.  And, yeah, it was -- it was a

2    very busy time and the financing market was extremely

3    difficult.  Very hard to find financing for a company of that

4    nature with those problems.

5    Q    Now, Mr. Califano took you through some questioning about

6    whether you were looking at actual fees and comparing them to

7    potential fees.  Do you recall that?

8    A    Yes.

9    Q    On your Exhibit B, --

10   A    Did you say Exhibit B?

11   Q    Yes.

12   A    Yes.

13   Q    When you looked at the -- you looked at the monthlies and

14   you looked at the restructuring fee and you looked at the

15   financing fees that were contained there, were you -- were

16   those potential or were those actual?

17   A    These would have been all potential.  These were in the

18   engagement letter, so no indication as to --

19   Q    Right.  And so at the bottom, where you did your analysis

20   of the proposed Houlihan fees, you were comparing potential to

21   potential; is that right?

22   A    That's correct.

23   Q    Okay.  In terms of a DIP fee, if you go -- if you turn

24   back to Exhibit A, how did you treat the Houlihan fee on the

25   Blue Torch facility?

Lewis - Redirect                          192

1   A    Well, we include it in the total fees that Houlihan earned

2   on the assignment.  We -- even though it was paid prepetition

3   on a two-days-before-petition financing, we -- I believed that

4   to be essentially a DIP financing, a good financing,

5   presumably.  But they -- we included the fee in there because

6   our analysis of all-in fees went back to the beginning of the

7   engagement for all of the comparables, and therefore it made

8   apples-to-apples comparisons appropriate to look at all the

9   prepetition fees that related to the specific assignment that

10  was under the engagement letter.

11  Q    Finally, tell the Court a little bit more about your

12  testimony in the *C&J Services* matter.  Why was the Court

13  unhappy with that testimony?

14  A    Um, --

15         MR. CALIFANO:  Objection, Your Honor.  How does he

16  know why the Court was -- how does he know why Judge Jones was

17  unhappy with --

18         MR. STONE:  I'll withdraw that part of the question.

19         THE COURT:  Why don't you rephrase your question, Mr.

20  Stone.

21         MR. STONE:  Yes, Your Honor.

22         THE COURT:  This time, don't speculate.

23         MR. STONE:  Yes.

24  BY MR. STONE:

25  Q    Tell, the Court more about your testimony in the *C&J*

1  matter.

2  A    We provided a -- we were asked to step into a situation

3  about a month before confirmation of that plan by a number of

4  hedge funds who were unhappy with the structure of the plan.

5  That plan had proposed a valuation for C&J for $700 million

6  against a total prepetition debt of between $1.4 billion and

7  $1.5 billion.  And a number of the hedge funds were unhappy

8  with that valuation.

9       There was also a rights issue being done at a discount to

10  the $700 million, the $600 million.

11      And we were asked to prepare a valuation that would give

12  the Court some level of comfort that there was an argument to

13  be made that there might be value above the $1.5 billion of

14  debt that ought to go to the equity.

15      So we prepared a pretty top-level valuation.  We

16  understood that it wasn't a detailed -- we didn't have access

17  to the company's cash flow projections and the like.  But we

18  took a general understanding of the way companies were trading

19  at that moment, and at that point there was a great

20  expectation that the oil business was going to turn around in

21  2017 and that it was going to go back up.  And so all the

22  stocks were trading significantly -- at a significant premium,

23  even though they were all -- most of the services companies

24  were negative cash flow, the stocks of undistressed companies

25  were looking good.

1    And our argument was that this company probably should be

2    worth $2-1/2 billion plus, based on direct comparables of

3    similar companies in its business.  And we made that

4    proposition to the judge.  And it was -- and we accepted that

5    it was a very high-level analysis.  And, in fact, the judge

6    rejected it.  He -- they went forward with that plan at $700

7    million.  And on day one of the plan, the equity traded at $41

8    a share with 50 million shares outstanding.  So the market

9    valued that business at $2-1/2 billion on the day of the

10   confirmation of the hearing.

11   And we felt that our valuation had been justified.  We

12   believed it was a fair valuation.  It just -- it wasn't

13   accepted in the context of the case that was heard.  But we

14   think that the actual value that the market showed that

15   company to be worth vindicated our valuation, at the end of

16   the day.

17              MR. STONE:  No further questions.

18              THE COURT:  Does anyone --

19              MR. CALIFANO:  Your Honor?

20              THE COURT:  Anyone else have any questions for Mr.

21   Lewis?

22              MR. CALIFANO:  I just have a couple of recross.

23              THE COURT:  Okay.

24              MR. CALIFANO:  I'll be very brief, Your Honor.

25                        RECROSS-EXAMINATION

1    BY MR. CALIFANO:

2    Q    Just referring to Exhibit B, --

3    A    B?

4    Q    B, your --

5    A    Yes.

6    Q    -- declaration.  That's -- the assessment of Houlihan

7    still depends on limiting the funding -- funded debt to $630

8    million; is that correct?

9    A    Yes.

10   Q    Okay.  So its position in this chart would change if the

11   Blue Torch financing was included, correct?

12   A    Yes.

13   Q    Okay.  And it would change once again if you counted the

14   helicopter leases?

15   A    Correct.  My -- my --

16   Q    Thank you.

17   A    My judgment would be that's not the correct analysis.

18   Q    Okay.  But I just asked --

19   A    But yes, I agree with you on that, yeah.

20   Q    Okay.  Now, you -- I think you were testifying when Mr.

21   Stone asked you about *Fleetwood*, that that was a special case

22   and that was a unique circumstance and the fee reflected that,

23   correct?

24   A    Yes.

25   Q    Okay.  Do you recall testifying in a *Fleetwood* case?  I'll

1    just -- and this is your quote.  "I respectfully submit that

2    this fee structure, which is similar to fee arrangements which

3    have been authorized in other Chapter 11 cases in which

4    Greenhill and other leading investment bankers have rendered

5    services, is reasonable in light of industry practice, has

6    market rates both in and out of Chapter 11 proceedings, and --

7    based on the individuals' experience and the scope of work to

8    be performed."  Correct?

9    A    Yes.

10   Q    So back then, you were saying it was market?

11   A    I was saying the overall -- the overall structure, which

12   included a $3 million cap, I was saying that number.  I didn't

13   define the individual pieces of the structure, but the overall

14   fee I said was --

15   Q    Well, didn't you just say that it was unique based on the

16   circumstances of that case?

17   A    The structuring of it was unique, yes.

18   Q    Okay.  So, back then, you said it was market; now you're

19   saying it's unique?

20   A    No.

21          MR. STONE:  Object, Your Honor.  Argumentative.

22          THE COURT:  Sustained.

23   BY MR. CALIFANO:

24   Q    All right.  Now, you say in C and -- and we get to *C&J.*

25   You say you were brought in by a hedge fund that was upset,

1    correct?

2    A    I don't know if it was upset.  I was brought in by a hedge

3    fund who argued --

4    Q    Those are your words.  How is that different from here?

5    Weren't you brought in by a hedge fund that was upset with the

6    Houlihan fees?

7    A    I don't know how to answer that.  I was -- I was asked

8    whether I'd provide testimony from a hedge fund, yes, who --

9    Q    Okay.

10   A    -- was unhappy with the fee level.  Yes.  Agree.

11   Q    So the same as *C&J*, correct?

12   A    Oh, *C&J* was a much more complicated issue.  It was a

13   valuation issue.  And it was a much bigger deal and much more

14   complicated, yes.

15   Q    Okay.  I didn't read all of Judge Jones' quote about you

16   because I didn't want to go too far, but now that you've

17   brought it up, I feel like I have to.  And this is what he

18   said about your report.  "But to deliberately cut corners in

19   an effort to mold the truth is something that may be done in

20   other jurisdictions but not in the Southern District of Texas

21   and not in Courtroom 400."

22        Do you remember him saying that?

23   A    Yeah.

24   Q    Okay.

25             MR. CALIFANO:  No further questions, Your Honor.

 1              THE COURT:  Mr. Stone, do you have any other

 2   questions of Mr. Lewis?

 3              MR. STONE:  I do not, Your Honor.

 4              THE COURT:  Mr. Lewis, it's probably not relevant for

 5   today, but what was the business of *Fleetwood*?  I guess I'm

 6   not familiar with it.

 7              THE WITNESS:  Oh, a recreational vehicle

 8   manufacturer.

 9              THE COURT:  Okay.  Just big --

10              THE WITNESS:  An RV business.

11              THE COURT:  RVs?  Yes.  You may step down, sir.

12              THE WITNESS:  Thank you.

13         (The witness steps down.)

14              MR. LEBLANC:  Your Honor, we have no further

15   witnesses.

16              THE COURT:  Thank you.  Does the Debtor intend to

17   call another witness?

18              MR. CALIFANO:  Your Honor, if we could just have five

19   minutes.  I'm sorry to impose on your patience.

20              THE COURT:  You're not --

21              MR. CALIFANO:  But five minutes to decide whether we

22   want to do rebuttal or not.

23              THE COURT:  You're not imposing on my patience yet,

24   Mr. Califano.

25              MR. CALIFANO:  Well, Your Honor, we did settle the

1  other things, so --

2          THE COURT:  All right.  You know I'm joking.  Five

3  minutes.

4          MR. CALIFANO:  Your Honor, I have to stay in your

5  good graces because tomorrow I've got --

6          THE COURT:  You'll be back.  Five minutes.  All

7  right.

8      (A recess ensued from 3:11 p.m. to 3:16 p.m.)

9          THE CLERK:  All rise.

10         THE COURT:  Good afternoon again.  Please be seated.

11  Thank you.  Mr. Califano?

12         MR. CALIFANO:  Your Honor, we have no further

13  witnesses.

14         THE COURT:  All right.  How long would you all like

15  for closing on this motion?

16         MR. CALIFANO:  I don't need long, Your Honor.  I

17  don't need long at all.

18         THE COURT:  Ten?  Would that be enough?

19         MR. LEBLANC:  That would be fine with me, Your Honor.

20         THE COURT:  Ten per side?  And I think the United

21  States Trustee still has a single issue, right?

22         MS. KIPPES:  Yes, Your Honor.  I think I can get that

23  done in under five.

24         THE COURT:  Okay.  All right.  Mr. Califano, you get

25  to go first and last.

1      CLOSING ARGUMENT ON BEHALF OF THE DEBTORS

2          MR. CALIFANO:  Thank you, Your Honor.

3      Your Honor, we're here on Houlihan's retention.  And, you

4   know, based on the context of this case, as you can tell by

5   the objection, the objection went into a lot of things that

6   really weren't relevant to -- the objection as filed --

7   weren't really relevant to their retention.  Not their

8   qualifications.  That stuff, I'm not going to address, but

9   obviously you can see some motivation here.

10     The Houlihan fee has been revised in response to the

11  creditors' concerns, okay?  The vast majority of their

12  concerns related to these potential fees.  Now, one fee that

13  they crowed about, Mr. Niemann has said repeatedly, and the

14  order will reflect, he's not seeking anything for the Blue

15  Torch exit.

16     With respect to the rights offering, those rights

17  offerings have come out of the plan.  But we all should

18  remember that the only way that those rights offerings ever

19  came into the plan were if the creditors accepted the plan and

20  agreed to fund.  Okay?  So it was always in their discretion.

21  It was always their decision.  It was not a fee which was

22  going to be imposed upon them.  Because, as Mr. Niemann said,

23  if they thought the fee was too high, they would say, well,

24  we'll put the money in, but only if you cut your fee.

25     So it was a red herring, okay, Your Honor.  It was pointed

1    to.  It's out of the plan now.  And it was never something

2    that Houlihan could have gotten absent the creditors' approval

3    and consent.

4        The balance of the fee, Your Honor, is reasonable.

5    $200,000 a month is reasonable, especially under the

6    circumstances.

7        A number of the comps they're using are prepacks.  Very

8    different on the monthlies for a prepack.  You don't have the

9    extent of the work that is being done.  So I don't think we

10   can look at those prepacks or prearranged cases, or the case

11   where the secured creditor was being -- was bidding in in a

12   363 sale in (inaudible).  I don't think any of those are

13   relevant.

14       I think the one thing you can take away, probably the only

15   thing you can take away from Mr. Lewis' testimony, is that

16   each one of these cases is different, Your Honor.

17       In the context of this case, this is an extremely

18   reasonable fee.  Okay.  You can't ignore the helicopter

19   leases, because as we said from the beginning, one of our

20   major tasks is restructuring those leases.  And we're dealing

21   with 15 different lessors and we're valuing helicopters and

22   making deals based on market value.  That's significant work.

23   You can't discount that.

24       You can't discount the Blue Torch facility just because

25   you don't like it or because it's unusual.  It still is funded

1    debt that needs to be dealt with as part of the plan.

2        So if you put those numbers back in that I think Mr. Lewis

3    arbitrarily took out, well, then it's smack in the middle of

4    all of his charts, Your Honor.  And I think that's what's

5    reasonable, and I think that's what's reasonable under the

6    facts and circumstances of this case.

7        And the Code doesn't say that the debtor-in-possession

8    gets to hire people on market terms.  The Code says on what's

9    reasonable.  And we think this is reasonable in the context of

10   this case.

11       Now, the speed premium, Your Honor, I would think the

12   creditors would like that.  Well, we call it the pace premium;

13   they call it the speed premium.  I would think they would like

14   that, because that saves money.  And in a case like this,

15   where we have said from the beginning the new owners of this

16   company are going to be the creditors, we've said that from

17   the beginning -- there is nothing -- which is one reason why I

18   don't understand the fighting that we're doing -- but we've

19   said from the beginning the creditors will be the new owners.

20   Because of that, I would think they would appreciate that

21   premium, because the premium is a fraction of what this case

22   will cost if it's extended.  The premium is a fraction of the

23   negative impacts from Chapter 11 on this case.

24       And then, once again, Your Honor, this is in their

25   control.  It's in the control of the creditors.  Because if we

1  don't emerge -- and at the same time they're complaining about

2  a pace premium, they're doing everything -- they were doing

3  everything they could to slow the case down, but I think that

4  has changed -- but I would think that they would like the pace

5  premium.  I would think the pace premium, from the creditors'

6  standpoint, would be the new standard.  I mean, Mr. Lewis

7  testified that, even though it's unusual, it is beneficial.

8  It benefits the estate.  So why should we disregard something

9  that benefits the estate just because it's new and novel?

10  Okay.

11      Now, the Debtor -- the pace premium was very important to

12  these Debtors.  It was very important to these Debtors.

13  Because as you've heard from -- in every hearing, they need to

14  get out quickly.  This is not a company which will fare well

15  in Chapter 11.  There's a lot of competition and there are a

16  number of competitors that are in trouble, so there is a

17  reason for the pace premium.

18      You've also heard Mr. Bospflug testify that Houlihan has a

19  unique skillset, understanding, and they have been very happy

20  with their performance and they were impressed by their

21  performance and their skillset.

22      Now, can we compare in each one of those cases, which I

23  think the chart was distorted because they dropped out $200

24  million in real debt, but are we comparing each one of those

25  bankers to their skillset?  No.  But I think we have here, we

1   have a fee which is reasonable, especially once the

2   clarification is made about what they're seeking and what is

3   no longer in the plan, and we have a debtor who is saying,

4   They have proven that they're, you know, that they're

5   qualified, and we want them and we need them.

6        I think, under the circumstances, Your Honor, there really

7   is no basis for this objection.  This basis is a spillover of

8   a lot of the rancor that I hope is about to leave this case.

9   But we haven't heard anything today from Mr. Lewis or from the

10  cross of Mr. Niemann or from anything else that would indicate

11  that it is unreasonable for this Debtor to hire Houlihan based

12  on these terms.

13       Thank you.

14           THE COURT:  Would you mind, on the record -- you said

15  it in opening, but I just want to make sure I have this

16  straight -- the discount that you discussed, the 30 percent

17  discount?

18           MR. CALIFANO:  Yes, Your Honor.  And this was arrived

19  at between -- and, you know, I wish we could have had a

20  counterparty, but the company saw the objections, saw where

21  the objections were focused, and these two changes came at the

22  same time, rights offering and discounted buyout coming out of

23  the plan.  Okay.  So that changes a lot of the math.

24       But then on the financing transaction fees, they've all

25  been reduced by 30 percent.  So the two percent fee for

1  secured financing is dropped to 1.4 percent.  The three

2  percent fee on unsecured financing is dropped to 2.1 percent.

3  And then the equity raise is dropped from six percent to 4.2

4  percent.

5      And I will tell Your Honor that two and three were the

6  same numbers that Mr. Lewis testified in favor of back in

7  2009, but they have -- Houlihan has agreed with the company to

8  reduce those fees, and the company has agreed and offered up

9  to the creditors that we'll drop those two most objectionable

10  portions of our plan.  And we will be filing this week an

11  amended plan, an amended disclosure statement, that drops

12  those two provisions that gathered so much ire.

13      So, Your Honor, once again, I think under these

14  circumstances it's clearly reasonable to hire Houlihan on the

15  terms in their engagement letter as modified by the agreement

16  today.  Thank you.

17          THE COURT:  You get to go last.  And in your last

18  pass, if you would address what we know is the United States

19  Trustee's issue, all right?

20          MR. LEBLANC:  Yes, Your Honor.

21   CLOSING ARGUMENT ON BEHALF OF THE UNSECURED CREDITORS' COMMITTEE

22          MR. LEBLANC:  Good afternoon, Your Honor.  Andrew

23  Leblanc of Milbank on behalf of the Official Committee.

24      Your Honor, let me just try to address very quickly the

25  issues we have, and they're twofold.  I mean, the first one,

1   Mr. Califano can say that the fees are reasonable, but they're

2   literally off the charts, and I mean that.  Even Mr. Niemann's

3   own chart of monthly fees shows that $200,000 a month is off

4   of the chart.  He admitted today under cross-examination that

5   the $200,000 -- the one fee that was $200,000 was an out-of-

6   court case.  It didn't have to come in before Your Honor.  It

7   didn't have to get approved.  So there's literally not a

8   single case in his study that has a fee that is $200,000, but

9   theirs does.  Mr. Lewis' evidence is exactly the same.  It's

10  literally off the charts.

11      But Your Honor, it's in some respects the wrong way to

12  think about this, because the way to think about this is

13  what's the total all-in fee.  And importantly, when the

14  company was -- apparently, when the company was being

15  presented with this by Mr. Niemann, Mr. Niemann didn't present

16  that information to the board.  What the board received was an

17  analysis of just the monthly fees and the restructuring fees,

18  but that analysis shows that the monthly fee is beyond any

19  other case and that the restructuring fee is beyond any other

20  case.  That's what the evidence shows.  And I'll talk in a

21  minute about the debt issues, but that's what the evidence

22  shows.

23      And what he also didn't show is all of the other bells and

24  whistles that these investment banker letters have, with good

25  reason, because the crediting of fees, caps on fees, because

1  we don't know what's going to happen.

2      Now, they told us today as we walked in here that they'd

3  removed the rights offering or they will remove the rights

4  offering from the plant.  It's -- that's fine.  They remove

5  the rights offering.  But the engagement letter still, and if

6  Your Honor approves it under 328, their fee application will

7  still provide them with a 4.2 percent fee on any rights

8  offering.

9      So, if as the future owners of the company, the creditors,

10 if the creditors decide that they want to raise capital to

11 take out the two tranches of secured debt that are sitting in

12 front of them, they're going to have to pay Houlihan a fee.

13 And the testimony, Mr. Niemann's testimony was that'd be an

14 $8.4 million fee, on top of the six or the $6.9 million, on

15 top of the monthly fees, and on top of any other financing

16 fees, because there's no crediting whatsoever.

17     Mr. Lewis' evidence, which wasn't rebutted -- they didn't

18 challenge any of the evidence he offered -- showed that in

19 virtually every case there's some form of crediting, whether

20 it's from existing creditor -- whether it's crediting because

21 it's from an existing creditor or it's just crediting for

22 financing raised against the transaction fee, so that the

23 investment banker can have an expectation of an all-in fee

24 that is reasonable.

25     Now, we talked about this with Mr. Niemann, the all-in fee

1    -- and Mr. Lewis talked about it as well -- the all-in fee

2    that they calculate here, using the Debtors' current plan,

3    again, the one even extracting the rights offering, has an

4    all-in fee that exceeds $11 million.  And again, if you look

5    at Mr. Lewis' Exhibit D, which is the chart of actually-

6    received transaction -- actually-received total fees for

7    investment bankers, that is off the charts yet again.  It's

8    almost two percent of the funded debt of this company that

9    would be paid in fees.  It's a quarter of their EBITDA that

10   would be paid in fees, a quarter of their annual earnings that

11   would be paid in investment banker fees.

12       What Mr. Lewis testified to and what the evidence actually

13   shows is that what is market in these cases is a 1.1 percent

14   fee.  That is the average fee.

15       Now, Your Honor, as Your Honor knows, that pales in

16   comparison.  That's a multiple of what Your Honor approved in

17   the *Erickson* case, $125,000 and a $2 million transaction fee

18   with a $3 million cap on total fees.  It pales in -- those --

19   these numbers are just enormous for the type of work that's

20   being done here.

21       And there's lots of examples.  We get -- because if we

22   look at *CHC*, using that case as an example and correcting for

23   the two mistakes that were made in Mr. Niemann's chart,

24   adjusting the debt for the additional $500,000.  And again, we

25   think it's wrong to include operating leases as part of that

1    analysis.  It makes no sense whatsoever.  It's not the funded

2    debt of the company.  It is not funded debt of any company.

3    But if you want to do it and you're doing a comparative study

4    of 39 different firms and the fees that were paid in those 39

5    different firms, you have to be consistent.  So, to be

6    consistent, you either have no operating lease expense as part

7    of the financing and instead you use what's in every

8    disclosure statement, what's in every 10-K, what's in every

9    first-day declaration that says, Here is what the funded debt

10    of the company is, and you use that as your metric, or you go

11    through every one of those cases and you figure out what the

12    operating lease expense is and you add it to their debt.  It's

13    far simpler.  You just have to compare apples to apples.  You

14    can't compare apples to oranges, which is what was done here.

15    And Mr. Niemann admitted it in his analysis.  He didn't

16    include operating leases for CHC.  He did include them for the

17    subject company.

18      So, Your Honor, the issue we have is that these fees are

19    off the chart.  And it's no answer -- even the 30 percent, if

20    you compare the 30 percent reduction in the financing fees,

21    you still have an above-market and beyond-market monthly fee.

22    You have a beyond-market transaction fee, the $6.9 or the $6

23    million.  And you have an above-market -- even those fees,

24    once reduced, are still above the market.  You can see that

25    from Mr. Lewis' work, even after being reduced by 30 percent.

1      That doesn't even take into account the fact that every

2 other one of these has crediting or a cap as a way to cabin

3 the fees.

4      Your Honor, if you were to approve this structure today,

5 and even if the plan that's proposed was -- were confirmed,

6 and this company had to pay at the end of the day more than

7 $11 million in investment banking fees for this plan, it would

8 be very unfortunate.  I think that wouldn't be consistent with

9 328.

10      Now, the other issue we have, Your Honor, I won't dwell on

11 it, but we certainly have concerns about the conduct of the

12 case and whether or not this case is being run for the benefit

13 of an insider.  They can say it's not an insider plan, but

14 let's just be honest.  Mr. Gonsoulin is the largest

15 shareholder of this company.  He's appointed every member of

16 the director, or at least has the -- board of directors, or he

17 has the ability to remove every one of them.  He's the one

18 with whom they negotiated this plan.  He is the one.

19      They didn't negotiate it with unsecured creditors.  They

20 proposed a plan without negotiating with unsecured creditors.

21 And Your Honor, they've done that.  Okay.  We're dealing with

22 it.  We're going to mediation.  That's all fine and well.  But

23 we think there are real things that have to be investigated

24 there.  That's the reason that we went back to that August

25 22nd presentation, to determine whether or not these were --

1   the structure of these prepetition negotiations were

2   Houlihan's design.  And we think that's a question that needs

3   to be looked at, which is why -- and let me get to sort of the

4   finishing here, Your Honor.  There is no evidence in this

5   record upon which you could approve this fee.  There's no

6   evidence of actual negotiations, of changes in terms, of

7   anything like that, other than what you just had happen this

8   morning when we walked into court, that they've reduced the

9   fee.

10      What we would submit, Your Honor, would be appropriate

11  here, particularly because we are now going to mediation with

12  respect to the plan, is we think Your Honor should take this

13  *sub judice*.  Allow us to have the mediation.  We will deal

14  with this in the context of that mediation.  You could decide

15  it at any time, obviously, Your Honor, but we think it would

16  be inappropriate for the Court to decide it now.  Because if

17  there's a new plan that arises from that, then we'll either

18  know what Houlihan's fee would be under that new plan, or

19  alternatively, as Mr. Niemann said, he wants to get the fee

20  approved by this Court, but then he concedes that he's happy

21  to negotiate it if the creditors want to put in money and will

22  condition it on him taking less of a fee than this Court

23  approves.  Let's just get to that step right now.  Your Honor

24  could take this *sub judice*, not approve it, because we don't

25  question Houlihan's qualifications.  We don't take lightly the

1   idea of standing before the Court and objecting to their

2   retention or the components of their retention that are

3   problematic to us.  And let us try to deal with that as part

4   of this process as we go forward.  And if we can't, then Your

5   Honor can approve -- Your Honor can decide the motion.  And I

6   would submit, Your Honor, you would have to say it can't be

7   approved on this record.  They've got to come back and present

8   evidence from somebody to show that it was actually

9   negotiated.  And I don't think you could ever approve it on

10  this record because it literally is a fee that is off the

11  charts when you look at it on a total basis.  And we know that

12  already based on their proposed plan.

13      Let's see what it is after negotiation, after we're

14  sitting in a room with a mediator.  It's not going to be the

15  focus of this mediation, Your Honor, but we think it could

16  absolutely benefit from that time where people can actually

17  spend time together and see if we can get to a resolution on

18  this issue as well.

19      What we would urge, though, Your Honor, is to not enter an

20  order on this.  And not -- we don't think you can approve it,

21  but certainly we don't think you should approve it today,

22  because it locks in -- it's just another point of leverage.

23  He -- Mr. Niemann said he'll negotiate his fee if people want

24  to put money in to take out that secured debt.  Let's let that

25  happen now, before Your Honor approves it.

1    I'm happy to answer any questions, Your Honor, but I think

2    the evidentiary record on this was pretty clear.  I don't

3    think there's any real dispute about -- there's no evidence

4    that this is a reasonable fee under any standard.

5        Unless the Court has any questions, I would -- we would

6    urge the Court to defer ruling on this motion.  Or,

7    alternatively, if Your Honor is not inclined to do that, to

8    deny the motion and -- without prejudice and allow them to

9    resubmit with additional evidence and sharpening their pencils

10   on the fees.

11           THE COURT:  Thank you, Mr. Leblanc.

12           MR. LEBLANC:  Thank you, Your Honor.

13           THE COURT:  I actually don't have any questions of

14   you.  Thank you.

15       Hold on, Mr. Califano.  You're still wanting to cut off

16   the U.S. Trustee, but they need to --

17           MR. CALIFANO:  I'm sorry, Your Honor.

18           THE COURT:  They get heard.

19           MS. KIPPES:  Next time I'm going to wear a really

20   loud jacket so people can see me.

21      CLOSING ARGUMENT ON BEHALF OF THE UNITED STATES TRUSTEE

22           MS. KIPPES:  Your Honor, Meredith Kippes on behalf of

23   the United States Trustee.

24       I'm going to piggyback off of Mr. Leblanc a little bit.

25   He called these fees off the charts.  Noted that the all-in

1  fee with the 30 percent reduction is now $11 million if

2  everything happens and they get everything.  He noted it's two

3  percent of the funded debt.  It's a quarter of EBITDA.

4      These are precisely why -- these sorts of concerns about

5  what might happen at the end is precisely why the U.S. Trustee

6  has asked for 330 review.  Because as Judge -- you're Judge

7  Hale -- Judge Lynn said in the *Mirant* case, "The best measure

8  of a professional's contribution to a plan process is the

9  value of their contribution to the case."  And at the end of

10  the case, we can look at, for lack of a better word, the

11  *gestalt* of the case.  We can look at the whole thing and see

12  what happened and see if the fees are reasonable.  There's no

13  reason to decide whether they're reasonable now.  You can do

14  that at the end under 330.

15      Thank you.

16      THE COURT:  Thank you.  Mr. Califano, you get to go

17  last.

18      MR. CALIFANO:  Yes.  Sorry about that, Your Honor.

19      REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE DEBTORS

20      MR. CALIFANO:  First of all, let me address Mr.

21  Leblanc.  You know, and I'm going to go -- I'm just going to

22  ask Your Honor to look at two of the exhibits from their

23  expert.  Because I don't know how they're getting to this.

24  Okay.

25      THE COURT:  That was the 33; is that right?

1          MR. CALIFANO:  Yes, 33.  Your Honor, first of all, he

2    says there's no deals where there isn't a cap, and I'm just

3    going off his Exhibit B, listing a number of deals, and I

4    assume the checkmark means that there is a cap.  There are a

5    number of these comparables that don't have the cap.  So, I

6    just don't know where that came from.

7          But more basically, Your Honor, what happens on every

8    issue here, right, is they change it into this narrative of

9    the insider transaction and the insider plan.  Well, this is a

10   public company, okay, and Mr. -- counsel for the Committee

11   loves to get up here and testify.  All right.  They never have

12   a witness.  Today was the first time they brought one, but

13   every other time it's an empty chair and counsel is giving his

14   opinion of what's going on here.  And he says, well, the board

15   is -- well, yes, Mr. Gonsoulin has 70 percent of the voting

16   rights.  We said that from the beginning.  It's no fact which

17   they uncovered.  All right, Your Honor?

18         And I hope Your Honor got a chance, even though the 1103

19   motion is being put off, we answered their 12 questions.  But

20   every time they don't like something, they slip into this is

21   an insider transaction, everything is wrong, we need to

22   investigate.  They can't point to any specifics.  And now that

23   the rights offering issues are out, this is a really

24   straightforward debt-for-equity plan.  But they fall into that

25   at every turn.

1    And they -- then they talked about a point of leverage.

2    How can they -- how can they say that it gives us more

3    leverage than when we're going -- than it would give them if

4    we went into a mediation with our financial advisor's fee and

5    retention hanging in the balance?  First of all, that creates

6    an inherent conflict.  Okay.  Because we have an advisor,

7    then, who knows, well, if I cut a deal here, if I advise my

8    client to cut a deal, you know, my fees will be wrapped up in

9    it.  So, that creates inherent conflict.  So, I just think

10   that's inappropriate.

11       But then think about the leverage it creates by putting

12   somebody's fees at risk while they're having a mediation and

13   while they're throwing around these allegations.

14       And they said they didn't come in here lightly to object

15   and they -- they came in here, obviously, with one of their

16   hedge fund clients making a call and finding somebody who

17   would come up with an opinion that mattered.  That matched.

18       We have shown -- this is not an apples-to-apples

19   comparison.  This was a manipulative comparison that we had.

20   They compared the potential fees that Houlihan could get to

21   actual fees given in other cases.

22       So, if you look at Exhibit A and this $11 million number,

23   if you look at the postpetition fees, how do they get to $11

24   million?  You have monthlies of, assuming a six-month case, of

25   $946,000 -- this is their calculation -- and a recap fee of

1    $6,900,000.  You have a potential exit ABL fee of $3 million.

2    That's potential.  There is no ABL lender in prospect right

3    now.  That is a potential fee.

4        So, if the Debtor -- but now that fee has been reduced, in

5    fact, by 30 percent.  So, that would be a possible $2 million

6    if an ABL is obtained.

7        But the specific fees, the fees that are likely to occur,

8    now that the rights offerings are gone, are the transaction

9    fee and the monthlies.  It's not $11 million, Your Honor.  And

10   that ABL fee is calculated on a possible -- on the maximum

11   number of a possible ABL.  That's a completely different fee.

12   It is not $11 million, as they say.  There is a potential

13   upside, now reduced to $2 million, if the full amount of that

14   ABL is raised.  That's what it is.

15       So, the real fees you should be looking at are just the

16   monthly and the restricting fee.  And it's a far different

17   story, Your Honor.  And I don't casually throw around numbers

18   like $11 million.

19       And with respect to the U.S. Trustees' objection, Your

20   Honor, in this court, investment bankers are hired under 328.

21   Across the country, investment bankers are hired under 328.

22   Mr. Martin -- I'm sorry, Mr. Lewis testified at his deposition

23   that 328 is the appropriate standard for investment bankers to

24   be hired.  It has become standard.  We cited in our papers a

25   number of cases from this district.  That is typical for

1    investment bankers because they're not hourly-rate-based.  You

2    can't -- it's success-fee-based.  And it would be unfair to

3    retain them on a success fee basis and then look back at it

4    and recalculate it.  I mean, that's what the cases say, and

5    it's -- I know in every case the U.S. Trustee is bound to

6    object to it, Your Honor, but this has become the standard.

7         So, with respect -- another thing that Mr. -- that

8    Creditors' Committee counsel testified to was that there was

9    no negotiation.  Mr. Bospflug testified that he negotiated

10   this engagement letter.  Okay.  He negotiated it prepetition,

11   he negotiated it before this plan was in prospect and after

12   months of getting information from Mr. Niemann and assessing

13   his credit -- assessing his abilities.

14       Your Honor, there isn't any basis to deny their retention.

15   I think Your Honor has all the power, unlike my adversary.  I

16   think you have the power both to grant it or deny it.  I think

17   you should grant it, Your Honor.  I think we need Houlihan.

18       I also think their suggestion that it be tied up in the

19   mediation is completely inappropriate, because it would then

20   create an inherent conflict between the Debtor and one of the

21   professionals it relies on.

22       So, I think the record is clear, Your Honor.  I think we

23   have spent more than enough time on it.  And I think we need

24   to put this to bed.  This leverage issue that they have, let's

25   put it to bed, let's go on with the mediation, and I am

1   convinced that we are going to have a deal in short order.

2   But I think we have to stop letting allegations that have no

3   basis, that they've never put a witness on for, they've never

4   given a shred of evidence, and we have a mountain of evidence

5   to the contrary, they've never put it before your Court, this

6   Court, and they have avoided having these issues tested, but

7   rather, they keep trying to use them as a way to get another

8   path.  Let's get past this, let's go on to mediation, and

9   hopefully next time we are before Your Honor we're going to

10  have the framework of a deal.

11      Thank you, Your Honor.

12          THE COURT:  Thank you, Mr. Califano.  We'll come back

13  to a ruling in Houlihan after we've heard the other matters.

14          MR. CALIFANO: Thank you, Your Honor.

15          THE COURT:  I don't know which one we should move

16  into next.  Maybe the KEIP.

17          MR. CALIFANO:  I think the KEIP, because the KEIP, we

18  have a proffer that the U.S. Trustee has asked for, and Mr.

19  Simon is going to read it into the record.

20          THE COURT:  All right.

21          MR. SIMON:  Your Honor, thank you again.  Good

22  afternoon.  Dan Simon, DLA Piper, on behalf of the Debtors.

23      I am pleased to announce that we have, over the course of

24  the last 24 hours and into this hearing, worked constructively

25  with the Committee to reach a deal.  We have papered the deal.

1    Our client has signed off, I believe, and I'll ask Creditors'

2    Committee counsel to also confirm at the end that not only do

3    they agree with the deal that I read into the record, but also

4    that their Committee has approved that deal.

5         And so, with your patience, I will read it into the

6    record, and then I will provide a relatively brief proffer of

7    Mr. Del Genio.

8              THE COURT:  All right.

9              MR. SIMON:  The Key Employee Incentive Plan that is

10   attached to the motion would be approved subject to the

11   following revisions:  The net operating cash flow metric would

12   switch to an EBITDA metric based on the Debtors' 2019 business

13   plan, provided that $35 million of EBITDA would be the

14   threshold metric, and that metric would be adjusted based on

15   the timing of the exit.  The $35 million number would be

16   adjusted, that is.

17        Restructuring-related professional fees would not be

18   included in the EBITDA operating metric, and all EBITDA

19   targets are net of all amounts payable under the KEIP plan.

20        Payments under the KEIP are to be paid in all cash;

21   provided, however, that solely at each KEIP participant's

22   option and discretion, with such notice to be provided no

23   later than two weeks prior to the proposed effective date, a

24   portion of the KEIP payment may be converted from cash to new

25   equity in the Reorganized Debtor at plan value consistent with

1  past practices.

2      Upon the consummation of a restructuring transaction, the

3  maximum aggregate -- *i.e.*, for all Debtor KEIP participants --

4  -- payout in cash, if earned, will be equal to the sum of (1)

5  the threshold bonus, or $3,182,567; (2) Fifty percent equal to

6  the incremental difference between the threshold bonus and the

7  target bonus, which is equal to $530,428; and (3) a twenty

8  percent safety bonus on a prorated basis based on timing from

9  January 1, 2019 through the date of emergence.

10      On December 31, 2019, the company's overall performance

11  will be measured based on the KEIP metrics as outlined in the

12  KEIP and as modified by what I'm describing now, with the

13  company to pay, at the time the annual incentive plan payments

14  are made, consistent with past practices, the incremental

15  difference in cash, up to the maximum amount contemplated by

16  the KEIP.

17      Subject to the next provision, all cash payments made upon

18  the consummation of a restructuring transaction shall be

19  accrued, earned, payable, and not subject to clawback.

20      That next provision is as follows:  If any KEIP

21  participant leaves before the later of (1) when the company

22  pays amounts due at the time the annual incentive plan

23  payments are made, consistent with past practices; or (2)

24  April 1, 2020, there is a full clawback of (a) fifty percent

25  of the incremental difference between the threshold bonus and

1    the target bonus, in an amount not greater than $530,428, to

2    the extent actually paid; and (b) the prorated safety bonus,

3    to the extent actually paid; provided, however, that if the

4    KEIP participant is terminated without cause, there is no

5    clawback, and if the KEIP participant is constructively

6    terminated, and that term will be agreed upon by the parties,

7    there is no clawback.

8        As provided in the KEIP plan, the KEIP participants may be

9    entitled to receive payment under the KEIP for multiple sale

10   transactions; provided, however, that in the event that a sale

11   transaction occurs in conjunction with a restructuring

12   transaction, the KEIP participant shall only be entitled to

13   receive one payment equal to the greater of the KEIP payment

14   attributable to such sale transaction or the restructuring

15   transaction fee for the entire transaction.  And a sale

16   transaction that occurs post-emergence shall not give rise to

17   any payments under the KEIP plan unless such sale transaction

18   would result in payments greater than amounts payable under

19   the KEIP plan as calculated through the date of the sale

20   transaction.

21       In such circumstance, KEIP participants shall be entitled

22   to the greater of the KEIP payment attributable to such sale

23   transaction or the previously-paid restructuring transaction

24   fee.

25       Two more bullets, Your Honor.

1        As provided in the KEIP plan, in the event of the sale of

2   any division but such sale is less than $500 million, the

3   EBITDA metric shall be adjusted on a pro forma basis for

4   measurement purposes effective at the time of the divestiture,

5   and all KEIP participants, including those that are terminated

6   as a result of the sale, shall be eligible to receive a

7   restructuring transaction fee based upon the adjusted budget

8   and other metrics relating to a restructuring transaction.

9        And lastly, the bankruptcy court maintains jurisdiction in

10  the event there is a dispute on the terms outlined above,

11  either before, at, or after any payment -- after the time of

12  any payment under the KEIP.

13       So, Your Honor, that's the record.  That's the deal.  As I

14  was reading through the bullets, I realized I might as well

15  address it in plain English.  The deal is as follows, and this

16  is all subject to what I just said.  But, basically,

17  previously, the KEIP payment would be paid in full in cash

18  upon either the consummation of a restructuring transaction or

19  a sale transaction.  Now, it's paid in part.  It's paid up to

20  the threshold, plus an incremental piece.  And this gives

21  management the ability to earn the difference basically on the

22  backend.  It gives the Creditors' Committee some comfort that

23  each of these KEIP participants won't be leaving immediately

24  after consummation of that, the transaction.  That was the

25  basis of the deal.

1    And with that, Your Honor, I would ask the Creditors'

2  Committee to confirm that that has been agreed upon.

3         MR. LEBLANC:  Yes, Your Honor.

4         THE COURT:  Thank you.

5         MR. SIMON:  Before I go into the proffer of Mr. Del

6  Genio which was asked for by the U.S. Trustee, I would just

7  note for the record:  This was not an easy deal to get to,

8  Your Honor, and I just want to thank Mr. Zellin from the

9  Committee, Mr. Pulio (phonetic), Mr. Del Genio, Mr. Bospflug,

10  and Mr. Grath (phonetic) for helping move this along very

11  quickly.

12    Just moving along, Your Honor, we'll just proffer the

13  testimony of Mr. Del Genio.  As you know, Mr. Del Genio is

14  present in the courtroom, and if called upon to testify, would

15  testify as to the following.

16         PROFFER OF TESTIMONY OF ROBERT DEL GENIO

17         MR. SIMON:  Mr. Del Genio is a managing director at

18  FTI Consulting.  He currently serves as the chief

19  restructuring officer of the Debtors, and has served in that

20  capacity since March 12, 2019.

21    Prior to the petition date, Mr. Del Genio, along with

22  other members of FTI, certain attorneys from DLA Piper, and

23  Mr. Jamie Hinch, the Debtors' chief administrative officer,

24  compromised a working group to review, evaluate, modify, and

25  ultimately recommend a Key Employee Incentive Plan for PHI.

Del Genio - Proffer                          225

1      The purpose of the working group and ultimately the

2   purpose of the implementation of the KEIP was to properly

3   incentivize senior management of the Debtors through the

4   Chapter 11 bankruptcy case.  Although certain elements of the

5   KEIP have retentive effects, the KEIP is not primarily

6   retentive, and is, in fact, an incentive plan.

7      Through that process, which began in January and

8   culminated in the compensation committee's approval of the Key

9   Employee Incentive Plan on February 20, 2019, the KEIP, as

10  approved by the compensation committee on that date, contained

11  two triggers for payment.  Either the consummation of a

12  restructuring transaction or the consummation of a sale

13  transaction.

14     The sale transaction requires a sale of all or

15  substantially all of the Debtors' businesses in excess of $500

16  million.  The restructuring transaction is payable based upon

17  financial metrics, previously net operating cash flow, now

18  EBITDA, between threshold, target, and stretch, and that's

19  based upon the Debtors' financial performance during the

20  relevant period.

21     The KEIP also includes a safety component which can modify

22  the KEIP payments upwards or downwards by 20 percent.  Mr.

23  Del Genio would further testify that safety is always an

24  important component of any incentive plan at PHI.

25     Mr. Del Genio would further testify that the metrics

Del Genio - Proffer                    226

1    described are difficult to achieve, and it is possible that a

2    sale transaction or a restructuring transaction is triggered

3    but no KEIP bonus would be payable.

4         Since the filing of the motion, Mr. Del Genio was involved

5    in various settlement negotiations with the Committee

6    regarding resolving the Committee's objection to the KEIP,

7    including just prior to and during today's hearing.  The

8    settlement as read into the record earlier accurately

9    represents the settlement as agreed upon during this hearing,

10   and Mr. Del Genio would testify as such.

11        This would conclude the proffer of Mr. Del Genio.

12             THE COURT:  Thank you, Mr. Simon.

13        Mr. Del Genio, if you would come up and let me swear you

14   in.  I believe you may be asked questions, so why don't you

15   just come up all the way to the front, if you would?

16             ROBERT DEL GENIO, DEBTORS' WITNESS, SWORN

17             THE COURT:  You may be seated.  Did you hear the

18   proffer of your testimony by Mr. Simon?

19             THE WITNESS:  I did, Your Honor.

20             THE COURT:  And was it true and correct?

21             THE WITNESS:  Yes, it was.

22             THE COURT:  And if you had been asked questions and

23   given answers, would you have testified the same?

24             THE WITNESS:  Yes, I would.

25             THE COURT:  Is there anything that you'd like to add

Del Genio - Cross                          227

1    to your proffer?

2              THE WITNESS:  The only thing I'd like to add is Mr.

3    Simon was involved in this and he deserves some credit as

4    well.

5              THE COURT:  I'm sure he appreciates that.

6         Does anyone have any questions of Mr. Del Genio?

7              MS. KIPPES:  Thank you, Your Honor.  Meredith Kippes

8    on behalf of the United States Trustee.

9                        CROSS-EXAMINATION

10   BY MS. KIPPES:

11   Q    Good afternoon, Mr. Del Genio.

12   A    Good afternoon.

13   Q    I have a few questions.  Who negotiated the incentive plan

14   on behalf of the Debtors?

15   A    The incentive plan was presented by the working group,

16   which was made up of Mr. Simon and members of my team, myself.

17   We also worked with the compensation committee.  So, we

18   presented this, and Mr. Hinch was involved from the company

19   side initially because he's the chief administrative officer

20   and very familiar with their historic compensation plans.

21        We then, with the formation of that, a conversation with

22   Mr. Bospflug, who is the president and chief operating

23   officer, about KEIP participants and the structure of this,

24   presented it to the compensation committee.  They, like all

25   compensation committees, asked questions, challenged, and we

1  worked through that to ultimately come up with a plan that we

2  were really prepared to present to this Court.

3  Q    Okay.  Did current management have separate counsel during

4  the negotiations?

5  A    They might have, but I don't -- I didn't interact with

6  them, so that, I don't know.

7  Q    Do you know whether this -- somebody independent of the

8  Debtor was negotiating the incentive plan on behalf of the

9  current management?

10 A    What I would say is that the -- as part of the working

11 group, we had put that together.  Mr. Bospflug talked to his

12 management team, and they found this acceptable, knowing that

13 it had to be approved by the Court.  So, it was a conversation

14 with them.  They understood the provisions of that.  They went

15 through that, quite frankly, Mr. Simon and I took questions on

16 that and explained that to members that had some questions,

17 but there was also discussion on that side.

18     The other thing I'd point out is, because the compensation

19 committee, it regularly looks at how their compensation

20 relates to the peer group and does studies on that, that they

21 were pretty familiar with how their compensation worked

22 historically.  And then the work we put together with DLA to

23 show what are comparable for KEIPs, they also had the benefit

24 of that, as well as the compensation committee and our

25 judgment on what was market, which I have testified to.

Del Genio - Cross                    229

1    Q    Okay.  Do you think any of the current management would

2    resign if this isn't approved today?

3    A    Well, I believe that this KEIP is very important to

4    provide the incentives for management.  KEIPs are designed so

5    that you have proper incentives during this process, because

6    what -- there's two things that I think are really important.

7    Is (1) you need to preserve and enhance the value of the

8    company and the estate for the benefit of all the

9    stakeholders; and (2) is they need to focus on providing safe

10   and reliable transportation.

11        KEIPs are designed so management can be focused in the

12   midst of what I would call the Chapter 11 process.  And

13   there's a lot of distractions in that process.  And what you

14   need to do is you need to design incentives so they know, if

15   they're doing what they need to do, they're going to get

16   properly incentivized, so they're not worried about what their

17   compensation is going to be, they're not going to listen to

18   people who might be talking to them about seeking other

19   offers, which there has been some inbound inquiries.  We felt

20   very strongly, and so did the compensation committee, we need

21   to have that in place to, first and foremost, drive those

22   incentives I've talked to, but as Mr. Simon says, there is

23   some retentive aspect to it.  And if people are focused on,

24   here's what I need to do, these are what are the incentives in

25   place, and if I do that I will be rewarded, they are less

Del Genio - Cross                          230

1   likely to seek other opportunities, or more importantly,

2   respond to other opportunities.

3   Q    Okay.  Thank you for that.  My question was:  Do you think

4   any of current management might resign right now?  Do you have

5   a sense of that?

6   A    Yeah, I -- what I would tell you is I know there have been

7   -- there are certain -- and, again, I'm not going to be

8   specific because --

9   Q    That's fine.

10  A    -- of the confidential nature of this, --

11  Q    Yes.

12  A    -- but there have been -- every member of senior

13  management has been approached.

14  Q    Okay.

15  A    And I believe that this is the -- and I've said this

16  before -- best management team in this industry.  They've done

17  a really good job.  And these are executives that can work in

18  not only this industry, but other businesses.  And I think if

19  they're not taken care of, there's a high likelihood they

20  could seek other employment.

21  Q    Do any of them, the incentive plan recipients, have job

22  offers?

23  A    They have -- they have been approached.

24  Q    They have been approached?

25  A    They have been approached by other parties.  And I have

Del Genio - Cross                                    231

1  talked to Mr. Bospflug and Mr. Hinch about who has been

2  approached.  Again, it's confidential, but they are -- one of

3  the reasons that this KEIP is in place is, again, to provide

4  the right incentives and to make sure that they're focused on

5  doing what they're doing.  And it's not just my concern.  It

6  was a concern of the compensation committee as well.

7  Q   Okay.

8          MS. KIPPES:  No further questions, Your Honor.  Thank

9  you.

10         THE COURT:  Thank you, Ms. Kippes.  Does the

11  Committee have any questions of Mr. Del Genio?

12         MR. LEBLANC:  We do not, Your Honor.

13         THE COURT:  Mr. Simon, do you have any follow-up

14  questions?

15         MR. SIMON:  Just very brief, Your Honor.

16                       REDIRECT EXAMINATION

17  BY MR. SIMON:

18  Q   Mr. Del Genio, Ms. Kippes asked you whether current

19  management retained separate counsel in connection with the

20  KEIP.  How many KEIPs have you seen in your experience, either

21  at FTI or CDG or previously?

22  A   It seems like almost every case there's a discussion on

23  KEIP.  People at the firm kind of refer to me as the KEIP

24  magnet because I seem to get involved in most of these.  So,

25  it's a pretty typical situation for me because it always seems

1  like this is an important issue and I'm the one, a lot of

2  times, that has to deal with it.  So, it's -- I'm used to

3  dealing with this.

4  Q    Do you find it customary for management to retain separate

5  counsel in connection with the KEIP?

6  A    I think it's rare.  I merely have seen it on one or two

7  occasions, but they're very rare.

8  Q    Certainly not customary?

9  A    It is not customary.

10  Q    And it doesn't surprise you in this case that that didn't

11  happen, either?

12  A    No, I think management usually relies on the professionals

13  that the company retains and what their view is of the KEIP as

14  it relates to the bankruptcy process, both financial and legal

15  professionals.

16  Q    Okay.  Lastly, Ms. Kippes asked you if you thought

17  management would resign if the KEIP were not approved today.

18  That being a tough question, let me ask you:  Is there a risk

19  of any one of the KEIP participants leaving if the KEIP were

20  not approved today?

21  A    Yes, I believe there's risk, and that's why the -- one of

22  the reasons.  But again, I think the -- what I think is very

23  critical here is a well-designed KEIP with the right type of

24  incentives keeps management focused on what they're doing and

25  less likely to listen or look for other alternative, which is

Del Genio - Redirect                               233

1  another way of saying it has -- keeps them focused and less

2  likely to leave.

3  Q    What do you think the business impact would be to the

4  Debtors if one or more of the KEIP participants left?

5  A    It would be very significant.  These are experienced

6  executives that are not easy to replace that have worked in

7  this industry, for this company and similar companies, and it

8  would be very difficult to replace.  And it would harm the

9  company significantly if these senior members left at this

10 point in time.

11 Q    Lastly, did the working group and the compensation

12 committee take all of those factors into account when

13 formulating and implementing the KEIP?

14 A    Yes, we did.

15         MR. SIMON:  Thank you, Your Honor.  Nothing further.

16         THE COURT:  Does anyone else have any questions of

17 Mr. Del Genio?

18     You may step down, sir.  Thank you.

19         THE WITNESS:  Thank you.

20     (The witness steps down.)

21         THE COURT: Anything further on the KEIP motion?  Ms.

22 Kippes, were you -- are you satisfied with your objections?

23         MS. KIPPES:  Your Honor, I'll take that as an

24 invitation to argue a little bit.  Meredith Kippes on behalf

25 of the United States Trustee.

1    As Mr. Del Genio acknowledged, there are retention aspects

2    to this KEIP.  This is why we had asked the Court to consider

3    it under the higher standard of 503(c)(1) rather than the

4    lower standard of 503(c)(3).  And we maintain that the Court

5    should look at this, since it involves insiders and it does

6    have a retention aspect, that the Court should evaluate this

7    plan under 501(c)(3) and evaluate whether the Debtor has met

8    the standards under 501(c)(3).

9    As the Court knows, it's the Debtors' burden.  And if a

10   plan does not require affirmative action -- it does here --

11   beyond that contemplated prepetition, then it's not an

12   incentive plan.  There's testimony -- the proffered testimony

13   of Mr. Del Genio suggests that there are metrics in place

14   which would meet the standard.  But again, that is for the

15   Court to decide.  And we would ask that the Court decide it

16   under Section 503(c)(1) rather than the lower standard of

17   503(c)(3).

18   Thank you.

19   THE COURT:  Thank you.  Mr. Simon, you get to go

20   last.

21   MR. SIMON:  Your Honor, there was uncontroverted

22   testimony.  In fact, Ms. Kippes' questions did not address

23   whether this was an incentive plan or a retention plan.  This

24   is clearly an incentive plan.  We're seeking it under

25   503(c)(3) of the Bankruptcy Code and Section 363 of the

1    Bankruptcy Code.  There is a slightly different -- there's

2    some uncertainty in the case law about the proper standard to

3    apply under those sections, either the business judgment rule

4    or some slightly different standard, as highlighted by Judge

5    Lynn in *Pilgrim's Pride*, but in any event we have met those

6    standards.

7         I think it's very important to note that the Key -- the

8    economic participants in this KEIP have now signed off on this

9    KEIP with the deal with the Creditors' Committee.  The sole

10   retentive effect that was addressed in the U.S. Trustee's

11   objection was simply that they have to be here in order to be

12   paid.  We noted in our reply that's illogical.  That doesn't

13   make sense.  Because if it -- if that weren't the case, we

14   would actually be incentivizing these employees to leave.

15   Certainly, that's not the law, and that's not appropriate as

16   argued by the U.S. Trustee.

17        This is under 503(c)(3).  We have shown that's it's

18   justified by the facts and circumstances of this case.  Mr.

19   Del Genio just highlighted the fact that there are

20   solicitation impacts relating to these key participants.  This

21   was in the mind of the compensation committee on February

22   20th, and it still is today.  And it's important and

23   appropriate and well within the business judgment of the

24   Debtors to implement this Key Employee Incentive Plan, and we

25   believe it is justified by the facts and circumstances.

1          Thank you.

2              THE COURT:  Thank you.  We'll go to mediation and

3     adjournment, take a short recess, I'll come back and give you

4     a ruling in this one.

5              MR. SIMON:  Okay.

6              MR. CALIFANO:  Your Honor, we just need five minutes

7     to work out the language for mediation.  We just have to work

8     out one term.  Is it all right if we take a five-minute break

9     for the mediation?  I know we have time constraints.

10             THE COURT:  Sure.  That'd be fine.  Remember that Mr.

11    Levick -- where are you, Mr. Levick?

12             MR. LEVICK:  I'm right here, --

13             THE COURT:  Yes.  Okay.

14             MR. LEVICK:  -- Your Honor.

15             THE COURT:  Mr. Levick has some issue on mediation

16    that we're going to have to address.

17             MR. CALIFANO:  Right.  He wants to come, and we don't

18    want him there.

19             THE COURT:  I suspected as much.  We'll be in recess

20    for five minutes, though, okay?

21        (A recess ensued from 4:11 p.m. to 4:19 p.m.)

22             THE CLERK:  All rise.

23             THE COURT:  Good afternoon.  Please be seated.  Thank

24    you.

25        All right.  That was actually productive, Mr. Califano.

1      Mr. Simon, the KEIP motion is going to be granted under

2  Section 503(c)(3) and 363.  There may be some hint of some

3  sort of retention, but I think that's often the case with

4  KEIPs.  But in any event, if you would prepare an order and

5  circulate it, I'll sign it upon receipt.

6          MR. SIMON:  Thank you, Your Honor.  What I'll do is

7  I'll send a revised plan to the Committee counsel and we'll

8  make sure we have their sign-off on that before.

9          THE COURT:  All right.  Mediation?

10         MR. CALIFANO:  Yes, Your Honor.  We have an agreement

11 on a mediation process, Your Honor.  And Mr. Dunne or Mr.

12 Khalil can interrupt me if I get anything wrong.

13         THE COURT:  I'm sure they will.

14         MR. CALIFANO:  Yeah.  They didn't need my permission,

15 I guess.

16     All -- the Debtors' disclosure statement is going to be

17 moved to May 29th.  The Committee's standing motion is going

18 to be moved to May 29th.  We have agreed to a litigation

19 standstill except for two exceptions.  The Committee wants to

20 file a motion to terminate exclusivity that will be on for the

21 29th.  The Debtors will be filing a motion for cash collateral

22 usage with -- but -- and I've told the Committee counsel we

23 will preview that motion with them.

24     The mediation is to start as soon as possible.  Monday, if

25 the mediator is available.  We have agreed that, subject to

1   their availability, we can't agree for them, either Judges

2   Houser, Jernigan, Jones, or Isgur, we would be fine with.  And

3   we're fine -- we'll leave it with Your Honor to choose.  I

4   don't know who you --

5       THE COURT:  Uh-huh.  I don't know that I can get a

6   sitting judge that soon, Mr. Califano.

7       MR. CALIFANO:  But we'll start -- we can start and

8   we'll push -- if we have to push things out further, we'll

9   push things out further.  But we're just saying we will be

10  available whenever the mediator is available and as soon as

11  Monday.

12      THE COURT:  And let me ask.  Why aren't you all going

13  -- why aren't you all actually just going ahead and using a

14  mediator that you can get on board?

15      MR. CALIFANO:  Well, honestly, Your Honor, and it's

16  -- I think that based -- and I think Mr. Dunne agrees with me

17  -- I think, based on the tenor of the case, having a judge

18  will encourage people to behave in a better fashion.  It's --

19  I mean, I think we're -- we would be -- we would appreciate

20  having a sitting judge in place.  We think it would be helpful

21  to the process.

22      THE COURT:  All right.  I'm just not sure I can

23  accomplish that for you.

24      MR. CALIFANO:  No, I understand that, Your Honor.

25      THE COURT:  I'll just say that.

1          MR. CALIFANO:  I understand that.  I understand.  And

2     if you want, we can have -- we can do reach-out to the various

3     chambers.

4          THE COURT:  Well, why don't you let me react to that

5     first with them.  I don't --

6          MR. CALIFANO:  Thank you, Your Honor.

7          THE COURT:  And then I'll just get back with you all

8     promptly, because I think this does need to be resolved.

9          MR. CALIFANO:  The participants -- we suggest the

10    participants in the mediation, at this stage, Your Honor, be

11    the Debtor; Thirty Two, LLC; the Official Committee of

12    Unsecured Creditors; and the Indenture Trustee.  We think

13    there are significant enough issues among those constituents

14    that need to be resolved, and then at a further date it may or

15    may not make sense to bring in other participants.  But right

16    now, there are a number of issues, and I think we've got to

17    take sort of the main event first and then work our way from

18    there.

19       So, that's -- I know I was kind of flip when I said we

20    didn't want Mr. Levine [sic] there.  It's not that.  We just

21    really have too much to focus on between the Debtors and the

22    Committee.

23         THE COURT:  So, who would be participating in the

24    mediation?

25         MR. CALIFANO:  It would be the Debtor; Thirty Two,

1   LLC; the Official Committee of Unsecured Creditors; and the

2   Indenture Trustee.  And as I said, Your Honor, a two-week

3   litigation hold except for the motion to terminate exclusivity

4   and the cash collateral motion that'll be filed.  And the

5   Debtors' time to respond to the motion to terminate

6   exclusivity will be conterminous with the end of mediation,

7   either successful or when the parties say mediation won't work

8   any further.

9       Did I get it right?

10          MR. DUNNE:  You got it right.

11          MR. CALIFANO:  Thank you.

12          MR. DUNNE:  Your Honor, just a couple of comments

13  from the Committee.  And for the record, it's Dennis Dunne

14  from Milbank.

15      We support mediation.  We think it's time.  I think what

16  you saw with us today on the KEIP is an example of what can be

17  accomplished when we get the requisite information, full

18  engagement from the Debtors, and people are trying to draw

19  towards a solution.  And I agree that we should put down the

20  litigation cudgels for a few weeks and see where we can get

21  to.

22      With respect to the sitting judge request for mediator, I

23  just -- frankly, I just found myself, and this is anecdotal,

24  and, you know, the plural of anecdote is not data, so it's

25  just anecdotal -- which is that I've had better success with

1    sitting judges in the past few years, or recently retired

2    judges, and would love to take a shot at that in this case

3    because we'd love to try to get something done in the next

4    month.

5         And I think, as Mr. Califano was saying before about some

6    of the rancor, part of what we've been reacting to is what I

7    think has been the out-of-sequence.  You had the plan filed

8    and now we're going to go do the negotiations.  Let's put that

9    behind us and let's do the negotiations and let's hope we're

10   here at the end of May with good news and that we don't have

11   to worry about all that other litigation that'll pop up on the

12   29th.

13            THE COURT:  Thank you.

14            MR. CALIFANO:  Thank you, Your Honor.

15            THE COURT:  All right.  So, on a mediator, my

16   intentions would be to make an inquiry and try to get back

17   with you all, maybe as soon as tomorrow on that.

18            MR. CALIFANO:  Okay.

19            THE COURT:  So you can react to that.

20            MR. CALIFANO:  As you know, I'll be in town for a

21   couple of days.

22            THE COURT:  We're glad to have you.  All right.  Let

23   me hear Mr. Levick's comment.

24            MR. LEVICK:  Good afternoon, Your Honor.  I'm kind of

25   used to people not wanting me around, so I didn't find that

1    offensive.  As you know, I represent Christina Wray in a

2    putative class of class action plaintiffs who were former

3    customers of the Debtor.  In other words, they used the air

4    ambulance service.

5        This motion was filed on Friday.  I conferred with the

6    Debtor.  Mr. Califano is correct:  They didn't want to invite

7    my putative class or the counsel for the putative class.  The

8    Committee didn't really have an opinion on whether we could

9    attend or not, but they thought, if push come to shove, they

10   might not want us there, either.

11       But let me give you a quick background, Your Honor.  As

12   recently as Friday, this past Friday, on ABCnews.com, there's

13   been another big news story about the air ambulance industry

14   and its controversial financial collection practices.  As you

15   know, someone may be taken by an air ambulance and they're not

16   conscious and there's no contract, and before they know it

17   they're handed a bill for between $50,000 and $60,000, Your

18   Honor.  And Mr. -- the Debtors' rep; I'm sorry, I have his

19   name right here -- Del Genio testified at the 341 meeting last

20   Friday that the reasonable or average cost of that should be

21   about $10,000, $11,000, or $12,000.  Well, that's the point of

22   the putative class action claimants.

23       It's unusual in this case, Your Honor, because the class

24   is not owed money, the class actually owes money to the

25   Debtor, but this class has been described as financially

1   crippled.  After going through all of this physical harm,

2   they're having their financial lives ruined by air ambulance

3   companies.  And I'm here to try to help them and maybe put a

4   stop to this or to come up with something reasonable.

5       So, here we are in this situation, and we're weighing our

6   options, Your Honor.  We have a pending case in Arizona.  Do

7   we file a motion for relief from stay to continue that?  Do we

8   file some kind of cause of action in this Court that may try

9   to stay some of the collection practices until this Court or

10  another court can determine what the reasonable value of such

11  a service is?  Because, remember, there's no contract.

12      To establish a reasonable value of these services can help

13  the Debtor, Your Honor, and the reason is because they're

14  trying to collect also from insurance companies.  The issue of

15  what is collectable from the putative class is very important

16  to feasibility in the plan, to collections in the plan, but

17  it's also important, you know, for humanity, to try to do

18  something for these thousands of people that are being

19  harassed and think that their financial lives have come to an

20  end.

21      So, I think there is a chance to do the right thing and to

22  maybe end this litigation in Arizona and not have to file

23  something in this Court that's going to turn out to be very

24  expensive and time-consuming.  Here we are on basically one

25  hearing, one contested hearing today, and look at all the

1  attorneys that showed up.  I am a big believer in mediation.

2  I've had mediation get me out of a lot of jams, and I think

3  that -- I'm glad to see that these parties are going to

4  mediation.  We just want a seat at the kids' table.  We will

5  only speak if spoken to, Your Honor.  We realize that while we

6  may think we're the big fish, we're not exactly the big fish

7  at this mediation, but it is such an unusual issue and it

8  looks like you're going to get an all-star mediator, I think

9  we take advantage of that if there's the chance, and we sit

10  down there, and when they have time for us, we'll pipe up, and

11  maybe we can reach a deal on this issue that is crucially

12  important to thousands of people.

13      So, I know this motion was filed Friday, and here I am on

14  Monday, but I am asking for a seat at the table.

15      Thank you, Your Honor.

16          THE COURT:  Thank you, Mr. Levick.  One more right

17  behind you, Mr. Califano.

18          MR. GOLUBCHIK:  Good afternoon, Your Honor.  David

19  Golubchik; Levene, Neale, Bender, Yoo & Brill; for the other

20  Official Committee of Equity Security Holders.

21      The Equity Committee was just formed late on Thursday, and

22  I reached out to Debtor -- Committee counsel.  I won't use the

23  kids' table, but I'll use the sandbox analogy, kind of can we

24  play in the sandbox with you, and I guess the message is not

25  enough sand in the sandbox.

1    We have a case that started with about half a billion

2  dollars in equity, presumably creditors in the money, the

3  issue is Equity Committee.  We have the U.S. Trustee forming

4  the Equity Committee.  So, there's some view that equity has

5  an interest in this case.  And the day after the Equity

6  Committee was formed, I guess the Debtor filed a valuation

7  that says the assets are worth or the company is worth about

8  half a billion dollars.  So, not only is equity out of the

9  money, but that creditors are partially out of the money.

10    It's an important issue, and based on the Debtors' motion,

11  the goal here is to minimize litigation and focus on

12  resolution of the case.  So far, the Committee has been

13  handling the laboring oar of the litigation.  It only seems

14  appropriate that the Equity Committee appointed by the U.S.

15  Trustee should be part of this process, rather than engage in

16  litigation while these guys are working on a mediation.  So,

17  we're here telling the Court that we believe the Equity

18  Committee should be part of the process.

19         THE COURT:  Thank you.

20         MR. CALIFANO:  Your Honor, what we do -- what we work

21  out with the Official Committee of Unsecured Creditors isn't

22  going to be binding on any other creditor.  Okay.  We have

23  serious issues with the Official Committee, as you've seen

24  from the beginning of this case, and we think we can resolve

25  them.  But we think it's best if the main players be focused.

1    Now, the class action, it's an uncertified class of people

2    who say they owe less money to us than we say they owe.

3    Completely inappropriate.  They can be dealt with.  If they

4    want to make a motion for relief from stay, litigation hold

5    doesn't want to -- doesn't apply to them.  If they want to

6    make -- file a class action proof of claim, I'll welcome that.

7    With respect to the Equity Committee, Your Honor knows our

8    belief about the Equity Committee.  There isn't anything here

9    for equity.  Okay.  I think the clearest indication of that

10   was that Mr. Gonsoulin, who owns a big chunk of equity, walked

11   away from his equity and his only participation is on his

12   secured claim.  That has issues, but it's pretty clear -- and

13   Houlihan filed a valuation where the midrange was $480-some-

14   odd million.  And we know that the debt here is greater than

15   that.

16   We need to focus on the main event, and the main event is

17   resolving the issues that we have with this Unsecured

18   Creditors' Committee, which represents the majority of the

19   debt here in this case.  It's been tough enough to get here,

20   to get to the point where we're talking about a mediation.  We

21   can't have it complicated by other participants who have much

22   smaller stakes, if any stake at all.

23   Now, we're not going to be able to make a deal that binds

24   the equity or binds this putative class, but we have our own

25   issues to work out, Your Honor, that will only be complicated

1   by having these other participants.  We chose the participants

2   because those are the ones we need to resolve the litigation

3   that is in front of us.

4       One thing, and I'm sure Mr. Dunne will speak for himself,

5   but one thing we do agree on is that we need our clients and

6   Thirty Two, LLC in the room talking.  It's not going to end

7   this case.  There's other constituents to deal with who will

8   be dealt with in due course.  But we need to resolve these

9   issues with our main constituents, and then -- before we can

10   go forward, or else there's nothing in here for anyone and

11   this case becomes a morass.  We'll deal with those people

12   before we confirm a plan.  We'll deal with them as part of the

13   process.  But right now, we need to focus on the main

14   antagonist.

15       Thank you, Your Honor.

16           THE COURT:  Thank you.

17           MR. DUNNE:  Your Honor, it's Dennis Dunne on behalf

18   of the Official Committee.

19       I agree that we should narrow the list of attendees at

20   mediation for now, for a few reasons.  Principally, we -- I'd

21   like to focus on maximizing the chance that we have success

22   between and among the Debtors and, you know, the Official

23   Committee and the secured creditors, and recognizing that then

24   we may have to engage others as we move that deal forward.

25       I've also been involved in too many mediations where

1    additional parties quickly become ancillary and they end up

2    just sitting in a conference room while the mediator has

3    concluded what we've concluded, that he or she should spend

4    the bulk of his or her time focused on trying to get a deal

5    between the Debtors and the Official Creditors' Committee, and

6    then all we've done is kind of run up the cost to the estate

7    by have other estate representatives sit there.

8        With respect to the class action question, I don't think

9    that those issues there are right for this mediation that

10   we're talking about, in terms of the capital structure and the

11   balance sheet of Reorganized PHI.  And with the Equity

12   Committee, we all recognize that if we get to a deal we'll

13   have to turn around and figure out a way to deal with them or

14   address their concerns otherwise.

15       Thank you.

16            THE COURT:  Thank you.

17            MR. GOLUBCHIK:  Just briefly, Your Honor.  I guess

18   what -- to me, what Mr. Califano says just makes no sense.

19   First of all, Mr. Gonsoulin is giving up equity.  Under the

20   insider plan, he gets a lot more of the equity, so I've got

21   that deal.  But how the creditors are treated directly affects

22   equity.  We have a priority scheme, a waterfall.  So, I don't

23   think you can have one without the other.

24       Of course, the possibility is the Debtor, creditors, get

25   together, work out a plan that makes sense, and basically cut

1  the bottom off.  That's exactly why the Equity Committee

2  should be -- an Official Equity Committee should be part of

3  the process.

4          THE COURT:  Thank you.  I said I didn't want to take

5  another recess, but let me take just a real quick one.  We'll

6  come back and talk about that.

7      (A recess ensued from 4:37 p.m. to 4:39 p.m.)

8          THE CLERK:  All rise.

9          THE COURT:  Please be seated.  Thank you.

10     On the mediator, I still think that a private mediator is

11 what you're going to end up with, maybe a former judge, but

12 I'll at least ask the four.  I kind of know what is happening

13 in at least two of their lives.  And I'll get back to you all

14 tomorrow.

15     I think the Official Committee of Equity needs to

16 participate in this process.  They were just formed.  It may

17 very well be that they're out of the money, but I do think

18 that, to fulfill their fiduciary duty to their constituents,

19 they need to attend.

20     The putative class action, I think, does not participate

21 in this mediation.

22     And I'll get back with Mr. Califano and Mr. Dunne tomorrow

23 just on the answer on the mediator.

24     On Houlihan, we actually need to write something up.  I

25 can do this by CourtCall tomorrow at 9:00.  I think some of

1    you are actually going to be here for hearings.  So you can

2    just register by CourtCall.  I'm going to give you a ruling at

3    9:00 o'clock tomorrow morning.  All right.

4              MR. CALIFANO:  Thank you, Your Honor.

5              THE COURT:  Thank you very much.

6         (Proceedings concluded at 4:40 p.m.)

7                           --oOo--

8

9

10

11

12

13

14

15

16

17

18

19                          CERTIFICATE

20        I certify that the foregoing is a correct transcript from
     the digital sound recording of the proceedings in the above-
21   entitled matter.

22     **/s/ Kathy Rehling**                        **04/30/2019**

23   _____    _____
     Kathy Rehling, CETD-444                          Date
24   Certified Electronic Court Transcriber

25

251

INDEX

PROCEEDINGS                                                    5

WITNESSES

Debtors' Witnesses

Matthew Niemann
- Direct Examination by Mr. Hynes                            26
- Cross-Examination by Mr. Leblanc                          44
- Redirect Examination by Mr. Hynes                        104
- Recross-Examination by Mr. Leblanc                       118

Lance Bospflug
- Direct Examination by Mr. Hynes                          128

Robert Del Genio
- Direct Testimony by Proffer by Mr. Simon                 224
- Cross-Examination by Ms. Kippes                          227
- Redirect Examination by Mr. Simon                        231

Unsecured Creditors' Committee's Witnesses

Martin Lewis
- Direct Examination by Mr. Stone                          137
- Cross-Examination by Mr. Califano                        158
- Redirect Examination by Mr. Stone                        189
- Recross-Examination by Mr. Califano                      195

EXHIBITS

Debtors' Exhibits                          Identified Received

29    Application to Retain Houlihan Lokey      37        39
30    Niemann Declaration                       38        39
33    Lewis Declaration                        144        --
35    PJT Fee Comparison                        34        37

CLOSING ARGUMENTS (Houlihan Lokey Retention)

- By Mr. Califano                                          200
- By Mr. Leblanc                                           206
- By Ms. Kippes                                            214
- By Mr. Califano                                          214

INDEX
Page 2

RULINGS

Motion for Entry of Final Orders (I) Authorizing the          14
Debtors' Proposed Form of Adequate Assurance of Payment
to Utility Companies, (II) Establishing Procedures for
Resolving Objections by Utility Companies, (III)
Prohibiting Utility Companies From Altering, Refusing, or
Discontinuing Service and (I) Granting Related Relief
filed by Debtor PHI, Inc. (9) - *Granted*

Motion to Employ and Retain Professionals in the Ordinary    15
Course of Business as Other Professional filed by Debtor
PHI, Inc. (180) - *Granted*

Emergency Motion In Limine to Preclude Debtors from          25
Introducing Certain Evidence filed by Creditor Committee
Official Committee of Unsecured Creditors (373) - *Denied*

Motion (I) Authorizing the Debtors to Implement Key          237
Employee Incentive Plan and Key Employee Retention Plan
and (II) Granting Related Relief filed by Debtor PHI,
Inc. (108) - *Granted*

Emergency Motion of the Debtors for Entry of an Order        249
Approving Appointment of Mediator to Mediate Issues
Related to a Chapter 11 Plan of Reorganization filed by
Debtor PHI, Inc. (353)

Motion for Limited Adjournment of Disclosure Statement       249
Hearing and Limited Extension of Deadline for Objecting
to Approval (268)

Application to Employ and Retain Houlihan Lokey Capital,     250
Inc. as Investment Banker Nunc Pro Tunc to the Petition
Date filed by Debtor PHI, Inc. (102)

Motion to Reject Executory Contract or Unexpired Lease
filed by Debtor PHI, Inc. (130) - *Reset to May 29, 2019
at 9:00 a.m.*

END OF PROCEEDINGS                                           250

INDEX                                                     251-252

**Exhibit "B"**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| PHI, Inc., *et al.*,[1] | Case No. 19-30923-hdh-11 |
| Debtors. | (Jointly Administered) |

**ORDER (I) AUTHORIZING THE DEBTORS
TO IMPLEMENT KEY EMPLOYEE INCENTIVE PLAN AND
<u>(II) GRANTING RELATED RELIEF</u>**

This matter coming before the Court on the Motion[2] filed by the above-captioned debtors

(collectively, the "<u>Debtors</u>") seeking approval and implementation of the Debtors' KEIP and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: PHI, Inc. (5707), PHI Air Medical, LLC (4705), AM Equity Holdings, L.L.C. (0730), PHI Tech Services, Inc. (5089) and PHI Helipass, L.L.C. (4187). The corporate headquarters and the mailing address for the Debtors listed above is 2001 SE Evangeline Thruway, Lafayette, LA 70508.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

granting related relief; the Court having reviewed the Motion; all as more fully set forth in the Motion; and upon consideration of the First Day Declaration, the Del Genio Declaration, the testimony in support of the Motion, and the announcement and the reading into the record of an agreement between the Debtors and the Official Committee of Unsecured Creditors during the April 29, 2019 hearings; and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing were adequate and appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and this Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED as set forth below.

2.      The KEIP, as described in **Exhibit A** to the Motion, is hereby approved subject to the following modifications, which were announced in open Court and read into the record as the agreement between the Debtors and the Official Committee of Unsecured Creditors:

- The Net Operating Cash Flow metric will switch to an EBITDA metric based on the Debtors' 2019 Business Plan, provided that $35 million of EBITDA will be the "Threshold" metric, which Threshold will be adjusted based on the timing of the Restructuring Transaction.

- Restructuring-related professional fees will not be included in the EBITDA metric, and all EBITDA targets will be net of all amounts payable under the

KEIP.

- Payments under the KEIP are to be paid in all cash; provided, however, that solely at each KEIP Participant's option and discretion, with such notice to be provided no later than two weeks prior to the proposed effective date, a portion of the KEIP payment may be converted from cash to new equity in the reorganized Debtor at plan value consistent with past practices.

- Upon the consummation of a Restructuring Transaction, the maximum aggregate -- i.e., for all Debtor KEIP Participants -- payout in cash, if earned, will be equal to the sum of (1) the Threshold bonus, or $3,182,567; (2) fifty percent equal to the incremental difference between the Threshold bonus and the Target bonus, which is equal to $530,428; and (3) a twenty percent safety bonus on a prorated basis based on timing from January 1, 2019 through the date of a Restructuring Transaction.

- On December 31, 2019, the Company's overall performance will be measured based on the KEIP metrics, as modified by this Order, with the Company to pay, at the time the Annual Incentive Plan payments are made, consistent with past practices, the incremental difference in cash, up to the maximum amount contemplated by the KEIP.

- All cash payments made upon the consummation of a Restructuring Transaction shall be accrued, earned, payable, and not subject to clawback, subject to the following: if any KEIP Participant leaves before the later of (1) when the Company pays amounts due at the time the Annual Incentive Plan payments are made, consistent with past practices; or (2) April 1, 2020, there is a full clawback of (a) fifty percent of the incremental difference between the Threshold bonus and the Target bonus, in an amount not greater than $530,428, to the extent actually paid; and (b) the prorated Safety Bonus, to the extent actually paid; provided, however, that if the KEIP Participant is terminated without cause, there is no clawback, and if the KEIP Participant is constructively terminated, and that term will be agreed upon by the Company and the Official Committee of Unsecured Creditors, there is no clawback.

- As provided in the KEIP, the KEIP Participants may be entitled to receive payment under the KEIP for multiple Sale Transactions; provided, however, that in the event that a Sale Transaction occurs in conjunction with a Restructuring Transaction, the KEIP Participant shall only be entitled to receive one payment equal to the greater of the KEIP payment attributable to such Sale Transaction or the Restructuring Transaction Fee for the entire transaction. And a Sale Transaction that occurs post-emergence shall not give rise to any payments under the KEIP unless such Sale Transaction would result in payments greater than amounts payable under the KEIP as calculated through the date of the Sale Transaction. In such circumstance, KEIP Participants shall be entitled to the greater of the KEIP payment attributable to such Sale Transaction or the previously-paid Restructuring Transaction Fee.

- As provided in the KEIP, in the event of the sale of any division but such sale is less than $500 million, the EBITDA metric shall be adjusted on a pro forma basis for measurement purposes effective at the time of the divestiture, and all KEIP Participants, including those that are terminated as a result of the sale, shall be eligible to receive a Restructuring Transaction Fee based upon the adjusted budget and other metrics relating to a Restructuring Transaction.

- This Court will maintain jurisdiction in the event there is a dispute on the terms outlined above, either before, at, or after any payment -- after the time of any payment under the KEIP.

3.      To the extent there is any inconsistency between the KEIP and this Order, this Order shall govern.

4.      The Debtors are further authorized to take any and all actions as may be necessary, desirable or appropriate to effect, implement, and/or consummate the KEIP as modified by this Order, including without limitation, making the payments that may become due thereunder, without further application or order of this Court.

5.      All amounts earned and payable under the KEIP as modified by this Order shall have administrative expense priority under sections 503(b) and 507(a)(2) of the Bankruptcy Code for all purposes in these chapter 11 cases and in any other cases under the Bankruptcy Code to which these cases may convert.

6.      This Court shall retain jurisdiction over all matters set forth in the Motion, including the entitlement of any party to any payment pursuant to the KEIP as modified by this Order.

### # # # End of Order # # #