David B. Golubchik (admitted *pro hac vice*)
Eve H. Karasik (admitted *pro hac vice*)
Gary E. Klausner (admitted *pro hac vice*)
**LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.**
10250 Constellation Boulevard, Suite 1700
Los Angeles, CA 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: dbg@lnbyb.com
      ehk@lnbyb.com

-and-

Jason S. Brookner (Texas Bar No. 24033684)
Lydia R. Webb (Texas Bar No. 24083758)
Amber M. Carson (Texas Bar No. 24075610)
**GRAY REED & McGRAW LLP**
1601 Elm Street, Suite 4600
Dallas, TX 75201
Telephone: (214) 954-4135
Facsimile:  (214) 953-1332
Email: jbrookner@grayreed.com
      acarson@grayreed.com
      lwebb@grayreed.com

**COUNSEL TO THE OFFICIAL COMMITTEE
OF EQUITY SECURITY HOLDERS**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| PHI, INC., *et al.*,[1] | § | Case No. 19-30923-hdh-11 |
| | § | |
| Debtors. | § | Chapter 11 (Jointly Administered) |
| | § | |

**THE OFFICIAL COMMITTEE OF EQUITY SECURITY
HOLDERS' OBJECTION TO THE DEBTORS' DISCLOSURE STATEMENT**

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: PHI, Inc. (5707), PHI Air Medical L.L.C. (4705), AM Equity Holdings, L.L.C. (0730), PHI Tech Services, Inc. (5089), and PHI Helipass, L.L.C. (4187) (collectively, the "Debtors"). The corporate headquarters and mailing address for the Debtors listed above is: 2001 SE Evangeline Thruway, Lafayette, Louisiana 70508.

The Official Committee of Equity Security Holders (the "Equity Committee"), for its Objection (the "Objection") to the *Disclosure Statement for the Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. 506] (the "Disclosure Statement"), respectfully represents:[2]

## I. PRELIMINARY STATEMENT

1.      Chapter 11 provides a process for businesses to reorganize or, if warranted, to liquidate.  Chapter 11 was not conceived as a device to enable a controlling shareholder to evade his fiduciary duties and wipe out the interests of all other shareholders in violation of applicable corporate law.  Nor was Chapter 11 conceived to allow a controlling shareholder, during the period of exclusivity, to "purchase" a substantial interest in the stock of the reorganized debtor, without (1) subjecting his proposed acquisition to a market valuation and (2) allowing shareholders, who would otherwise receive nothing under his plan, the opportunity to share in such acquisition.  This Court should not countenance unlawful and inequitable conduct which perverts the beneficial and economically necessary policies of the Bankruptcy Code into a vehicle that allows corporate insiders to achieve personal objectives at the expense of investors who have relied upon multiple public filings which presented a healthy and viable business with substantial equity.

2.      As will be demonstrated below, PHI's proposed Chapter 11 Plan (defined below) cannot be confirmed, as a matter of law, for three reasons:

---

[2] The Equity Committee is informed that an agreement in principle regarding the Plan and certain related contested matters may have been reached among the Debtors, Thirty Two LLC, Mr. Al Gonsoulin and the Official Committee of Unsecured Creditors (the "Creditors' Committee").  The Equity Committee is also in on-going negotiations for its own resolution.  However, because no definitive documentation has been executed and no amendments to the Plan or Disclosure Statement have been filed with the Court, this Objection is filed out of an abundance of caution in order to preserve the Equity Committee's rights in the event no global settlement is reached.

a. The Plan violates Louisiana corporate law by allowing the Debtors' controlling shareholder, Al Gonsoulin ("Gonsoulin") the exclusive right to purchase a substantial interest in the Reorganized Debtors' stock without allowing other shareholders, whose interests are being nullified under the Plan, an opportunity to participate in that acquisition and, accordingly, the Plan fails to satisfy the requirement of section 1129(a)(3);

b. The Plan fails to satisfy the criteria for "cramdown" set forth in Bankruptcy Code section 1129(b)(2)(C) because, *inter alia*, it:

(1) violates the absolute priority rule as interpreted and applied by the United States Supreme Court in *North Lasalle*,

(2) provides for a Class senior to equity (Thirty Two LLC's Class 2 Claim) with a distribution of potentially more than 100 percent of the value of its claim, and

(3) is not "fair and equitable" and "unfairly discriminates" between equity holders;

c. The Plan provides for extensive third party releases, under conditions which are not permitted in the Fifth Circuit and which are prejudicial to shareholders who do not receive ballots and, therefore, cannot "opt out" of the releases.

3. Further, from the standpoint of whether the Disclosure Statement provides "adequate information" to all interested parties, including shareholders, none of the foregoing issues presents what is perhaps the most fundamental defect concerning the Disclosure Statement and the Plan, which is sleight of hand that is being used to under-value the Debtors' business. Valuation is the pretext behind the elimination of all equity interests in the Debtors and for the Debtors' controlling shareholder to use his secured claim as currency to acquire a substantial interest in the Reorganized Debtors. While the Disclosure Statement hearing is not the appropriate forum for litigating valuation, as will be discussed below, the myriad questions and highly suspect nature of the Houlihan Valuation demonstrates the profound inadequacy of the

information necessary for parties in interest to evaluate the Plan and determine whether to support or oppose it. Indeed, nowhere in the Debtors' lengthy Disclosure Statement do the Debtors provide any credible explanation as to the cataclysmic evaporation of value between (1) December 31, 2018, when the Debtors' Annual Report represented that its business had a positive equity value of $473 million, (2) May 9, 2019 when the Debtors filed their SEC Form 10Q, in which they represented that, as of March 31, 2019, the Debtors had a positive equity value of $439 million **versus** (3) the position the Debtors took when they filed their *First Amended Joint Plan of Reorganization* on May 17, 2019 [Docket No. 495] (the "Plan"), in which they claimed to be insolvent by at least $300 million. Thus, the Debtors base their Plan on their contention that $700 million of value evaporated within four (4) months of filing for Chapter 11.

4. Indeed, the Houlihan Valuation is particularly unreliable as a justification for providing no recovery to equity holders. Throughout its report, Houlihan reiterates that its valuation: (1) does not reflect the market value at which any of the Debtors' assets could be sold or liquidated, (2) is not an opinion as to the fairness of the restructuring transaction embodied in the Plan, and (3) is based entirely on the Debtors' projections which Houlihan admits it has not verified—but on which it has relied in calculating enterprise value, using a formula based on projected EBITDA. *See* Docket No. 506 at pages 109-111. In addition, the Debtors' claim that they conducted a rigorous sale/capitalization process prior to filing these Chapter 11 cases appears to be highly exaggerated; on the contrary, the Debtors made no serious effort to find a buyer(s) for the business as a whole or any portion thereof.

5. Other inadequacies of the Disclosure Statement include the following:

a. The Disclosure Statement fails to disclose the percentage of common stock of the Reorganized Debtors that will be distributed to each of the Classes that will be

receiving stock pursuant to the Plan, or the Reorganization Value of the stock to be allocated to each Class. Therefore, there is no way for parties in interest to know, among other things, the percentage of stock ownership of the Reorganized Debtors which will be allocated to Thirty Two, Gonsoulin's entity, or the value of that stock, and whether Thirty Two may be acquiring more value than the amount of its claim.

b. The Disclosure Statement does not explain why the opportunity to purchase stock of the Reorganized Debtor was not given to all shareholders, as opposed to having been given exclusively to the controlling shareholder, contrary to the requirements of Louisiana law.

c. The Disclosure Statement does not explain why, in September 2018, prior to the creation of the Special Restructuring Committee of the Board, when Thirty Two acquired the senior debt of Whitney Bank, the Debtors did not offer the opportunity to all shareholders, as opposed to Gonsoulin exclusively, contrary to the requirements of Louisiana law.

d. The Disclosure Statement does not explain why the Debtors refused, and continue to refuse, to conduct a robust M&A process during their Chapter 11 cases, prior to promoting a Plan that extinguishes equity.

## II. STATEMENT OF FACTS

### A. The Debtors' Business Operations and Principal Assets.

6. PHI is a publicly held global helicopter services company, providing transportation services in the United States and abroad. PHI operates primarily through two business segments: (a) Oil and Gas ("O&G"), which facilitates crew change operations for offshore oil companies in the Gulf of Mexico, Australia, and other international locations, as well as helicopter repair, maintenance and overhaul services for customer-owned aircraft; and (b) Air Medical ("Air Medical"), which provides air medical transportation and related services for

hospitals and emergency service agencies throughout the continental United States. These two principal operating segments constitute substantially standalone platforms.

7.       A third business segment is dedicated to technical services ("Technical Services"), involving helicopter repair and overhaul services for flight operations customers, as well as the operation of six aircraft for the National Science Foundation in Antarctica.

8.       As of the Petition Date, PHI owned or operated approximately 238 aircraft worldwide (approximately 17 of which are leased, eight of which are owned by the customer and operated by PHI, and the remaining 213 owned by PHI). Of these, 119 aircraft are dedicated to O&G operations, 111 are dedicated to Air Medical, six are dedicated to Technical Services, and two are used for general corporate purposes.

**B.       The Debtors' Joint Plan**

9.       The Plan divides all creditors and interest holders into 10 Classes, four of which – the secured claim of Thirty Two (Class 2), the claims of Note Holders holding, in the aggregate, $500 million of Notes (Class 4), the claims of certain Aircraft Lessors (Class 5), and the claims of General Unsecured Creditors (Class 6A) – will receive stock of the Reorganized Debtors in exchange for their claims. Class 10, consisting of Existing PHI Interests, will neither receive nor retain anything under the Plan. Therefore, when the Plan becomes effective, Thirty Two (Gonsoulin) and the Note Holders will hold the substantial majority of the Reorganized Debtors' stock and consequently, its value.

10.       Neither the Plan nor Disclosure Statement states either the actual percentage of stock to be distributed to each of the Classes receiving stock, or the value of such stock as of the Effective Date.

11.       The Plan also provides for broad releases of numerous categories of persons and entities who are non-Debtors, which would purport to bind creditors and, possibly, shareholders,

without providing any consideration to them. These releases are particularly offensive to shareholders in light of their potential claims against officers, directors and the controlling shareholder. To make matters worse, the releases would be effective unless the releasing parties take affirmative steps to opt out of providing the releases. Yet, equity security holders do not vote under the Plan and thus do not appear to be receiving any document on which an opt out may be registered.

**C.**     **The Debtors' Prepetition Valuation of its Businesses**

    *1.*     ***The Debtors' Representations of Equity Prior to Filing Chapter 11***

12.     Prior to this bankruptcy, PHI was publicly-traded on the NASDAQ exchange. PHI issued voting and non-voting shares of common stock, although the economic value of each is the same. PHI's CEO and Chairman of the Board, Mr. Gonsoulin, holds approximately 70-percent of PHIs voting shares and approximately 20-percent of its non-voting shares. Mr. Gonsoulin also wholly-owns Thirty Two, LLC, which acquired the Debtors' prior $130 million asset based loan in September 2018 (which has been referred to in these cases as "the September 2018 Transaction") and is now the Debtors' senior secured creditor with respect to certain of the Debtors' key assets.

13.     With regard to its stock, the Debtors stated the following in their first-day motions:

> As of December 31, 2018, PHI had approximately 15,800,000 outstanding shares of common stock, held by over 750 equity holders. Further, the holders of such common stock change on a regular basis through active trading in the over-the-counter market.

14.     In fact, from January 2, 2019 through March 15, 2019, PHI non-voting stock traded a daily average of 510,900 shares—or a total of 47.5 million shares over the same period.

15.     As set forth below, the Debtors made multiple prepetition public filings with the Securities and Exchange Commission (the "SEC") and other outlets that showed hundreds of millions of dollars of equity.

    a.    **Solvency**

- In its Annual Report, prepared as of December 31, 2018 filed, PHI stated that its equity book value was in excess of $473 million, just 73 days prior to this bankruptcy.

- The Debtors' CRO has also testified that the Debtors "did not arrive in Chapter 11 due to operations failures, and the Company's business model remains strong."

- Even in the Debtors' 10-Q filed with the SEC on May 9, 2019, the Debtors are still showing shareholder equity in the amount of over $439 million ($439,508,000.00) as of March 31, 2019.

    b.    **Voluntary Petition**

- As of the Petition Date, the Debtors stated that the book value of their assets were in $1 to $10 billion and their debts were $500,000,001 to $1 billion.

    c.    **Equity Grants**

- On February 20, 2019 — just 22 days prior to this bankruptcy — the Debtors paid approximately $800,000 to their officers in exchange for certain equity grants issued by PHI, which, historically, were never paid in cash but only in equity shares.  If equity was "out of the money," there would have been no reason for the Debtors to make this purchase. [3] [4]

    d.    **Expansion Plans**

- The Debtors are expanding international operations, with a recently completed acquisition in New Zealand (HNZ) and operations in Cyprus just getting off the ground.  Only approximately 18 months prior to its Chapter 11 filing, the Debtor acquired HNZ for a cash payment of $120 Million.

---

[3] The Form 4s are available at https://www.sec.gov/cgi-bin/own-disp?action=getissuer&CIK=0000350403

[4] Transcript of Proceedings, March 18, 2019, 133:20-21.

### e. Incentive Plans

- The Debtors' KEIP Motion includes incentives for a potential sale of assets in excess of $700 million, suggesting that the Debtors believe it is possible their businesses could be sold for an amount that exceeds their debts.[5]

### f. Warrants Offered to Equity

- An article was published on or about February 8, 2019 that provided that certain bondholders offered a restructuring deal to the Debtors that would fully equitize their notes, while offering a small amount of warrants to equity.[6] By including warrants for equity holders, this proposal implies that equity had value.

### g. Bankruptcy Schedules

- The Debtors' schedules show assets in excess of $1.3 billion, and liabilities of less than $800 million.[7]

### 2. The Debtors' Bankruptcy Filings and Testimony Show an Operationally Sound, Solvent Company

16. On March 8, 2019, the Debtors filed their Voluntary Petitions [Docket No. 1].

The Voluntary Petitions states that PHI has the following:

- Estimated Assets: $1,000,000,001 - $10 billion

- Estimated Liabilities: $500,000,001 - $1 billion

17. The Debtors' CRO also stated in his declaration in support of the Debtors' first day motions that:

- "While the oil and gas business segment has been plagued by industry downturns over the last five years, PHI has generally weathered the storm

---

[5] *See* KEIP motion [Docket No. 108] (the "KEIP Motion") ¶ 17(d) (discussing potential sale transaction proceeds).

[6] *See* article titled PHI Bondholder Group Plans to Propose Full Equitization of $500M Senior Notes as March 15 Maturity Looms, available at https://seekingalpha.com/instablog/50044715-contrarian-value-investor/5268748-phi-bondholder-group-plans-propose-full-equitization-500m-senior-notes-march-15-maturity.

[7] Docket No. 493.

over this period, and even continued to expand internationally, thereby further solidifying its reputation as a global leader in helicopter services."[8]

- "PHI did not arrive in Chapter 11 due to operational failures, and the Company's business model remains strong."[9]

- "What necessitated the commencement of these Chapter 11 Cases is the looming maturity date—March 15, 2019—of those certain unsecured 5.25% Senior Notes (defined and further described below) in the aggregate principal amount of $500 million."[10]

- "Through this process, PHI will protect its business as a going concern, ensure long-term financial stability, and secure a sustainable capital structure into the future."[11]

- "Put simply, PHI's business operations remain strong and its reorganizational prospects are promising."[12]

18.    The Debtors' COO (Mr. Bospflug) testified at the first-day hearings about the Debtors' growth and expansion—underscoring the statements in the Del Genio Declaration that the business remains strong.  He stated:

> In December of 2017, we closed on an acquisition of a company called Helicopters New Zealand, HNZ.  So they greatly expanded our footprint internationally. . .
>
> …..
>
> Well, just starting with Texas, we have 23, soon to be 24, air medical bases.

19.    The Debtors' COO also discussed a new business in Cyprus, "which is a business that they're just getting off the ground."  Furthermore, when asked about the recent "energy crunch," the COO stated: "Well, from here, it's a positive outlook."  The Debtors also filed an

---

[8] *See* Declaration of Robert A. Del Genio, Chief Restructuring Officer of PHI, Inc., in Support of First Day Pleadings [Docket No. 16] ("Del Genio Declaration"), ¶ 6.

[9] *See* Del Genio Declaration, ¶ 7.

[10] *See* Del Genio Declaration, ¶ 7.

[11] *See* Del Genio Declaration, ¶ 8.

[12] *See* Del Genio Declaration, ¶ 10.

officer incentive (*i.e.*, KEIP) motion, which contemplates a potential sale of two of the Debtors' business units for a cumulative price in excess of $700 million.

20.     None of the foregoing suggests that the Debtors are in a major financial crisis that warrants either the accelerated plan process currently taking place, or the elimination of equity's financial interest in order to reorganize.

### 3.     The Mysterious, Unexplained Disappearance of Value

21.     Notwithstanding the Debtors' solvency, robust operations, and continued investment in international operations expansion, the Debtors nonetheless contend that equity is presently worthless and will be extinguished under the Plan.  All of this raises the obvious the question: If there was nearly half a billion dollars in equity value on December 31, 2018, what happened in the 73 days that followed, leading up to the Chapter 11 filings on March 14, 2019? The Del Genio Declaration provides a detailed history of the Debtors' operations, but is noteworthy for the lack of any adequate explanation for the huge loss of equity value that the Debtors assert occurred here.

### D.     The Debtors' Prepetition M&A Process Was Inadequate

22.      While the Debtors have deemed the details of the M&A process confidential for the most part, analysis of this confidential information demonstrates that the alleged M&A process it was basically a farce.  Moreover, the Equity Committee has learned from executives at a number of the most likely suitors for all or a portion of the Debtors' business that they were not contacted regarding an acquisition of the O&G business (or HNZ) separately, and that at least one potential strategic buyer that contacted the Debtors' professionals regarding HNZ and other assets was told that the Debtors were not considering M&A options.  This is critical, because most strategic parties (and their financial backers) agree that industry consolidation, particularly in the O&G segment, is a necessity.

23.     For example, the CEO for Era Group, Inc., one of the Debtors' key competitors, is on the record publicly stating that the industry is facing a "once in a generation" opportunity to consolidate.[13]  Particularly in the Gulf of Mexico, there are substantial synergies and cost savings to be realized by consolidation (*e.g.*, $50 million of cost savings and synergies, capitalized at a multiple of 8.0x, would result in $400 million of additional enterprise value available to be shared between merger partners).

24.     The Equity Committee believes that the failure to pursue a broader, more aggressive M&A strategy, that includes the potential break-up and sale of the Debtors' O&G segment, has resulted in significantly less value available to the Debtors' stakeholders (including its shareholders), and ignoring this opportunity significantly understates the Debtors' potential value.  The Debtors' failure to fully develop their M&A options as part of their strategic alternatives and restructuring process has compromised substantial value that would otherwise be available to all stakeholders.

### III. ARGUMENT

A.     <u>**The Disclosure Statement Should Not Be Approved Because the Debtors' Plan is Patently Non-Confirmable.**</u>

25.     Ordinarily, confirmation issues are reserved for the confirmation hearing, and not addressed at the disclosure statement hearing.  *In re A. Capital Equip., LLC*, 688 F.3d 145, 153 (3d. Cir. 2012).  However, if it appears there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue at the disclosure stage thus

---

[13] <u>Era CEO: Offshore Helicopter Industry "Not Sustainable" (AINonline, April 27, 2019)</u>, available at <u>https://www.ainonline.com/aviation-news/general-aviation/2019-04-27/era-ceo-offshore-helicopter-industry-not-sustainable</u> ("The CEO of helicopter services company Era Group said this week that the helicopter offshore oil-and-gas business is 'not sustainable' and 'in dire need of consolidation.' Chris Bradshaw made the remarks in written comments contained in the company's annual report issued April 24."); *see also* <u>Large O&G Helicopter Operators – Is 2019 the Danger Zone?</u> (Helicopter Investor, Feb. 22, 2019), available at <u>https://www.helicopterinvestor.com/articles/large-og-helicopter-operators-is-2019-the-danger-zone-472/</u> (discussing, *inter alia*, potential chapter 11 filings, including Bristow and PHI, and the potential for an M&A boom).

avoiding the time and expense of a solicitation process and a confirmation hearing for a plan that is dead on arrival. *Id.* (citations omitted); *see also In re U.S. Brass Corp.*, 194 B.R. 420, 422 (Bankr. E.D. Tex 1996) ("Disapproval of the adequacy of a disclosure statement may sometimes be appropriate where it describes a plan of reorganization which is so fatally flawed that confirmation is impossible"); *In re Felicity Assoc., Inc.*, 197 B.R. 12, 14 (Bankr. D.R.I. 1996) ("[i]t has become standard Chapter 11 practice that when an objection raises substantive plan issues that are normally addressed at confirmation, it is proper to consider and rule upon such issues prior to confirmation, where the proposed plan is arguably unconfirmable on its face").

26.     Applying Bankruptcy Rule 7042 and 9014(c), this Court has held that it can and should address issues which may render a plan facially unconfirmable before approving dissemination of a disclosure statement and plan. *See In re ReoStar Energy Corp.,* 2012 WL 1945801, at *4 (Bankr. N.D. Tex. May 30, 2012). In *ReoStar,* this Court, after considering objections, required the debtors to demonstrate at a hearing, if their proposed plan was feasible under section 1129(a)(11), whether it complied with section 1129(a)(1), and whether it was filed in good faith under section 1129(a)(3). *Id.* The Court should likewise prevent dissemination of the Disclosure Statement and Plan because the Debtors Plan cannot be confirmed for the reasons set forth below.

**B.     The Plan Violates Bankruptcy Code Section 1129(a)(3) as it Proposes To Implement a Transaction Which Violates Louisiana State Law and was Not Proposed in Good Faith.**

27.     The Plan proposes that Class 2 – the class comprising the secured claim of Thirty Two – "shall receive, in full and final satisfaction, settlement, release, and discharge of its rights with respect to and under such Allowed Thirty Two Claim, the New Common Stock Class 2 Distribution." Stated simply, Gonsoulin's secured debt is being used as currency to purchase equity in the Reorganized Debtors. This use of Thirty Two's secured claim (itself acquired in a

transaction not offered to other shareholders) to acquire shares of the Reorganized Debtors, while precluding other shareholders from participating in such acquisition, is contrary to Louisiana's corporate law which obligates the Debtors and Gonsoulin to offer the same opportunity to all shareholders. The Debtors, instead of allowing Gonsoulin to use Thirty Two's $130 million secured claim to buy shares in the Reorganized Debtors (the percentage of which is not disclosed), could, and should, have provided to all shareholders the opportunity to make a combined capital contribution to the Reorganized Debtors in exchange for stock. Shutting shareholders out of the process is made even more egregious by the Plan's nullification of all existing equity interests.

28. Under Louisiana law, the September 2018 Transaction (pursuant to which Thirty Two LLC took out the Whitney Bank financing) was a "director's conflicting interest transaction." Such a transaction is only effective if a majority of disinterested directors or shareholders vote to approve the transaction (provided that certain requirements have been met), or if the transaction "judged according to the circumstances at the relevant time, is established to have been fair to the corporation." La. Stat. § 12:1-861. Significantly, when Gonsoulin arranged to acquire the senior debt from Whitney Bank, the Debtors had not yet formed the Special Restructuring Committee and he, as the 70 percent shareholder had control of shareholder votes.

29. "Fair to the corporation" means that the transaction as a whole was beneficial to the corporation, taking into appropriate account whether it was fair in terms of the director's dealings with the corporation, and comparable to what might have been obtainable in an arm's length transaction, given the consideration paid or received by the corporation. La. Stat. § 12:1-860.

30.     However, even if a transaction may be "fair" to the corporation, courts have found that there can be a breach of fiduciary duty when other shareholders are not given the same opportunity as an interested director.  *See, e.g. Trayanoff v. Oak Island Land Co.*, 870 So. 2d 349, 359 (La. App. 4 Cir. 2004) ("the issuance of stock to themselves was not a breach of any fiduciary duty because Trayanoff was afforded the same opportunity to acquire additional stock and simply opted not to do so…."); *Brumley v. Leam Investments, Inc.*, No. CIV. 09-1078, 2012 WL 525474, at *18 (W.D. La. Feb. 16, 2012) ("It is . . . undisputed that each shareholder, including Kenneth, was offered the same opportunity to purchase the preferred shares of stock . . . . Therefore, under Louisiana law, Kenneth has no claim for corporate mismanagement or breach of fiduciary duty as the actions of the defendants . . . are deemed fair as they constitute no more than 'the seizing of an opportunity that was offered to all shareholders.'"); *see also Yuspeh v. Koch*, 840 So. 2d 41, 50 (La. App. 5 Cir. 2003), *writ denied* (insider sale of stock for less than its true value and without notice to minority shareholders constituted fraud and a breach of fiduciary duty.); *Foster v. Blackwell*, 747 So. 2d 1203, 1220-21 (La. App. 3 Cir. 1999), *writ denied* (under the circumstances, purchases of stock were fair to the corporation when, among other things, all Board members and shareholders "were notified of the particular offerings and were given opportunity to purchase shares equal to their percentages of stock ownership in the corporation").  There is a breach of fiduciary duty even when a board approves a loan that saves a company from insolvency but nonetheless fails to inform shareholders with an adequate and disinterested explanation of the shareholders' options and potential consequences, particularly where that loan was later converted to equity ownership.  *Olinde v. 400 Group*, 686 So.2d 883, 902-03 (La.App.1 Cir. 1996) *reh'g denied* Feb. 7, 1997.

31.     Here, neither the Debtors nor Gonsoulin offered to other shareholders the same opportunity to participate in the September 2018 Transaction, which Gonsoulin entered into (through Thirty Two) on his own behalf.  This alone was a corporate opportunity that Gonsoulin took for himself, including the benefits of interest, default interest, and other rights to fees and costs customarily associated with a loan, including a first right to the Debtors' assets as collateral for the secured loan.  And, as noted above, Gonsoulin acquired the senior debt at a time when he controlled the Board and before the Special Restructuring Committee of the Board had been formed.

32.     The Thirty Two debt for equity swap under the Plan permits Gonsoulin to use Thirty Two's secured debt as currency to acquire shares of the Reorganized Debtor, without offering other shareholders the same opportunity to acquire such new stock.  Shareholders should have been given the opportunity to fund the payoff of Thirty Two in exchange for stock in the Reorganized Debtors.  *See Trayanoff*, 870 So. 2d at 359; *Brumley*, No. CIV. 09-1078, 2012 WL 525474, at *18; *Yuspeh*, 840 So. 2d at 50; *Foster*, 747 So. 2d at 1220-21.

33.     The Debtors' attempt to cram down the Plan on equity holders and provide Gonsoulin the exclusive shareholder opportunity to acquire shares in the Reorganized Debtors renders the Plan non-confirmable under section 1129(a)(3).  That section requires that the court find that: "The plan has been proposed in good faith and not by any means forbidden by law".  Granting to Gonsoulin the exclusive opportunity to purchase shares of the Reorganized Debtors (whether he is using cash or credit for releasing a claim is irrelevant), to the exclusion of all other existing shareholders, is forbidden by applicable Louisiana law.

34.     However, even if such a transaction could be upheld under state law, it is fundamentally unfair and inequitable to holders of equity interests.  The Debtors' grant of such

an exclusive opportunity to Gonsoulin, coupled with the extinguishment of all other shareholders' interests, demonstrates the lack of good faith with which this Plan has been proposed.

35.    In addition to the above, the Debtors have further violated state law through their pre-petition "abandonment" of a sale process, and their post-petition efforts to "sell" a substantial percentage of the business to an insider.  This is a clear foray into Revlon-land and a breach of duty of care to non-insider shareholders.

36.    In 1986, the Delaware Supreme Court created the Revlon doctrine when it affirmed a lower court decision to enjoin transactions between Revlon, Inc. and Forstmann Little & Co. designed to avoid a hostile takeover of Revlon.  *Revlon, Inc. v. MacAndrews & Forbes Holding, Inc.*, 506, A.2d 173 (Del. 1986). The *Revlon* decision determined that, under the duty of care owed by corporate directors, once a board determines that its company is for sale, it must "maximize . . . the company's value at a sale for the stockholders' benefit," adding that the directors' "role change[s] from defenders of the corporate bastion to auctioneers charged with getting the best price for the stockholders at a sale of the company."  The court further noted that directors breached their duty of loyalty when they entered into the "auction-ending" contract with Forstmann Little.  The intent of *Revlon* – to maximize the company's value for the benefit of the shareholders – is a natural corollary to a debtor in possession's duty to maximize value. *Love v. Tyson Foods, Inc.*, 677 F.3d 258, 273 n. 11 (5th Cir. 2012) ("The debtor in possession performing the duties of the trustee is the representative of the estate and is saddled with the same fiduciary duty as a trustee to maximize the value of the estate available to pay creditors") (citations omitted); *see also Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352 (1985) (holding that a trustee has the duty to maximize value of the estate).

37.    As in *Revlon*, once the Debtors' Board of Directors determined that a sale is to be explored, the duty of care flowed to the shareholders to maximize value.  Instead, the Debtors' ceased their efforts in favor of structuring a "sale" transaction to Mr. Gonsoulin through this bankruptcy and the proposed Plan.  The Debtors' Board of Directors failed in its duty of care to the Debtors' shareholders.

**C.    The Plan Violates Bankruptcy Code Sections 1129(b)(1)**

38.    Section 1129(b)(1) of the Bankruptcy Code provides, in pertinent part, that

> "if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."

11 U.S.C. § 1129(b)(1) (emphasis added).

39.    The Debtors' disparate treatment of equity holders who are not Gonsoulin, as compared to the treatment of Gonsoulin, discriminates unfairly, and violates section 1129(b)(2). In the months leading up to the bankruptcy filing, Gonsoulin used his role as an officer, director and majority shareholder to take advantage of corporate opportunities through his own self-dealing to obtain the then most senior position in the Debtors' capital structure.   Most importantly, not only does the Plan's creation of an exclusive opportunity for Gonsoulin to acquire the Reorganized Debtors' stock constitute a violation of Louisiana State law, but the Plan also creates a disparate (and substantially less favorable treatment) for members of Gonsoulin's Class—equity holders.   Accordingly, the Plan is not "fair and equitable" and "unfairly discriminates" against the non-Gonsoulin shareholders.

**D.**     **The Plan Violates The Absolute Priority Rule as Applied by the U.S. Supreme Court in _North LaSalle_ as it is a Disguised New Value Contribution That Has Not Been Market-Tested**

40.     The proposed conversion of Mr. Gonsoulin's Thirty Two's secured debt to equity runs afoul of the Supreme Court's decision in _Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle Street Partnership_, 526 U.S. 434 (1999) ("_North LaSalle_").

41.     In its motion to terminate the Debtors' exclusivity [Docket No. 448] (the "Exclusivity Motion"), the Creditors' Committee explained how Gonsoulin's acquisition of the secured creditor position prepetition is a preloaded "new value contribution" and how Gonsoulin's use of the exclusive right to propose a plan violates North LaSalle.  The Equity Committee filed a joinder to the Exclusivity Motion.  _See_ Docket No. 507.

42.     The gravamen of the Exclusivity Motion is stated in its introduction, and provides just one basis as to why the Plan is unconfirmable on its face: "Just as here, in _North LaSalle_, the insider did not receive the ownership stake in the reorganized company on account of his existing equity interest; in _North LaSalle_, the insider proposed to purchase the reorganized equity for cash; here, the controlling shareholder [Mr. Gonsoulin] is slated to receive such stake in exchange for debt he recently acquired – debt that could just as easily be repaid in cash or new debt under any number of alternative plan structures."  Exclusivity Motion ¶ 1.

43.     In _North La Salle_ the debtor proposed a reorganization plan under which certain of its former partners would contribute new capital in exchange for the debtor's entire ownership of the reorganized entity.  The old equity holders were the only ones who could contribute new capital.  The debtor's principal creditor, Bank of America, objected to the plan and, as the sole member of an impaired class of creditors, was able to block a consensual confirmation on a consensual basis.  The debtor, however, attempted to cram down the plan under section 1129(b) of the Bankruptcy Code.  Among the conditions for cram down is a requirement that the plan be

"fair and equitable" with respect to each impaired class of claims or interests that has not accepted the plan.  The debtor argued that the plan could be found to be fair and equitable because there was no class junior to equity (which was being wiped out under the plan) that was going to receive or retain anything of value under the plan.  The bank argued that the plan violated the absolute priority rule because, in effect, the plan gave existing equity a right (the exclusive right to purchase an interest in the reorganized entity) that was not made available to a senior class (Bank of America) or otherwise subjected to a market test.  Despite this argument, the plan was confirmed by the bankruptcy court and its decision was affirmed by the district court and the Seventh Circuit.

44.     The Supreme Court was asked to decide two questions; first, could a "new value" plan satisfy the absolute priority rule and second, could such a plan be approved during the exclusivity period, at a time when other parties in interest, whose claims were being impaired, would not have the right to pursue an alternative plan.  The Supreme Court did not decide the new value question.  However, the Court reversed the Bankruptcy Court's confirmation order, finding that a plan, which gave old equity the exclusive right to acquire new interests in the reorganized debtor during the exclusivity period, could not be confirmed over the objection of an impaired class.  Rather, the determination of whether old equity was providing sufficient value had to be market tested through a competitive process.  *North LaSalle*, 526 U.S at 458 ("Whether a market test would require an opportunity to offer competing plans or would be satisfied by a right to bid for the same interest sought by old equity is a question we do not decide here.  It is enough to say, assuming a new value corollary, that plans providing junior interest holders with exclusive opportunities free from competition and without benefit of market valuation fall within the prohibition of § 1129(b)(2)(B)(ii)").

45.     The Debtors' Plan presents a virtually identical scenario to that which the Supreme Court rejected in *North La Salle*.  Here, during the period of exclusivity, the Debtors have proposed a Plan which grants the controlling shareholder the exclusive opportunity to purchase shares in the Reorganized Debtors in exchange for the release of his affiliate's $130 million secured claim.  This opportunity to acquire shares of the Reorganized Debtors was not offered to any other shareholders, whose interests will otherwise be extinguished.  Gonsoulin's use of his secured claim to purchase a substantial equity interest in the Reorganized Debtors is no different than paying cash for the new equity.  Accordingly, the Debtors' shareholders, at a minimum, should have been given the opportunity to contribute to a $130 million fund to be used to satisfy Thirty Two's secured claim and to share in the stock to be issued in exchange for such payment.

46.     Therefore, just as Bank of America's interest were improperly impaired by the debtors' proposed reorganized plan in *North La Salle*, the interests of equity holders in this case are similarly being improperly impaired without the ability to market test Gonsoulin's acquisition of the Reorganized Debtors' stock.

47.     The Plan does not specify what percentage ownership Gonsoulin will acquire through his release of Thirty Two's claim, nor do the Debtors attempt to value that interest— both of which are serious disclosure failures.  Accordingly, parties in interest, as well as this Court, have no way of knowing whether Gonsoulin is receiving stock having a value in excess of the $130 million claim being released.  If so, that would give him more value than that to which he may be entitled—at the expense of other stakeholders.  Since the Debtors are now enjoying the protection of exclusivity, there is no way to "market test" whether the percentage ownership

being acquired by Gonsoulin is worth more (or substantially more) than he is "paying". This is exactly the problem the Supreme Court articulated in reversing confirmation of the LaSalle Plan.

E.    **The Plan Contains Illegal Third Party Releases.**

48.    On May 30, 2019 the Office of the United States Trustee ("UST") filed its *Objection to Disclosure Statement for First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. ] (the "UST Objection").

49.    The UST Objection sets forth a comprehensive and thorough analysis of the impermissible and improper provisions of the Plan pertaining to releases, waivers and exculpations (collectively, the "Release Provisions"). The UST demonstrates that the Release Provisions are illegal, improper and contrary to well established Fifth Circuit law as well as case law decided in order circuits. The Equity Committee hereby adopts and incorporates herein the UST's arguments and authorities as if repeated verbatim.

50.    Of particular pernicious note, although all parties are deemed to grant the releases unless they opt out, the Plan provides that equity security holders are deemed to reject the Plan and, thus, do not vote. As a result, equity holders will not be receiving a piece of paper on which to register their opt out of the Release Provisions. This is but another example of the lack of good faith which the Debtors have demonstrated in proposing the Plan which divests all shareholders of valuable ownership interests and purports to give the Debtors' controlling shareholder the exclusive right to acquire a substantial ownership stake in the Reorganized Debtors.

51.    The insertion of the Release Provisions inflicts even more harm on shareholders by depriving them of rights to pursue legitimate and valuable claims against third parties (who

are providing no value and no consideration in exchange for the releases), and adds significant additional injury to what is already a gross insult.[14]

**F.    The Plan Wipes Out Equity Despite the Incontrovertible Evidence of Value.**

52.    The Plan provides that Class 10, defined as "Existing PHI Interest," shall not receive or retain any property under the Plan on account of such interests and the obligations of the Debtors and the Reorganized Debtors' on account of the Existing PHI Interests shall be discharged." Thus, the Plan provides for equity to be extinguished.

53.    Although there is no class junior to Equity that is going to receive or retain anything under the Plan, the Plan may still, nevertheless, not be confirmed if it is not "fair and equitable" and if it "discriminates unfairly" against the holders of the Debtors' common stock. This Plan could not be found to be fair and equitable if the Reorganized Debtors have sufficient equity, over and above that which is needed to satisfy creditor claims in full, to provide value to holders of the Debtors' common stock. While the Debtors take the position that there is no such value, the indisputable evidence, including the Debtors' publicly filed statements and reports, indicate that there is substantial value for common shareholders.

54.    Moreover, the sole basis upon which the Debtors contend that equity is out of the money is the Houlihan Valuation, which on its face is unreliable for two reasons. First, Houlihan's Valuation was based entirely on calculations that assume the accuracy of the Debtors' homemade financial projections; however, Houlihan has acknowledged that it made no attempt to verify the accuracy of such projections. Accordingly, if the Debtors' projections are inaccurate and, in particular, if they understate the Debtors' projected net revenues and profits,

---

[14] The Plan is unclear as to whether the Equity Interest holders are included in "Releasing Parties" who are providing the "Third Party Releases", or if they are subject to any of the other waivers, exculpations or settlements in Article IX of the Plan.  If the Debtors intend that Equity Holders be excluded from all such provisions, such intention needs to be clarified in a Plan modification and the Confirmation Order, if one is entered.

the Houlihan valuation becomes worthless.  In addition, Houlihan acknowledged, throughout

Exhibit D to the Disclosure Statement, that Houlihan's estimated values "do not purport to

constitute an appraisal of the assets of the Reorganized Debtors (b) do not constitute an opinion

on the terms and provisions or the fairness to any person, from a financial point of view, of the

consideration to be received by such person under the Plan (c) do not constitute a

recommendation of any holder of Allowed Claims as to how such holder should vote or how

such holder otherwise should act with respect to the Plan and (d) do not necessarily reflect the

actual market value that might be realized through a sale of liquidation of the Debtors" – hardly,

a ringing endorsement of the purported value espoused.

55.    Second, as is demonstrated in Part II. D. hereof, the purported sale process that

the Debtors allegedly undertook prior to the commencement of this Chapter 11 case appears to

have been anything but fulsome, and more likely calculated simply to check the box marked

"pre-petition marketing efforts" without any serious or sophisticated marketing strategy.  As a

result, the Debtors' contention that equity should be wiped out because there is no value that

would reach beyond payment to creditors must be disregarded along with the other self-serving

and overreaching provisions of the Plan.

**G.    The Disclosure Statement Contains Inadequate Information.**

56.    A Disclosure Statement must provide parties in interest with sufficient

information in order to make an informed judgment as to whether to support or oppose the

proposed Plan.  Although shareholders are being deprived of the right to vote (wrongfully) they

nevertheless have the right to be heard with regard to the Disclosure Statement and Plan and,

accordingly, have the right to object to the inadequacy of the information provided in the

Disclosure Statement.   11 U.S.C. § 1109(b).  A party in interest has the right to object to

inadequacy of a disclosure statement, even if it would not affect its vote.  *Everett v. Perez (In re Perez)*, 30 F.3d 1209 (9th Cir.1994).

57.    In addition to the deficiencies relating to the Houlihan Valuation described above, the Disclosure Statement is seriously inadequate in failing to provide, at the very least, the following material information:

a.    The Disclosure Statement fails to disclose the percentage of common stock of the Reorganized Debtors that will be distributed to each of the Classes that will be receiving stock pursuant to the Plan, or the Reorganization Value of the stock to be allocated to each Class. Therefore, there is no way for parties in interest to know, among other things, the percentage of stock ownership of the Reorganized Debtors which will be allocated to Thirty Two, Gonsoulin's entity, or the value of that stock, and whether Thirty Two (or any other party) may be acquiring more value than the amount of its claim.

b.    The Disclosure Statement does not explain why the opportunity to purchase stock of the Reorganized Debtors was not given to all shareholders, as opposed to having been given exclusively to the controlling shareholder, contrary to the requirements of Louisiana law.

c.    The Disclosure Statement does not explain why, in September 2018, prior to the creation of the Special Restructuring Committee of the Board, when Thirty Two acquired the senior debt of Whitney Bank, the Debtors did not offer the opportunity to all shareholders, as opposed to Gonsoulin exclusively, contrary to the requirements of Louisiana law.

d.    The Disclosure Statement does not explain why the Debtors refused, and continue to refuse, to conduct a robust sale process during their Chapter 11 cases to market test the value of the business or even individual segments of the business, to validate the Houlihan Valuation, and prior to promoting a Plan that wipes out equity.

## IV. CONCLUSION

58.    It appears that every significant economic constituency in this case, with the exception of the Debtors' controlling shareholder and the Aircraft Lessors who have been "locked up," is opposed to the Plan as currently drafted.  While creditors' primary interest is in receiving fair value for their claims, equity's goal is to preserve the economic interest in the Reorganized Debtors to which they believe they are entitled, based upon the Debtors' historic representations of substantial equity value.

59.    In addition, the Equity Committee believes that in light of the lack of good faith demonstrated by the Debtors in proposing this Plan, the Plan process can be legitimized only by the Debtors' commitment to a thorough marketing process conducted by independent investment bankers under the combined supervision of the Debtors, the Creditors Committee and the Equity Committee.  Although this Court cannot force the Debtors to undertake such a program, the Court can make clear in refusing to approve this Disclosure Statement that nothing short of a meaningful and fairly conducted marketing process will lead to confirmation of a Plan.

**WHEREFORE**, the Equity Committee respectfully requests that the Court deny approval of the Disclosure Statement, and grant such other and further relief as may be just and proper.

Respectfully submitted this 3rd day of June, 2019.

**GRAY REED & McGRAW LLP**

By: */s/ Jason S. Brookner*
     Jason S. Brookner
     Texas Bar No. 24033684
1601 Elm Street, Suite 4600
Dallas, TX 75201
Telephone: (214) 954-4135
Facsimile:  (214) 954-4135
Email: jbrookner@grayreed.com

- and -

David B. Golubchik (admitted *pro hac vice*)
Eve H. Karasik (admitted *pro hac vice*)
Gary E. Klausner (admitted *pro hac vice*)
**LEVENE NEALE BENDER YOO & BRILL L.L.P.**
10250 Constellation Boulevard, Suite 1700
Los Angeles, CA 90067
Email: dbg@lnbyb.com
          ehk@lnbyb.com
          gek@lnbyb.com

**COUNSEL TO THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on the 3rd day of June, 2019, he caused a true and correct copy of the foregoing document to be served via CM/ECF to all parties authorized to receive electronic notice in this case, and via electronic mail on counsel to the Debtors, the Creditors Committee, Mr. Gonsoulin, and the U.S. Trustee.

/s/ *Jason S. Brookner*
Jason S. Brookner